UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                              )
                                                    )
OLD CARCO LLC                                       )   Chapter 11
(F/K/A CHRYSLER LLC), *et al.*,                     )
                                                    )   Case No. 09-50002 (AJG)
            Debtors.                                )
                                                    )   Jointly Administered
                                                    )
                                                    )   Adv. No. _____
                                                    )
THE OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS OF OLD CARCO LLC (F/K/A                   )
CHRYSLER LLC),                                      )
                                                    )       COMPLAINT
            Plaintiff,                              )       JURY DEMAND
                                                    )
        v.                                          )
                                                    )
DAIMLER AG (f/k/a                                   )
DAIMLERCHRYSLER AG), DAIMLER                        )
NORTH AMERICA CORPORATION                           )
(f/k/a DAIMLERCHRYSLER NORTH                        )
AMERICA HOLDING CORPORATION),                       )
DAIMLER INVESTMENTS US                              )
CORPORATION (f/k/a                                  )
DAIMLERCHRYSLER HOLDING                             )
CORPORATION), JOHN DOES 1-50,                       )
RUEDIGER GRUBE, BODO UEBBER,                        )
THOMAS W. SIDLICK AND ERIC                          )
RIDENOUR,                                           )
                                                    )
            Defendants.                             )
                                                    )

Plaintiff the Official Committee of Unsecured Creditors (the "Creditors'

Committee" or "Committee") of Old Carco LLC (f/k/a Chrysler LLC) ("Chrysler" or

"Debtor"), by its undersigned counsel, alleges, upon knowledge as to its own status, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This suit is required to hold Daimler AG ("Daimler") accountable for billions of dollars in assets that it unlawfully extracted from Chrysler. In 2007, immediately before the sale of a controlling interest in Chrysler to Cerberus Capital Management LP ("Cerberus"), Daimler engineered a restructuring of Chrysler's businesses. As part of this restructuring, Daimler stripped away Chrysler's most valuable assets in exchange for assets that were worth considerably less, and sometimes for no consideration at all. These exchanges enriched Daimler at the expense of the many Chrysler creditors who now are unable to look to these assets to satisfy their claims. The Creditors' Committee brings this action to recover the value of these assets for the Chrysler bankruptcy estate.

2.      Events leading to this suit began in 2006 as Daimler came to the conclusion that its merger with Chrysler was a failure. Chrysler's business performance was deteriorating markedly, and income was falling far short of projections. Even before the sub-prime credit crisis dragged the U.S. economy into a recession, Chrysler's automotive sales were dropping: from 2.6 million cars in 1999, the first year after the Daimler merger, to 2.3 million in 2005 and down to 2.1 million in 2006.

3.      By early 2007, Chrysler was burdened with debt, including massive employment-related obligations, and other creditors' claims in excess of what it was likely to be able to pay on its own given its recent financial performance. Daimler knew that, as Chrysler's corporate parent and guarantor of many of Chrysler's debts, it faced a very real risk that it would be forced to make good on many billions of dollars of Chrysler's obligations. Daimler decided to avoid that risk by severing itself from Chrysler.

4.     Before ridding itself of its potential obligations to Chrysler's creditors, Daimler determined to wrest as much value as possible from the Chrysler companies. Daimler knew that portions of the Chrysler business, particularly the financing operations, had tremendous value. Daimler could extract that value, at the expense of Chrysler and its creditors, in at least two different ways. It could assume control over the assets by directly transferring ownership to non-Chrysler entities that Daimler owned or controlled. Or it could leave the assets in the group of Chrysler companies that was being sold but separate them from Chrysler itself. Any buyer of the Chrysler group, therefore, would pay more to Daimler because it would take these valuable assets free of potential claims by Chrysler's creditors.

5.     Daimler used both methods. It orchestrated an extremely complex corporate restructuring primarily during the spring of 2007, shortly before Daimler sold a controlling interest in Chrysler to Cerberus. During this restructuring, valuable assets that had been held by Chrysler were passed up the corporate chain to Daimler-owned entities. Other assets were taken from Chrysler and transferred to a newly created Chrysler holding company wholly owned by Daimler which was used as the vehicle for the sale to Cerberus. In both types of transfers, Chrysler received inadequate value in exchange for the assets taken away.

6.     The most egregious of these transfers was described in "Step 15" of the forty-eight step pre-sale restructuring plan. In this step, Chrysler transferred its U.S. and Canadian financing subsidiaries—collectively dubbed "FinCo" and by far Chrysler's most valuable business—to the new Chrysler holding company. In exchange, Chrysler received a note from FinCo and ownership of a different, and much less valuable, Chrysler automotive entity. FinCo then passed assets up to Daimler that Daimler valued at approximately $2.5 billion. In addition, by transferring FinCo to the holding company, Daimler was able to obtain

a substantially better price from Cerberus than Daimler would have been able to obtain had FinCo remained subject to claims by Chrysler's creditors.

7.     This restructuring and sale served Daimler's interests well, enabling it to extract the best possible terms in its sale of the Debtor, while eliminating billions of dollars of actual and contingent pension and other liabilities. But the transaction caused the Debtor (and its creditors) to suffer grievous harm. ████████████████████

████████████████████████

8.     Daimler engineered these unlawful fraudulent transfers for its own benefit and to the detriment of Chrysler's creditors. In this action the Creditors' Committee, as the authorized representative of the Debtor's estate, seeks to hold Daimler and its subsidiaries responsible in damages for the injuries caused by these fraudulent transfers. The Creditors' Committee also asserts claims for breach of fiduciary duty against certain of the Debtor's former directors and against Daimler directly for authorizing, or, in Daimler's case, causing the director defendants to authorize, these fraudulent transfers.

**The Parties**

9.     The Debtor is a limited liability company organized under the laws of Delaware. On April 30, 2009 (the "Petition Date"), the Debtor and 26 of its direct and indirect wholly-owned subsidiaries filed voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code.[1]

---

[1] The other debtors are Alpha Holding LP, DCC 929, Inc., Dealer Capital, Inc., Global Electric Motorcars, LLC, NEV Mobile Service, LLC, NEV Service, LLC, Old Carco Aviation Inc. f/k/a Chrysler Aviation, Inc., Old Carco Dutch Holding LLC f/k/a Chrysler Dutch Holding LLC, Old Carco Dutch Investment LLC f/k/a Chrysler Dutch Investment LLC, Old Carco Dutch Operating Group LLC f/k/a Chrysler Dutch Operating Group LLC, Old Carco Institute of Engineering, Old Carco International Corporation f/k/a Chrysler International Corporation, Old Carco International Limited LLC f/k/a Chrysler International Limited, LLC, Old Carco International

10.     Plaintiff Creditors' Committee was appointed by the Office of the United States Trustee for the Southern District of New York on May 5, 2009, to represent the interests of all unsecured creditors in the Debtors' chapter 11 cases. The current members of the Committee are: (i) International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW; (ii) DARCARS Imports, Inc.; (iii) Desiree Sanchez; and (iv) Patricia Pascale.

11.     Defendant Daimler f/k/a DaimlerChrysler A.G., f/k/a Daimler-Benz AG, is a stock corporation organized under the laws of the Federal Republic of Germany.

12.     On information and belief, at all times relevant to this complaint, defendant Daimler North America Corporation (f/k/a DaimlerChrysler North America Holding Corporation) ("DCNAH") was a direct wholly owned subsidiary of Daimler, and its officers and directors were dominated and controlled by Daimler.

13.     On information and belief, at all times relevant to this complaint defendant Daimler Investments US Corporation (f/k/a DaimlerChrysler Holding Corporation) ("DC Holding") was an indirect wholly owned subsidiary of Daimler, and its officers and directors were dominated and controlled by Daimler.

14.     On information and belief, John Does 1-50 are subsequent transferees of assets fraudulently transferred from the Debtor or to DCNAH or DC Holding.

---

Services, S.A. f/k/a Chrysler International Services, S.A., Old Carco Motors Corporation LLC f/k/a Chrysler Motors Corporation LLC, Old Carco Realty Company LLC f/k/a Chrysler Realty Company LLC, Old Carco Services Contracts Florida, Inc., Old Carco Service Contracts, Inc. f/k/a Chrysler Service Contracts Inc., Old Carco Technologies Middle East Ltd. f/k/a Chrysler Technologies Middle East Ltd., Old Carco Transport Inc. f/k/a Chrysler Transport Inc., Old Carco Vans LLC f/k/a Chrysler Vans LLC, TPF Asset, LLC, TPF Note, LLC and Utility Assets LLC.

15.     At all times relevant to this Complaint, defendant Ruediger Grube was a member of Daimler's board of management and Daimler's Chief of Corporate Development. He was also a member of the Debtor's board of directors.

16.     At all times relevant to this Complaint, defendant Bodo Uebber was an officer of Daimler and a member of Daimler's board of management, and a member of the Debtor's board of directors.

17.     At all times relevant to this Complaint, defendant Thomas W. Sidlick was an executive vice president of the Debtor and a member of its board of directors. He was also a member of Daimler's board of management.

18.     At all times relevant to this Complaint, defendant Eric R. Ridenour was chief operating officer of the Debtor and served on its board of directors. He was also a member of Daimler's board of management. The individuals identified in paragraphs 15 through 18 are hereinafter referred to collectively as the "Individual Defendants."

### Jurisdiction and Venue

19.     The Court has jurisdiction over this action under 28 U.S.C. Sections 157(a) and 1334. The claims for fraudulent transfer are core claims within the meaning of 28 U.S.C. Section 157(b)(2). The claims for breach of fiduciary duty are non-core claims. Venue is proper in this Court pursuant to 28 U.S.C. Sections 1408 and 1409. Plaintiff does not consent to entry of final orders or judgment by the Bankruptcy Court.

### Background

### The Chrysler Automotive Group's Operations

20.     In 1998, German car manufacturer Daimler acquired 100% of the equity of Debtor Old Carco LLC's predecessor-in-interest, Chrysler Corporation, and renamed it DaimlerChrysler Corporation. Since 1998, this entity has gone through several changes in

6

name and in form – from Chrysler Corporation to Chrysler Motors Corporation to DaimlerChrysler Corporation to DaimlerChrysler Corporation LLC to Chrysler LLC to Old CarCo LLC.

21.     For tax purposes, the Debtor's automotive operations were divided into two parts, DaimlerChrysler Corporation (n/k/a the Debtor) and DaimlerChrysler Motors Corporation ("Motors" and, together with the Debtor, "Automotive"). Motors was created as a separate legal entity from the Debtor solely to shift taxable income for sales and marketing services into jurisdictions with lower state income tax rates. Sales of Chrysler products in the U.S. became revenue for Motors, while its cost for these products was determined by transfer pricing rules that virtually guaranteed Motors a stable profit for tax purposes and created offsetting reductions in the income of the Debtor.

22.     Although Motors was the Debtor's parent, the two entities functioned as if they were divisions of the same company. For example, all of the administrative functions of the two companies, including accounting, payroll, human resources, legal, insurance, employee benefit plan administration, public relations, and procurement were performed by the Debtor.

23.     The Debtor manufactured Chrysler vehicles. Motors marketed, sold and distributed those vehicles to Chrysler dealers. Motors also sold and distributed parts to dealers that were manufactured specifically for Chrysler vehicles. The relationship between the Debtor and Motors as to these business activities was governed by a sales and distribution agreement which, by its terms, was terminable at will at the Debtor's election upon six months notice and with no penalty to the Debtor. The agreement further provided that, upon its termination, all of Motors' dealer agreements revert to the Debtor. In addition to its sales and

distribution activities, Motors also managed warranty claims on vehicles manufactured by the Debtor and a portion of the Debtor's extended warranty business under the terms of the agreement.

**The Debtor's Performance Declines And Daimler Determines to Sell the Debtor**

24.    Automotive's financial performance declined significantly in 2006, as it struggled to combat competitive pressures at the same time that the automotive industry itself was starting to recognize the depth of the long term challenges it faced. Although its operating plan had projected a profit of $1.8 billion for 2006, Automotive instead suffered a $1.4 billion loss as a general decline in consumer demand and a shift towards smaller, more fuel-efficient vehicles weighed on its financial results.

25.    Automotive's poor performance in 2006 was the impetus for the development of a series of new restructuring plans focused on reversing this downward slide. The original 2007 operating plan included a projection of $62.2 billion in revenue for 2007 and a loss of $0.8 billion, and projected that 2008 profit would only slightly exceed the break-even level. Automotive's subsequent projections reflecting its Recovery and Transformation Plan included a 2007 loss of $2.0 billion after restructuring costs.

26.    As a result of Automotive's declining performance, projected losses and significant health care and other post-employment benefits ("OPEB") liabilities, financial analysts attributed to Automotive a substantial implied negative equity value. JPMorgan Chase & Co. ("JPMorgan"), Daimler's advisor, determined that valuations over time from more than a dozen separate analysts indicated that Automotive's equity value ranged from negative $1.5 billion to negative $15.5 billion. Further, Daimler's own internal presentations to its Board of Management estimated the value contribution of Automotive to its market

capitalization to be approximately *negative* $7 billion based on its interpretation of similar analyst reports.[2]

27.     In or around late 2006, Daimler decided to sell the Debtor.  One of its principal reasons for doing so was a concern that the Debtor might be unable to satisfy its OPEB obligations, totaling approximately $17.5 billion, and that Daimler might be held responsible for those massive liabilities.  Daimler also faced potential liability for the Debtor's pension obligations, which Daimler estimated would be underfunded by $5 billion in the event the Pension Benefit Guaranty Corporation ("PBGC") terminated the Debtor's pension plan.  Daimler risked also having to fund the Debtor's future restructuring costs and continuing operating losses, and was liable as a guarantor of the Debtor's third-party obligations.

**The Debtor's Finance Subsidiaries, "FinCo"**

28.     At the time, the Debtor's most valuable business was its financial services arm, comprised primarily of DaimlerChrysler Financial Services Americas LLC ("DCFSA") and DaimlerChrysler Financial Services Canada Inc. ("DCFSCI") (collectively, "FinCo").  But FinCo's value, like the value of Debtor's other assets, was compromised by the Debtor's poor performance and over-leverage.  Moreover, Daimler knew that because the FinCo entities were subsidiaries of the Debtor, FinCo's value was subject to the claims of the Debtor's creditors.  Therefore, Daimler determined that its prospects for selling the Debtor (including FinCo) would be substantially enhanced if it were to separate FinCo from the Debtor, so that the two could be sold as sister companies rather than as parent and subsidiary.

---

[2] Daimler reported in its 2007 Annual Report that its stock price had increased 42% in 2007, indicating that, "(t)he main reason for the surge in the share price was the Group's decision to dispose of a majority interest in Chrysler."

Daimler's communications with bidders for these businesses confirmed that this separation of FinCo from the Debtor would greatly enhance the value of the overall package.

29.     At the same time that the market was attributing a negative implied equity value to Automotive, it attributed a substantial positive implied equity value to FinCo as a stand-alone business.  For example, several of the same analysts that had performed valuations for Automotive, estimated the implied equity value of FinCo as ranging from approximately $6 billion to $8 billion.

**The Internal Restructuring**

30.     In or about 2006, Daimler engaged JPMorgan and Ernst & Young LLP ("E&Y") to restructure and sell the Debtor.  E&Y was specifically engaged to advise Daimler on how to structure a comprehensive internal reorganization to separate Daimler's and Chrysler's operations and spinoff FinCo from the Debtor in preparation for the sale of Automotive and FinCo.  In response, E&Y proposed a 48-step corporate restructuring plan for Daimler entities in the NAFTA region (the "Step Plan"), which provided, among other things, for the separation of FinCo from the Debtor.  E&Y also proposed a multi-step rest-of-world corporate restructuring plan (the "ROW Step Plan" and, together with the Step Plan, the "Internal Restructuring") that included Brazil, Austria, Venezuela and the Mexico Passenger Car Carve-Out.

31.     In Step 5 of the Step Plan, Daimler caused Motors to contribute its equity interest in the Debtor to DC Holding.  In exchange for this contribution, Motors received an additional equity interest in DC Holding.  At the time of the transfer, DC Holding had no assets.

32.     In Step 7 of the Step Plan, Daimler caused Motors to distribute all of its equity interest in DC Holding – including the "consideration" it had received in Step 5 in exchange for the Debtor – to Daimler's direct wholly-owned subsidiary, DCNAH.

33.     In Step 11 of the Step Plan, Daimler caused DC Holding to create a special purpose company wholly owned by Daimler called DaimlerChrysler Holding LLC ("Holding"). Holding was created for one purpose: To provide a vehicle through which Daimler could sell its controlling interest in the Debtor, along with FinCo. Daimler next caused DC Holding to contribute its equity interest in the Debtor to Holding.

34.     In Step 13 of the Step Plan, Daimler caused DCNAH to contribute its equity interest in Motors and, in a second debtor entity, Utility Assets LLC ("Utility"), to DC Holding.

35.     In Step 14 of the Step Plan, DC Holding contributed its equity interests in Motors and Utility to Holding.

36.     On May 11, 2007, in Step 15 of the Step Plan, Daimler caused the Debtor's board of directors to approve the sale of the outstanding member interests in or shares of, as applicable, DCFSA and DCFSCI (which together comprised the preponderance of FinCo's value), as well as Mercedes Benz-Canada Inc. ("MB Canada"), to Holding in exchange for all of the outstanding member interests in Motors and Utility, and a five-year Promissory Note in the amount of $1.225 billion with a rate of 6% simple interest per annum issued by DCFSA to the Debtor (the "Note").

37.     In Step 26 of the Step Plan, Daimler caused the Debtor to sell and transfer its ownership of all of the outstanding capital stock of the Debtor's subsidiary 3208172 Nova Scotia Company ("Newco Truck ULC") to DC Holding in exchange for a non-

interest bearing promissory note in the principal amount of approximately $548 million. Daimler subsequently caused the Debtor to distribute and transfer the $548 million promissory note to Holding on or about June 21, 2007, and then Holding to distribute and transfer the $548 million promissory note to DC Holding. The Debtor received no consideration in exchange for its transfer of this note.

38.     In Step 35 of the Step Plan, Daimler caused the Debtor to sell and transfer its ownership of all of the outstanding capital stock of the Debtor's subsidiary 3208170 Nova Scotia Company ("Newco Services ULC") to Holding in exchange for a non-interest bearing promissory note in the principal amount of approximately $383 million. Daimler subsequently caused the Debtor to distribute and transfer the $383 million promissory note to Holding on or about July 10, 2007. The Debtor received no consideration in exchange for its transfer of this note.

39.     In Step 39 of the Step Plan, Daimler caused the Debtor to transfer 10,000 shares of the capital stock of Chrysler Foreign Sales Corporation to Holding, and then Holding to distribute the shares to DC Holding on or about July 30, 2007. The Debtor received no consideration in exchange for its transfer of these shares.

40.     In Step 3 of the ROW Step Plan for Brazil, Daimler caused a $35 million capital contribution to be made through DC Holding to Holding to the Debtor and finally to Chrysler do Brazil Ltda. Daimler then caused the Debtor to distribute its 99.6% legal and economic ownership interest in Chrysler do Brazil Ltda. to Holding on or about June 28, 2007, and then Holding to distribute the 99.6% ownership interest in Chrysler do Brazil Ltda. to DC Holding. In Step 4 of the ROW Step Plan for Brazil, Daimler caused Chrysler

International Services S.A., a subsidiary of the Debtor, to sell its 0.4% interest in Chrysler do Brazil Ltda. to DCNAH for $1.

41.     In Step 5 of the ROW Step Plan for Austria, Daimler caused DC Vienna, an indirect partially owned subsidiary of the Debtor, to transfer 99.99% of the shares in EvoBus Austria GmbH to Daimler, and Daimler caused DC Holding (Austria) GmbH, an indirect partially owned subsidiary of the Debtor, to transfer 0.01% of the shares in EvoBus Austria GmbH to EvoBus GmbH, a subsidiary of Daimler. In Steps 6 through 8 of the ROW Step Plan for Austria, Daimler then caused DC Vienna and DC Holding (Austria) GmbH to engage in a series of share repurchases and dividend distributions with DC Danubia, a subsidiary of Daimler. These transactions included a distribution denominated in Euros equivalent to approximately $122 million from DC Holding (Austria) GmbH to DC Danubia on or about May 11, 2007 and a redemption by DC Holding (Austria) GmbH of all of DC Danubia's preferred shares in exchange for cash.

42.     In Step 1 of the ROW Step Plan for Venezuela, Daimler caused Chrysler de Venezuela, LLC (an entity owned by the Debtor) to assign its Mercedes Benz, Freightliner, and Western Star distribution business to Inversiones 210607 C.A. (an entity owned by Daimler) in exchange for a promissory note denominated in the Venezuelan currency equivalent of $27 million bearing interest at 5% per annum. In Steps 6 and 7 of the ROW Step Plan for Venezuela, Daimler caused the Debtor to distribute this $27 million promissory note to Holding, and then caused Holding to distribute this note to DC Holding on or about August 2, 2007.

43.     In Step 1 of the ROW Step Plan for the Mexico Passenger Car Carve-Out, Daimler caused DC de Mexico S.A. de C.V (an entity owned by the Debtor) to assign its

13

Mercedes Benz and smart car distribution business to Distribuidora y Comercializadora MB, S. de R.L. de C.V. (an entity owned by Daimler) in exchange for a promissory note in the amount of $26.3 million bearing interest at 5.67% per annum, plus cash of $19.5 million, for total consideration of $45.8 million. The cash portion of the consideration was intended to cover taxes arising from the sale and therefore provided no net benefit to the Debtor. In Steps 6 and 7 of the ROW Step Plan for the Mexico Passenger Car Carve-Out, Daimler caused the Debtor to distribute this $26.3 million promissory note to Holding, and then caused Holding to distribute this note to DC Holding on or about August 2, 2007.

44.    As a result of these and other transactions, the Debtor transferred assets to Daimler, DCNAH, DC Holding, or Holding with a fair market value of approximately $9 billion or more. In exchange, the Debtor received the Note in the amount of $1.225 billion, and equity in both Motors and Utility that were nearly worthless, as described below.

45.    As part of the Internal Restructuring, Daimler, DCNAH, DC Holding, and John Does 1-50 were the subsequent transferees of a number of the Debtor's assets, and in each case neither Daimler, DCNAH, DC Holding, nor John Does 1-50 provided any net consideration in exchange for these assets. For example:

a. In Step 17 of the Step Plan, Daimler caused DCFSCI to transfer the Mercedes Benz and Freightliner ("MB/Truck") assets of DCFSCI to a holding company owned by DCNAH in exchange for a non-interest bearing promissory note in the principal amount of $98 million and cash of $5.3 million. Daimler subsequently caused DCFSCI to pay liabilities to third parties with the cash and to distribute and transfer the $98 million promissory note as a return of capital and

dividend to Holding, and then Holding to distribute and transfer the $98 million promissory note to DC Holding on or about August 3, 2007.

b. In Step 26 of the Step Plan, as described above, Daimler caused the Debtor to sell and transfer its ownership of all of the outstanding capital stock of Newco Truck ULC to DC Holding in exchange for a non-interest bearing promissory note in the principal amount of approximately $548 million. Daimler subsequently caused the Debtor to distribute and transfer the $548 million promissory note to Holding, and then Holding to distribute and transfer the $548 million promissory note to DC Holding on or about June 28, 2007.

c. In Step 32 of the Step Plan, Daimler caused the Debtor to sell and transfer the MB/Truck assets of DC Financial Services Mexico to DCFS Mexico, a Daimler subsidiary, in exchange for $975 million in cash. Daimler subsequently caused DC Financial Services Mexico to pay value-added taxes, to repay intercompany and third party liabilities, and to distribute the remainder of the cash to Newco Services ULC, its parent. In Step 35, Daimler caused Newco Services ULC to distribute the remaining cash of approximately $136 million to Holding on or about July 13, 2007, and then Holding to distribute the $136 million cash to DC Holding. In substance, Steps 32 and 35 constitute a transfer of the Debtor's equity interests in the MB/Truck assets of DC Financial Services Mexico for which the Debtor received no consideration.

d. In Step 37 of the Step Plan, Daimler caused Holding to distribute all of the outstanding capital stock of MB Canada to DC Holding.

15

e. In Step 38 of the Step Plan, Daimler caused DCFSA to transfer substantially all of the outstanding capital stock or membership interests, as applicable, of DaimlerChrysler Financial Services US LLC, Intrepid Insurance Co., Sociedad Financiera de Objeto Multiple and DaimlerChrysler Capital Services (debis) LLC, to DC Holding in exchange for promissory notes in principal amounts of approximately $2.4 billion. Daimler subsequently caused DCFSA to distribute and transfer the $2.4 billion promissory notes to Holding, and then Holding to distribute and transfer the $2.4 billion promissory notes to DC Holding on several dates in or about July 2007.

f. In Step 39 of the Step Plan, Daimler caused the Debtor to transfer 10,000 shares of the capital stock of Chrysler Foreign Sales Corporation to Holding, and then Holding to distribute the shares to DC Holding on or about July 30, 2007. The Debtor received no consideration in exchange for its transfer of these shares.

46. As a result of the transfers in the Step Plan, Holding became the parent of the Debtor; FinCo became a sister (instead of a subsidiary) of the Debtor, and a subsidiary of Holding; Motors became a subsidiary (instead of the parent) of the Debtor; and Daimler, DCNAH, or DC Holding or their subsidiaries directly owned certain Mercedes-Benz, Freightliner and other assets that had previously been owned by the Debtor.

**The Valuations**

47. In an admitted attempt to insulate itself from liability in connection with the Internal Restructuring, Daimler retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") to opine on, among other things, the relative value of the consideration exchanged in the simultaneous transactions proposed in Step 15.

50.     Houlihan Lokey's valuation was fundamentally flawed. ▮

**The Sale to Cerberus**

51.     Beginning in or around December 2006, Daimler, with the assistance of its advisors, JPMorgan and Ernst & Young, initiated efforts to solicit offers for the sale of the Debtor and FinCo.

52.     Five investors submitted bids.  The bids included implied negative equity values for Automotive of approximately negative $3 billion to negative $8 billion after considering pre-tax OPEB liabilities.  However, they ascribed an implied positive equity value for FinCo ranging from approximately $4 billion to $7 billion.[3]

---

[3] As described previously, after separating FinCo from the Debtor but before the sale to Cerberus, Daimler extracted in exchange for no consideration a number of FinCo entities and assets, primarily those related to Mercedes Benz and Freightliner, in transactions valued by

53.     The valuations done by Daimler's own advisors confirmed these amounts. The valuations prepared by both JP Morgan and Dresdner Kleinwort in support of their fairness opinions resulted in a selected equity valuation range for Automotive of negative $3.5 billion to negative $5.5 billion.

54.     On May 14, 2007 – three days after Daimler caused the Debtor's board of directors to approve the transactions in Step 15 – Daimler's Board of Management approved the agreements with Cerberus under the terms and conditions presented.

55.     Additionally, on or about May 14, 2007, Daimler executed an agreement to sell 80.1% of its interests in the Debtor and FinCo to CG Investor, LLC, an affiliate of Cerberus (the "Contribution Agreement").

56.     In or around August 3, 2007, Daimler closed the sale of its 80.1% interest in Holding, pursuant to the Contribution Agreement, for more than $7 billion.

57.     Of the purchase price, $3.45 billion was distributed to the Debtor as a capital contribution, $2.275 billion was distributed to FinCo as a capital contribution ($1.243 billion of which FinCo used to satisfy the Note it had issued to the Debtor, including interest), and $1.212 billion was distributed to Daimler.

58.     In addition, the Debtor repaid and/or forgave certain intercompany debts of Daimler, and Daimler repaid and/or forgave certain purported intercompany debts of the Debtor. Much of the purported intercompany debt repaid or forgiven by Daimler is more properly characterized as equity, contributed by Daimler at times when the Debtor was insolvent or near insolvent and in circumstances where no third-party would have extended financing to the Debtor on an unsecured basis.

---

Daimler in excess of $2.5 billion. Additionally, DC Financial Services Mexico was subsequently acquired by FinCo.

59.	In addition, Daimler caused the Debtor to repay approximately $1.825 billion of the Debtor's third party debt, which debt Daimler had guaranteed. This debt comprised: (a) $225 million of 30-year floating Auburn Hills Trust notes due on May 1, 2020, (b) $500 million of 101-year fixed 7.40% debentures due on August 1, 2097, (c) $500 million of 101-year fixed 7.45% debentures due on February 1, 2097, and (d) $600 million of 30-year fixed 7.45% debentures due on March 1, 2027. Daimler also caused the Debtor to arrange for the phase-out or transfer of other Daimler performance guarantees, indemnities, letters of credit and other contingent liabilities totaling at least $1.5 billion.

60.	As part of the sale to Cerberus, the Debtor transferred ownership of its Auburn Hills headquarters building, the country's second-largest office building under one roof (second only to the Pentagon), to Auburn Hills Owner LLC on August 3, 2007 for $325 million. The value of that property, based on both property tax appraisals and a reported August 2006 offer, was substantially more than $325 million.

**Lawsuits Pending at the Time of the Debtor's Transfer of FinCo**

61.	Numerous lawsuits were pending against the Debtor at the time of the Debtor's transfer of FinCo, which subsequently resulted in judgments that remain unsatisfied. For example:

a.	*Jeremy Knowles Gilbert Mohr v. DaimlerChrysler Corporation*, Circuit Court of Shelby Cty, Tennessee, Index No. CT 002433-03.

b.	*Ronnie Eugene Denton v. DaimlerChrysler Corporation*, United States District Court, Northern District of Georgia, Atlanta Division.

c.	*Jeremy Flax v. DaimlerChrysler Corporation*, Circuit Court, Nashville, Tennessee.

d.    *August and Juli Guillot v. DaimlerChrysler Corporation*, 34th Judicial District Court, St. Bernard Parish, Louisiana.

e.    *Gilbert Mohr v. DaimlerChrysler Corporation*, Circuit Court, Memphis, Tennessee.

f.    *Adriana Mraz v DaimlerChrysler Corporation*, Los Angeles County Superior Court, California.

62.    In addition, numerous lawsuits were pending against the Debtor at the time of the transfer of FinCo, which subsequently resulted in settlements that remain unsatisfied. For example:

a.    *Annette Walker v. DaimlerChrysler Corporation*, 3rd Judicial District Court, Salt Lake City, Utah.

b.    *Sheila Haynes v. DaimlerChrysler Corporation*, Kanawha County Circuit Court, West Virginia.

c.    *Charles Bagwell v. DaimlerChrysler Corporation*, Common Pleas Court, Morrow County, Ohio.

d.    *Charles Houck v. DaimlerChrysler Corporation*, Alameda County Superior Court, California

e.    *Larry Card v. DaimlerChrysler Corporation*, Stanislaus County Superior Court, California.

## Count I

### (Constructive Fraudulent Transfer under
### 11 U.S.C. Sections 548(a)(1)(B) and 550(a) against Daimler, DCNAH, DC Holding, and John Does 1-50)

63.     The Creditors' Committee realleges its allegations in paragraphs 1 through 62 as if fully set forth herein.

64.     Daimler caused the Debtor to transfer to Holding certain assets, including FinCo; MB Canada; Newco Truck ULC; Newco Services ULC; and 10,000 shares of Chrysler Foreign Sales Corporation (the "Transfers"). The Transfers were made for the benefit of Daimler, Holding's sole shareholder, in part to facilitate and make possible Daimler's sale of the Debtor to Cerberus on favorable terms.

65.     The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Transfers.

66.     Immediately following the Transfers, the Debtor (a) was insolvent; (b) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; and/or (c) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

67.     The Transfers are voidable pursuant to Bankruptcy Code § 548. As the entity for whose benefit the Transfers were made, Daimler is liable for the value of the Transfers pursuant to Bankruptcy Code § 550. In addition, Daimler, DCNAH, DC Holding, and John Does 1-50 are liable pursuant to Bankruptcy Code § 550 as the subsequent transferees of the assets identified in paragraph 45 above.

## Count II

**(Constructive Fraudulent Transfer under 11 U.S.C. Sections 544(b) and 550(a) and New York Debtor & Creditor Law §§ 273, 274 and/or 275 against Daimler, DCNAH and DC Holding and John Does 1-50)**

68.     The Creditors' Committee realleges its allegations in paragraphs 1 through 67 as if fully set forth herein.

69.     Daimler caused the Debtor to approve and implement the Transfers. The Transfers were made for the benefit of Daimler, Holding's sole shareholder, in part to facilitate and make possible Daimler's sale of the Debtor to Cerberus on favorable terms.

70.     The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Transfers.

71.     Immediately following the Transfers, the Debtor (a) was insolvent; (b) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; and/or (c) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

72.     The Transfers are voidable pursuant to Bankruptcy Code § 544(b) and New York Debtor & Creditor Law §§ 273, 274 and/or 275. As the entity for whose benefit the Transfers were made, Daimler is liable for the value of the Transfers pursuant to Bankruptcy Code § 550. In addition, Daimler, DCNAH, DC Holding, and John Does 1-50 are liable pursuant to Bankruptcy Code § 550 as the subsequent transferees of the assets identified in paragraph 45 above.

## Count III

**(Constructive Fraudulent Transfer under 11 U.S.C.
§§ 544(b) and 550(a) and New York Debtor & Creditor Law § 273-a Against Daimler,
DCNAH, DC Holding, and John Does 1-50)**

73.     The Creditors' Committee realleges its allegations in paragraphs 1 through 72 as if fully set forth herein.

74.     Daimler caused the Debtor to approve and implement the Transfers. The Transfers were made for the benefit of Daimler, Holding's sole shareholder, in part to facilitate and make possible Daimler's sale of the Debtor to Cerberus on favorable terms.

75.     The Debtor did not receive reasonably equivalent value or fair consideration in exchange for the Transfers.

76.     At the time of the Transfers, multiple lawsuits were pending against the Debtor. Those lawsuits have resulted in unpaid judgments and unpaid settlements.

77.     The Transfers are voidable pursuant to Bankruptcy Code § 544(b) and New York Debtor & Creditor Law § 273-a. As the entity for whose benefit the Transfers were made, Daimler is liable for the value of the Transfers pursuant to Bankruptcy Code § 550. In addition, Daimler, DCNAH, DC Holding, and John Does 1-50 are liable pursuant to Bankruptcy Code § 550 as the subsequent transferees of the assets identified in paragraph 45 above.

## Count IV

**(Constructive Fraudulent Transfer under 11 U.S.C.  §§ 544(b) and 550(a) and New York
Debtor & Creditor Law §§ 273, 273-a, 274 and/or 275 Against Daimler)**

78.     The Creditors' Committee realleges its allegations in paragraphs 1 through 77 as if fully set forth herein.

79. Daimler caused the Debtor to repay approximately $1.825 billion of the Debtor's third party debt, which debt Daimler had guaranteed. The Debtor's repayment of this third party debt was for the benefit of Daimler, an insider and the guarantor of the subject debt, because the repayment reduced Daimler's exposure by the amount repaid.

80. The Debtor's repayment of debt guaranteed by Daimler, the Debtor's corporate parent, was not in good faith, and the Debtor did not receive fair consideration within the meaning of New York Debtor & Creditor Law § 272.

81. Immediately following the Debtor's repayment of debt guaranteed by Daimler, the Debtor (a) was insolvent; (b) was engaged or was about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; and/or (c) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

82. At the time of the repayment, multiple lawsuits were pending against the Debtor. Those lawsuits have resulted in unpaid judgments and unpaid settlements.

83. The repayment of this third party debt is voidable pursuant to Bankruptcy Code § 544(b) and New York Debtor & Creditor Law §§ 273, 273-a, 274 and/or 275. As the entity for whose benefit these transfers were made, Daimler is liable for the value of these transfers pursuant to Bankruptcy Code § 550.

## Count V

**(Intentional Fraudulent Transfer under 11 U.S.C. Sections 548(a)(1)(A) and 550(a) against Daimler, DCNAH, DC Holding, and John Does 1-50)**

84. The Creditors' Committee realleges its allegations in paragraphs 1 through 83 as if fully set forth herein.

85.     Daimler caused the Debtor to approve and implement the Transfers. Daimler and the Debtor did so with the actual intent to hinder, delay and/or defraud the Debtors' present and future creditors.

86.     By reason of the foregoing, the Transfers were intentionally fraudulent and are voidable under 11 U.S.C. Section 548(a).

87.     The Transfers were made for the benefit of Daimler, Holding's sole shareholder, in part to facilitate and make possible Daimler's sale of the Debtor to Cerberus on favorable terms. As the entity for whose benefit the Transfers were made, Daimler is liable for the value of the Transfers pursuant to Bankruptcy Code § 550.

88.     As the subsequent transferees of the Debtors' assets identified in paragraph 45 above, Daimler, DCNAH, DC Holding, and John Does 1-50 are liable pursuant to Bankruptcy Code § 550.

## Count VI

### (Intentional Fraudulent Transfer under 11 U.S.C. Sections 544(b) and 550(a) and New York Debtor & Creditor Law §§ 276 and 276-a against Daimler, DCNAH, DC Holding, and John Does 1-50)

89.     The Creditors' Committee realleges its allegations in paragraphs 1 through 88 as if fully set forth herein.

90.     Daimler caused the Debtor to approve and implement the Transfers. Daimler and the Debtor did so with the actual intent to hinder, delay and/or defraud the Debtors' present and future creditors.

91.     By reason of the foregoing, the Transfers were intentionally fraudulent under New York Debtor & Creditor Law § 276 and are voidable under Bankruptcy Code § 544(b).

25

92.     The Transfers were made for the benefit of Daimler, Holding's sole shareholder, in part to facilitate and make possible Daimler's sale of the Debtor to Cerberus on favorable terms. As the entity for whose benefit the Transfers were made, Daimler is liable for the value of the Transfers pursuant to Bankruptcy Code § 550. In addition, Daimler is liable for plaintiff's attorneys' fees pursuant to New York Debtor & Creditor Law § 276-a because Daimler caused the Debtor to approve and implement the Transfers with the actual intent to hinder, delay and/or defraud the Debtors' present or future creditors.

93.     As the subsequent transferees of the Debtors' assets identified in paragraph 45 above, Daimler, DCNAH, DC Holding, and John Does 1-50 are liable pursuant to Bankruptcy Code § 550. In addition, DCNAH, DC Holding, and John Does 1-50 are liable for plaintiff's attorneys' fees pursuant to New York Debtor & Creditor Law § 276-a because they were dominated and controlled by Daimler and shared Daimler's actual intent to hinder, delay and/or defraud the Debtors' present or future creditors.

## Count VII

### (Breach of Fiduciary Duty Claim Against the Individual Defendants)

94.     The Creditors' Committee realleges its allegations in paragraphs 1 through 93 as if fully set forth herein.

95.     On May 11, 2007, each of the Individual Defendants served not only on as a member of the Debtor's board of directors but also as a member of Daimler's board of management. By virtue of their service in these dual capacities, each of the Individual Defendants owed fiduciary duties of loyalty both to the Debtor and to Daimler.

96.   On May 11, 2007, each of the Individual Defendants voted to approve the Debtor's transfer of FinCo to Holdings for Daimler's benefit and to the Debtor's detriment, thereby rendering the Debtor insolvent or deepening its insolvency.

97.   In addition, on June 21, 2007, and July 10, 2007, each of the Individual Defendants voted to transfer the promissory notes the Debtor had received in connection with, respectively, Steps 26 and 35.

98.   On information and belief, each of the Individual Defendants authorized, or alternatively knew of and acquiesced in, the Debtor's transfer of the Auburn Hills headquarters building to Auburn Hills Owner LLC on August 3, 2007.

99.   Because each Individual Defendant owed conflicting loyalties to the Debtor and to Daimler with respect to the Transfers, and because no member of the Debtor's board was free of such a conflict, each of the Individual Defendants bears the burden of proving the entire fairness of the Transfers.

100.   Each of the Individual Defendants breached his fiduciary duty of loyalty to the Debtor by approving the Transfers, which were not fair to the Debtor.

101.   As a direct and proximate result of the Transfers, the Debtor suffered damages in an amount to be proven at trial.

## Count VIII

### (Breach of Fiduciary Duty Claim Against Daimler)

102.   The Creditors' Committee realleges its allegations in paragraphs 1 through 101 as if fully set forth herein.

103.   At all times relevant to this Complaint, Daimler was the Debtor's 100% indirect shareholder and exercised control over all major corporate decisions made by the

27

Debtor. On May 11, 2007, all five members of the Debtor's board of directors served also as member of Daimler's board of management.

104. By means of its control over the Debtor and its directors, Daimler caused the Debtor to transfer FinCo to Holdings for Daimler's benefit and to the Debtor's detriment, thereby rendering the Debtor insolvent or deepening its insolvency. In addition, by means of its control over the Debtor and its directors, Daimler caused the Debtor to transfer the promissory notes the Debtor had received in connection with Steps 26 and 35. Finally, by means of its control over the Debtor and its directors, Daimler caused the Debtor to transfer the Auburn Hills headquarters building to Auburn Hills Owner LLC on August 3, 2007.

105. Daimler bears the burden of proving the entire fairness of the Transfers.

106. Daimler breached its fiduciary duty of loyalty to the Debtor by causing the Transfers, which were not fair to the Debtor.

107. As a direct and proximate result of these breaches, the creditors of the Debtor suffered damages in an amount to be proven at trial.

## Count IX

### (Unjust Enrichment Claim against Daimler)

108. The Creditors' Committee realleges its allegations in paragraphs 1 through 107 as if fully set forth herein.

109. As alleged above, Daimler, DCNAH, DC Holding, and John Does 1-50 benefited unjustly from the Transfers. It is inequitable and unjust for Daimler, DCNAH, DC Holding, and John Does 1-50 to have received, been enriched by, and retained without payment of value, such benefits from the Debtor.

28

110.   Equity and good conscience require that Daimler, DCNAH, DC Holding, and John Does 1-50 disgorge monies and other assets obtained improperly from the Debtor.

111.   Accordingly, judgment should be entered on the Creditors' Committee's claims against Daimler, DCNAH, DC Holding, and John Does 1-50 in an amount to be determined at trial, plus interest.

## Count X

### (Corporate Alter Ego Claim Against Daimler)

112.   The Creditors' Committee realleges its allegations in paragraphs 1 through 111 as if fully set forth herein.

113.   As alleged above, Daimler orchestrated a complex restructuring of its corporate subsidiaries, including Holding, DCNAH, DC Holding, and John Does 1-50, (the "Corporate Alter Egos") in an effort to extract value from Debtor without fair consideration and with the actual intent to hinder, delay and/or defraud the Debtors' present and future creditors.

114.   Daimler and the Corporate Alter Egos operated as a single economic unit. The Corporate Alter Egos were created and operated for the purpose of siphoning assets from Debtor to Daimler or its subsidiaries. Daimler dominated the Corporate Alter Egos and determined their actions solely with regard to Daimler's own self-interest.

115.   Daimler used the Corporate Alter Egos to commit an injustice against the Debtor and its creditors. As described more fully above, Daimler attempted to fraudulently convey assets rightfully belonging to Debtor and its creditors through a series of transactions involving the Corporate Alter Egos.

116. The Court should disregard the separate corporate existence of Daimler and the Corporate Alter Egos and find that Daimler is liable for the value of all fraudulent transfer proceeds received by the Corporate Alter Egos as well as all other obligations of the Corporate Alter Egos as determined at trial.

117. Accordingly, judgment should be entered on the Creditors' Committee's claims against Daimler in an amount to be proven at trial, plus interest.

### Jury Demand

Plaintiff demands a trial by jury on all issues triable to a jury.

### Prayer for Relief

**WHEREFORE,** plaintiffs demand that judgment be entered as follows:

A. On Count I, in an amount to be proven at trial, plus interest.

B. On Count II, in an amount to be proven at trial, plus interest.

C. On Count III, in an amount to be proven at trial, plus interest.

D. On Count IV, in an amount to be proven at trial, plus interest.

E. On Count V, in an amount to be proven at trial,

F. On Count VI in an amount to be proven at trial, plus interest and attorneys' fees.

G. On Count VII in an amount to be proven at trial, plus interest.

H. On Count VIII in an amount to be proven at trial, plus interest.

I. On Count IX in an amount to be proven at trial, plus interest.

J. On Count X in an amount to be prove at trial, plus interest.

K.    Granting such other and further relief as is just and proper.

Dated:  August 17, 2009
        New York, New York

                              Respectfully Submitted,

                              SUSMAN GODFREY L.L.P.


                              By:___ /s/ Stephen D. Susman____
                                   Stephen D. Susman
                                   S.D. Admissions No. SS8591
                                   ssusman@susmangodfrey.com
                                   Jacob W. Buchdahl
                                   S.D. Admissions No. JB1902
                                   jbuchdahl@susmangodfrey.com
                                   Suyash Agrawal
                                   S.D. Admissions No. SA2189
                                   sagrawal@susmangodfrey.com

                                   654 Madison Ave., 5th Floor
                                   New York, NY 10065
                                   (212) 336-8330


                              STUTZMAN, BROMBERG, ESSERMAN
                                   & PLIFKA, P.C.

                              Sander L. Esserman
                              Admitted *pro hac vice*
                              esserman@sbep-law.com
                              Robert T. Brousseau
                              Admission *pro hac vice* pending
                              brousseau@sbep-law.com
                              Peter D'Apice
                              S.D. Admissions No. PD3737
                              dapice@sbep-law.com

                              2323 Bryan Street, Suite 2200
                              Dallas, TX 75201
                              (214) 969-4900

                              *Attorneys for Plaintiff The Official
                              Committee of Unsecured Creditors of Old
                              CarCo LLC (f/k/a Chrysler LLC)*

31