**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| OLD CARCO LLC ) | |
| (F/K/A CHRYSLER LLC), *et al.*, ) | Case No. 09-50002 (AJG) |
| ) | Jointly Administered |
| Debtors. ) | |
| ) | |
| THE OFFICIAL COMMITTEE OF ) | |
| UNSECURED CREDITORS OF OLD CARCO ) | Adv. No. 09-00505 (AJG) |
| LLC (F/K/A CHRYSLER LLC), ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| DAIMLER AG, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS**
**DAIMLER AG, DAIMLER NORTH AMERICA CORPORATION,**
**AND DAIMLER INVESTMENTS US CORPORATION**
**TO DISMISS THE FIRST AMENDED COMPLAINT**

BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller
William S. Ohlemeyer
Tricia J. Bloomer
575 Lexington Avenue, 7th Floor
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

SHEARMAN & STERLING LLP
Alan S. Goudiss
Jaculin Aaron
Paula M. Howell
K. Mallory Tosch
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

*Attorneys for Defendants Daimler AG,*
*Daimler North America Corp.,*
*and Daimler Investments US Corp.*

Dated: March 5, 2010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 5

    A.    The Decision to Restructure and "Sell" Chrysler ...................................... 5

    B.    The Contribution Agreement with Cerberus ............................................ 7

    C.    The Transfer of Motors to Chrysler, the Separation of FinCo, and the Creation of Holding ............................................................................... 8

    D.    Other Steps in the Step Plan ................................................................... 11

    E.    The Complaint's Allegations Regarding "Reasonably Equivalent Value" .......... 11

    F.    Repayment or Forgiveness of Intercompany Debt and Third-Party Debt Guaranteed by Daimler ......................................................................... 12

        1.    Intercompany Debt ..................................................................... 12

        2.    Payment of Third-Party Debt Guaranteed by Daimler ............... 13

        3    Phase-Out of Credit Support Instruments ................................... 14

        4.    New Financing Arranged by Cerberus ....................................... 14

    G.    The Closing of the Contribution Agreement ........................................ 15

ARGUMENT ............................................................................................................... 17

    STANDARD OF REVIEW FOR A RULE 12(B)(6) MOTION TO DISMISS ............... 17

    I.    THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER (COUNTS I-IV) ...................................... 19

        A.    The Allegations of Insolvency in the Complaint Are Insufficient Because They Focus on Particular Elements of the Cerberus Transaction Rather Than the Transaction As a Whole ............................. 19

        B.    The Complaint Does Not and Could Not Plausibly Allege That Chrysler Was Insolvent As a Result of the Cerberus Transaction ............ 22

        C.    The Transfers and the Repayment of Third-Party Debt Were Made for Reasonably Equivalent Value ...................................... 24

1. The Complaint's Allegations Regarding Reasonably Equivalent Value Are Inadequate Because They Do Not Take into Account the Cerberus Transaction As a Whole............25

2. The Complaint's Attempt To Show Lack of Reasonably Equivalent Value by Claiming That Chrysler's Intercompany Debt Forgiven by Daimler Should Now Be Recharacterized As Equity Is Legally Insufficient....................................25

3. The Complaint's Allegations of a Lack of Reasonably Equivalent Value for the Transfer of FinCo Are Inadequate, Even If That Transfer Could Be Considered in Isolation ..............26

4. The Repayment of Third-Party Debt Was Made for Reasonably Equivalent Value ........................................27

II. THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL FRAUDULENT TRANSFER (COUNTS V AND VI) ........................................28

A. The Alleged Facts Do Not Create a Strong Inference of Fraudulent Intent........................................................28

B. It Is Implausible that Daimler (and Cerberus and the Banks) Would Intentionally Harm Chrysler ........................................29

III. THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY (COUNT VIII) ....................31

A. The Committee's Newly Asserted Claim for Aiding and Abetting Is Barred by the Release in Section 6(b) of Settlement Agreement III ........31

1. The Aiding and Abetting Claim Falls Squarely within the Claims Released under Section 6(b) of Settlement Agreement III................................................32

2. The Aiding and Abetting Claim Was Released Because It Was Not Asserted in Either the Proposed Complaint or The Original Complaint ................................................33

3. The Committee Is Bound by the Release in Settlement Agreement III................................................34

B. Even If the Aiding and Abetting Claim Had Not Been Released, It Would Still Fail As a Matter of Law ........................................35

1. Because Chrysler Was Not Insolvent, No Fiduciary Duties Were Owed to Chrysler That Encompassed the Interests Of Chrysler's Creditors................................................35

2.     Even If a Fiduciary Duty Had Been Owed, There Was No Breach .......................................................................................36

3.     Even If a Breach Occurred, the Alleged Facts Do Not Support an Inference of Knowing Participation by the Daimler Entities in Any Alleged Breach of Fiduciary Duty........................36

IV.     THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT IX)................................................................37

V.     THE COMPLAINT FAILS TO STATE A CLAIM FOR ALTER EGO LIABILITY (COUNT X) .........................................................................38

A.     The Facts Alleged in the Complaint Fail To Show "Complete Domination" by Daimler of Any of the Holding Companies ...................38

B.     No Element of Unfairness or Injustice Is Present Here ............................40

CONCLUSION.......................................................................................................................42

# TABLE OF AUTHORITIES

## CASES

*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008)......................................................................................26

*In re All Am. Bottled Water Corp.*, No. 06-43133, 2009 WL 722994 (Bankr. W.D. Wa. Mar. 17, 2009)......................................................................................21

*In re Allou Distribs.*, 379 B.R. 5 (Bankr. E.D.N.Y. 2007) ...........................................18

*In re Allou Distribs.*, 387 B.R. 365 (Bankr. E.D.N.Y. 2008) ......................................37

*In re Allou Distribs., Inc.*, 404 B.R. 710 (Bankr. E.D.N.Y. 2009) ...............................37

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .........................................................3, 17, 23

*In re BH S&B Holdings L.L.C.*, 420 B.R. 112 (Bankr. S.D.N.Y. 2009).............. *passim*

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .........................................3, 17, 18

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004).............37

*Calavano v. N.Y.C. Health & Hosp. Corp.*, 246 A.D.2d 317 (1st Dep't 1998) ...........34

*Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323 (S.D.N.Y. 2009) .....................18

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) ....................................18

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) .........................18

*Fletcher v. Atex, Inc.*, 68 F.3d 1451 (2d Cir. 1995).............................................38, 39

*In re Foxmeyer Corp.*, 286 B.R. 546 (Bankr. D. Del. 2002) .......................................21

*In re Foxmeyer Corp.*, 290 B.R. 229 (Bankr. D. Del. 2003) .......................................41

*Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-WCP, 2007 WL 4292024 (Del. Ch. Nov. 30, 2007)......................................................................36

*HBE Leasing Corp. v. Frank*, 48 F.3d 623 (2d Cir. 1995) ....................................20, 27

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759 (2d Cir. 1991)...............18

*Int'l Union, UAW v. Gen. Motors Corp.*, No. 07-CV-14074, 2008 WL 2968408 (E.D. Mich. July 31, 2008) ................................................................................................24

*In re Iridium Operating, L.L.C.*, 373 B.R. 283 (Bankr. S.D.N.Y. 2007)...................................4, 23

*Joseph v. Nationwide Insur. Co.*, Index No. 001450TSN00, 2002 WL 31748591 (N.Y. City Civ. Ct. Nov. 27, 2002)......................................................................................34

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) .........................................................18

*In re Lukens, Inc.*, 757 A.2d 720 (Del. Ch. 1999) ...............................................................36, 37

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913 (S.D.N.Y. 1995) ...............................................................................20, 28, 29, 34

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001)...............................................................35, 36

*In re MarketXT Holdings Corp.*, 361 B.R. 369 (Bankr. S.D.N.Y. 2007) .....................................29

*Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714 (2d Cir. 1974) ...............................34

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creds. of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139 (3d Cir. 1996) .........................................................................22

*Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260 (D. Del. 1989) ....................................40

*In re Musicland Holding Corp.*, 398 B.R. 761 (Bankr. S.D.N.Y. 2008) ................................18, 25

*N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92 (Del. 2007) ........36

*In re Nat'l Forge Co.*, 344 B.R. 340 (W.D. Pa. 2006) .................................................................21

*Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282 (S.D.N.Y. 2000) .................................................................................................18

*In re Official Comm. of Unsecured Creds. for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225 (4th Cir. 2006)..............................................................................................25, 26

*In re Old CarCo LLC (f/k/a Chrysler LLC), et al.*, Case No. 09-50002 ("*Old CarCo*") (Bankr. S.D.N.Y. filed Apr. 30, 2009).................................................................17, 33, 34

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ...........................................18

*Orr v. Kinderhill Corp.*, 991 F.2d 31 (2d Cir. 1993) .........................................................19, 20, 21

*Pereira v. Cogan*, No. 00 CIV 619 (RWS), 2001 WL 243537 (S.D.N.Y. Mar. 8, 2001) .............33

*Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772 (Del. Ch. 2004) ...........................36

*In re RSL Com Primecall, Inc.*, Adv. 03-2176 (ALG), 2003 WL 22989669 (Bankr. S.D.N.Y. 2003) ............................................................................................................37

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)..........................................................................18

*SEC v. Univ. Express, Inc.*, No. 04-CV-2322, 2008 U.S. Dist. LEXIS 35342 (S.D.N.Y. Apr. 30, 2008) ...........................................................................................................27

*In re Saba Enters.*, 421 B.R. 626 (Bankr. S.D.N.Y. 2009)................................................18, 28, 38

*Saito v. McCall*, Civ. A. No. 17132-NC, 2004 WL 3029876 (Del. Ch. Dec. 20, 2004) ..............36

*In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59 (Del. 1995) ...........................................37

*In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)...................................................18, 24, 27, 28

*Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994)................................................29

*Silverman v. Actrade Capital Inc.*, 337 B.R. 791 (Bankr. S.D.N.Y. 2005) ..................................18

*Simel v. JP Morgan Chase*, No. 05-CV-9750 (GBD), 2007 WL 809689 (S.D.N.Y. Mar. 19, 2007) ....................................................................................................................34

*Skluth v. United Merch. & Mfrs., Inc.*, 163 A.D.2d 104 (1st Dep't 1990) ...................................34

*In re Sunbeam Corp.*, 284 B.R. 355 (Bankr. S.D.N.Y. 2002) ....................................20, 38, 39, 40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ..............................................18

*In re Ticketplanet.com*, 313 B.R. 46 (Bankr. S.D.N.Y. 2004).....................................................40

*In re Trados Inc. S'holder Litig.*, Civ. A. No. 1512-CC, 2009 WL 2225958 (Del. Ch. Jul. 24, 2009) ....................................................................................................................36

*Trenwick Am. Litig. Trust v. Ernst & Young L.L.P.*, 931 A.2d 438 (Del. 2007), *aff'g* 906 A.2d 168, 194, 200 (Del. Ch. 2006)..........................................................................35, 36

*Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521 (D. Del. 2008)...................................................41

*United States v. Bestfoods*, 524 U.S. 51 (1998) ..........................................................................39

*VFB L.L.C. v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007) ................................................23

## STATUTES AND RULES

11 U.S.C. § 548(a)(1)(A) ................................................................................28

11 U.S.C. § 548(a)(1)(B) ...........................................................................19, 24

11 U.S.C. § 548(a)(1)(B)(i) ...........................................................................24

11 U.S.C. § 548(a)(1)(B)(ii)(I) ......................................................................22

11 U.S.C. § 548(a)(1)(B)(ii)(II) .....................................................................22

11 U.S.C. § 548(a)(1)(B)(ii)(III) ...................................................................22

Bankruptcy Code § 544 ............................................................................19, 28

Bankruptcy Code § 548 ............................................................................19, 28

Bankruptcy Code § 550 .................................................................................19

Fed. R. Bankr. P. 7009 ...................................................................................18

Fed. R. Bankr. P. 7012(b) .................................................................................2

Fed. R. Bankr. P. 7012(b)(6) ..........................................................................17

Fed. R. Civ. P. 9(b) ...................................................................................18, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................2, 17

N.Y. Debt. & Cred. Law § 272 ...................................................................24, 27

N.Y. Debt. & Cred. Law § 273 ..............................................................19, 22, 24

N.Y. Debt. & Cred. Law § 274 ...................................................................19, 22

N.Y. Debt. & Cred. Law § 275 ...................................................................19, 22

N.Y. Debt. & Cred. Law § 276 ........................................................................28

Defendants Daimler AG ("Daimler" or "Daimler AG"), Daimler North America Corporation, and Daimler Investments US Corporation (together, the "Daimler Entities") respectfully submit this Memorandum of Law in support of their Motion To Dismiss the First Amended Complaint ("Complaint") of the Official Committee (the "Committee") of Unsecured Creditors of Old Carco LLC ("Chrysler" or "CarCo") pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b). Documents cited herein are annexed to the accompanying Declaration of Alan S. Goudiss ("Goudiss Decl.").

## PRELIMINARY STATEMENT

In 2007, Chrysler received a $5 billion cash contribution and a new bank loan of $10 billion as a result of a major investment by an affiliate of Cerberus, one of the largest and most sophisticated private equity firms in the world. This recapitalization was part of a broader transaction in which Chrysler was restructured in order to make it a stronger and more flexible company and to unlock the potential value in Chrysler's financial services business by making it a stand-alone entity.

The overall transaction was so obviously beneficial for Chrysler that it was supported by Chrysler's major creditor constituencies. Many of the preeminent commercial and investment banks in the United States — JPMorgan Chase, Goldman Sachs, Citibank, Bear Stearns, and Morgan Stanley — endorsed the transaction by providing the $10 billion loan, without which the transaction would not have taken place. The transaction was supported as well by the UAW, which proclaimed it to be "in the best interests of our UAW members, the Chrysler Group and Daimler," and whose president, Ron Gettelfinger, voted for it as a member of Daimler's Supervisory Board. The UAW also endorsed the transaction by its actions, agreeing shortly after the transaction closed to accept hundreds of millions of dollars' worth of equity warrants of the restructured Chrysler as part of the funding for future health benefits for retirees.

Given this broad creditor support for the 2007 restructuring and recapitalization of Chrysler, not even the Creditors' Committee (of which the UAW is a member) is so brazen as to

challenge the entire transaction as a fraudulent transfer, or to claim that it caused Chrysler's bankruptcy. Instead, the Committee isolates and then attacks selected elements of the transaction as fraudulent transfers. This approach, however, renders the Complaint fatally defective as a matter of law. It is contrary to the well-established legal authority of this Circuit requiring steps in an integrated transaction be "collapsed" for purposes of analyzing whether a fraudulent transfer occurred.

The restructuring and recapitalization of Chrysler took place pursuant to a Contribution Agreement between the Daimler Entities and Cerberus, which provided both for Cerberus's equity investment and for a corporate restructuring to facilitate that investment. As set forth in the Contribution Agreement, the corporate restructuring was implemented through a "Step Plan," by which the businesses of Chrysler and Daimler were separated, Chrysler's financial services subsidiary ("FinCo") was made a stand-alone entity in order to enhance its ability to obtain third-party financing, and indebtedness between Chrysler and Daimler or guaranteed by Daimler was repaid or forgiven in anticipation of new debt financing being arranged by Cerberus. As a result of this comprehensive, integrated transaction (the "Cerberus Transaction"), Daimler's equity interest in Chrysler was reduced to 19.9 percent, Chrysler's pre-existing funded debt was extinguished, and Chrysler received a $5 billion cash injection. In addition to this $5 billion in cash, Chrysler received pursuant to the Cerberus Transaction $10 billion in new bank financing arranged by Cerberus, a $1.5 billion loan facility from a Daimler affiliate, a $0.5 billion loan facility from Cerberus, and many other elements of value. Moreover, Chrysler obtained a new majority owner, Cerberus, that was committed to making Chrysler a success — and, in fact, made an equity investment of billions of dollars to back up that commitment.

The Complaint alleges that certain of the transfers made pursuant to the restructuring set forth in the Step Plan and required by the Contribution Agreement were for insufficient consideration and that immediately following each of these individual transfers Chrysler was insolvent. But nowhere in the Complaint does the Committee allege that the entire, integrated Cerberus Transaction — including the corporate restructuring *and* the $5 billion in cash

contributions to Chrysler *and* the repayment or forgiveness of Chrysler's intercompany debt —
constituted a fraudulent transfer. In defiance of the applicable legal authority, the Complaint
improperly picks and chooses among particular elements of the Cerberus Transaction, avoiding
the ones that destroy the Committee's legal theories — such as Cerberus's injection of $5 billion
in cash into Chrysler pursuant to Steps 41, 42, and 43 of the Step Plan.

The Complaint thus fails to adequately allege the elements of a fraudulent transfer
because it applies the wrong legal standard and fails to address the relevant transaction. Even if
proved, the Committee's allegations about the lack of "reasonably equivalent value" for certain
specific transfers, "immediately following" which Chrysler was purportedly insolvent, would not
support a claim for fraudulent transfer.

These defects could not be cured by an amendment to the Complaint. Any allegation that
the entire Cerberus Transaction was a fraudulent transfer would be subject to dismissal for
failure to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937
1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). As shown by
the allegations of the Complaint and documents referenced in the Complaint, Cerberus invested
$7 billion to acquire a controlling interest in Chrysler and FinCo in the Cerberus Transaction, an
action that is inexplicable if Chrysler, the operating company, had been insolvent or had been
looted of its assets. Although the Complaint alleges that Cerberus and others viewed FinCo as
more valuable than Chrysler, it also alleges that FinCo's value depended upon the performance
of Chrysler (a reasonable assumption, since FinCo's business was the financing of wholesale and
retail purchases and leasing of vehicles that Chrysler manufactured). No investor would spend
$7 billion to acquire a controlling position in an insolvent company, or even a controlling
position in a finance company whose value depended upon the performance of the insolvent
company. Nor is it plausible that a group of sophisticated commercial and investment banks
would have loaned $10 billion to Chrysler if Chrysler had been insolvent. Any assertion that
Chrysler was rendered insolvent by, or did not receive reasonably equivalent value in, the
Cerberus Transaction would be implausible given this contemporaneous market information

based on the actions of market participants – which is the "best and most unbiased measure of fair market value." *See In re Iridium Operating, L.L.C.*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007).

The Committee's claim for actual fraudulent transfer is even more deficient, as it lacks not only the basic rudiments of plausibility but also the required particularity in pleading a fraud-based claim. The Complaint does not even begin to explain how a transaction that resulted in Chrysler's receiving, among other things, a $5 billion cash contribution could amount to "looting" designed to hinder, delay, or defraud creditors.

The Committee's remaining claims suffer from the same defects, and a few more. The claim against the Daimler Entities for aiding and abetting a breach of fiduciary duty by certain Chrysler directors must be dismissed because it was released pursuant to Settlement Agreement III, which was approved by this Court. It fails on numerous other grounds, including that the Committee has failed to allege adequately a breach of fiduciary duty by the directors. The unjust enrichment claim fails because it is based on the flawed fraudulent transfer claims. The corporate alter ego claim does not come close to meeting the pleading requirements for alter ego liability.

Although the Committee, its counsel, and its consultants conducted pre-suit discovery, reviewed documents, and deposed witnesses upon which it could rely in framing its claims, the Complaint utterly fails in its attempt to recast the restructuring of Chrysler undertaken as part of the Cerberus Transaction as a plot by Daimler to enrich itself at the expense of Chrysler and its creditors. As even the facts alleged in the Complaint demonstrate, the Cerberus Transaction does not remotely resemble a fraudulent transfer case in which a parent loots the assets of a subsidiary leaving behind a mere insolvent shell for its creditors. To the contrary, Chrysler emerged from the restructuring as a well-capitalized entity that was positioned to succeed (and that in the months after closing performed ahead of plan and was able to repay $3 billion of the $10 billion bank loan). Unfortunately, Chrysler's path to success was unexpectedly blocked by the global economic crisis and other unforeseen factors in 2008. Even the Committee does not assert that

the Cerberus Transaction caused the bankruptcy, or that Daimler could or should be held responsible for it.

The Complaint should be seen for what it is: a misguided attempt by a desperate creditors' committee to extract a settlement from a perceived deep pocket. The Committee has been given every opportunity to attempt to state a claim against Daimler, but its efforts cannot withstand the legal scrutiny required on a motion to dismiss. The law compels dismissal of the Complaint with prejudice.

## STATEMENT OF FACTS

Defendant Daimler AG is a stock corporation organized under the laws of the Federal Republic of Germany. Complaint ¶ 11 (paragraphs of the Complaint are cited herein in the form "¶ _"). Defendant Daimler North America Corporation (f/k/a DaimlerChrysler North America Holding Corporation) ("DCNAH") was and is a direct wholly owned subsidiary of Daimler AG, and defendant Daimler Investments US Corporation (f/k/a DaimlerChrysler Holding Corporation) ("DC Holding") was and is an indirect wholly owned subsidiary of Daimler AG. ¶¶ 12, 13.

### A.     The Decision to Restructure and "Sell" Chrysler

In 1998, Daimler AG acquired 100 percent of the equity of the debtor's predecessor-in-interest, Chrysler Corporation, and renamed it DaimlerChrysler Corporation (referred to herein as "Chrysler" or "CarCo"). ¶ 20. The Complaint alleges that in or around late 2006, Daimler decided to "sell" Chrysler and engaged JPMorgan Chase ("JPMorgan") and Ernst & Young LLP ("E&Y") "to restructure and sell" Chrysler. ¶¶ 27, 30. According to the Complaint, one of the principal reasons for this decision was a concern that Chrysler would be unable to satisfy its other post-employment benefit ("OPEB") obligations of approximately $17.5 billion and that Daimler might be held responsible for them (although the Complaint alleges no factual or legal basis for this conclusion). ¶ 27. Daimler also was allegedly concerned about its potential liability for Chrysler's pension obligations, restructuring costs and operating losses, and its

liability as a guarantor of certain of Chrysler's third-party obligations. *Id.*

Chrysler's most valuable business was its financial services arm, which was made up primarily of DaimlerChrysler Financial Services Americas LLC ("DCFSA") and DaimlerChrysler Financial Services Canada Inc. ("DCFSCI") (collectively, "FinCo" and together with Chrysler, the "Chrysler Group"), which were subsidiaries of Chrysler. ¶ 28. The market attributed a substantial positive implied equity value of $6 to $8 billion to FinCo, but only if it became a stand-alone entity. ¶ 29. Because FinCo's business was the financing of retail purchases and leases of Chrysler vehicles and floor-plan financing for Chrysler dealers, FinCo's value was compromised by Chrysler's poor performance and "over-leverage." ¶ 28. FinCo's value was also subject to the claims of Chrysler's creditors because FinCo was a subsidiary of Chrysler. *Id.* Therefore, Daimler determined that its prospects for selling Chrysler, including FinCo, would be substantially enhanced if it were to separate FinCo from Chrysler, so that they could be sold as sister companies rather than parent and subsidiary. *Id.*

Daimler's communications with bidders confirmed that the separation "would greatly enhance the value of the overall package." *Id.* The bids received reflected an implied negative equity value for Chrysler's vehicle business (referred to in the Complaint as "Automotive") of approximately negative $3 billion to negative $8 billion taking into account pre-tax OPEB liabilities, and a positive equity value for FinCo ranging from approximately $4 billion to $7 billion. ¶ 53. The Complaint alleges that valuations done by Daimler's advisors confirmed these amounts, reflecting a selected equity valuation range for Automotive of negative $3.5 billion to $5.5 billion. ¶ 54. These valuations were done before the deal with Cerberus and for that reason obviously did not take into account the $5 billion in cash and other elements of value that Chrysler received in the Cerberus Transaction.

E&Y advised Daimler on "how to structure a comprehensive internal reorganization to separate Daimler's and Chrysler's operations and spinoff FinCo from the Debtor [Chrysler] in preparation for the sale of Automotive and FinCo." ¶ 30. E&Y proposed a 48-step corporate restructuring plan in the NAFTA region (the "Step Plan"), which set forth steps to be taken to

accomplish this internal reorganization, as well as a "ROW Step Plan," for a restructuring in the rest of the world. *Id.*

B.     **The Contribution Agreement with Cerberus**

On May 14, 2007, DaimlerChrysler North America Finance Corporation ("DCNAF") and DC Holding (together, the "DC Contributors") executed a Contribution Agreement (the "Contribution Agreement," Goudiss Decl. Ex. 1) with CG Investor, LLC, an affiliate of Cerberus Capital Management, L.P. (hereinafter, "Cerberus"). Daimler executed the Contribution Agreement as well, but only as guarantor of the performance of the DC Contributors. Contribution Agreement, Preamble and § 11.10. Pursuant to the Contribution Agreement, Cerberus, through equity capital contributions to be made at closing, would acquire 80.1 percent of the equity of the Chrysler Group and Daimler's equity interest would be diluted down to 19.9 percent. ¶¶ 47, 56. Thus, Daimler did not "sell" Chrysler or FinCo but instead allowed the dilution of its equity interest by means of equity capital contributions made by a new investor. In addition to remaining a substantial investor in Chrysler, Daimler also negotiated with Cerberus detailed provisions for a "Contingent Value Right" to provide Daimler with a portion of the upside if Cerberus disposed of all or part of its investment in the Chrysler Group within two years of the closing of the Contribution Agreement (the "Closing"). Contribution Agreement § 5.12.

The corporate reorganization embodied in the Step Plan was not separate from the Cerberus Transaction, but instead was an integral part of it. The implementation of the Step Plan was agreed to in, and required by, the Contribution Agreement. That agreement stated:

> Restructuring Transactions. (a) The DC Contributors shall, and shall cause the Company and the respective Company Subsidiaries to, take the actions described in Schedule 5.05(a) (the "Pre-Closing Restructuring Transactions") prior to the Closing. The Pre-Closing Restructuring Transactions shall be implemented substantially in the manner specified on such Schedule or otherwise in a manner reasonably satisfactory to the Investor [Cerberus]. The DC Contributors shall regularly consult with the Investor regarding the manner and status of the implementation of the Pre-Closing Restructuring Transactions and shall provide the Investor with copies of all material agreements or other documents executed

7

in connection with such transactions.

Contribution Agreement § 5.05(a).  The Step Plan was included in the "Pre-Closing Restructuring Transactions" described in Schedule 5.05(a), and Section 5.05 of the Contribution Agreement thus required the implementation of the Step Plan.  The consummation of the Pre-Closing Restructuring Transactions (including the Step Plan) was furthermore a condition to Cerberus's obligation to make its equity contribution and close the Contribution Agreement:

> The obligations of the Investor [Cerberus] to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or written waiver, at or prior to the Closing, of each of the following conditions . . . .
>
> Pre-Closing Restructuring.  The Pre-Closing Restructuring Transactions shall have been consummated in all material respects.

Contribution Agreement §§ 8.02, 8.02(e).  As discussed below, the Pre-Closing Restructuring was also a condition to the new bank financing for Chrysler.  *See* § F.4, *infra*.

The Step Plan was an integrated series of steps that were generally required to be implemented in a particular order.  As noted by E&Y in the Step Plan:

> Important: The macro step plan reflects the proposed execution order of the identified steps (unless otherwise designated).  Any necessary work required to execute these steps should commence immediately and proceed in an expeditious manner so that the full execution of the steps in the order and timeframe identified will not be delayed.

Contribution Agreement, Schedule 5.05(a) at Annex 1.

## C.     <u>The Transfer of Motors to Chrysler, the Separation of FinCo, and the Creation of Holding</u>

As alleged in the Complaint, it was believed that the value of FinCo would be enhanced if it became a stand-alone company rather than a subsidiary of Chrysler.  Accordingly, the Step Plan agreed to in the Contribution Agreement included certain steps by which Chrysler would undergo a corporate reorganization, with the result that Chrysler and FinCo would no longer be parent and subsidiary but instead "sister" companies owned by a newly created holding company in which Daimler and Cerberus would have their equity interests.

Prior to the Pre-Closing Restructuring, Chrysler was a subsidiary of DaimlerChrysler

Motors Corporation ("Motors," and with Chrysler, "Automotive"), and Motors was a subsidiary of DCNAH. ¶ 21. Motors had been created as a separate legal entity in order to optimize the company's state income tax filing position. *Id*. Chrysler manufactured Chrysler vehicles, and Motors earned revenues from the sale of Chrysler products, while its cost for the products was determined by transfer pricing rules that virtually guaranteed Motors a stable profit for tax purposes and created offsetting reductions in Chrysler's income. ¶¶ 21, 23. Motors and Chrysler functioned as if they were divisions of the same company, with Chrysler performing all administrative functions for Motors. ¶ 22.

Through a series of steps in the Step Plan, Motors became a subsidiary of Chrysler, and Chrysler and FinCo became subsidiaries of a newly created holding company to be owned by Daimler and Cerberus. Specifically, in Step 5 of the Step Plan, Daimler caused Motors to contribute its equity interest in Chrysler to DC Holding, in exchange for which Motors received an additional equity interest in DC Holding. ¶ 31. In Step 7, Motors distributed its equity interest in DC Holding to DCNAH. ¶ 32. In Step 11, DC Holding created a special purpose company wholly owned by Daimler AG (through DC Holding) called DaimlerChrysler Holding LLC ("Holding") in order to provide a vehicle through which Daimler AG could "sell" its controlling interest in Chrysler and FinCo. ¶ 33. DC Holding contributed its equity interest in Chrysler to Holding. *Id*. In Step 13, DCNAH contributed its equity interest in Motors and Utility Assets LLC ("Utility") to DC Holding, and in Step 14, DC Holding contributed its equity interest in Motors and Utility to Holding. ¶¶ 34, 35.

On May 11, 2007 (the last business day before the execution of the Contribution Agreement in the pre-dawn hours of Monday, May 14), Chrysler's board of directors approved the sale of the equity interests of DCFSA and DCFSCI (which made up most of FinCo's value) and Mercedes-Benz Canada Inc. ("MB Canada") to Holding, pursuant to Step 15 of the Step Plan. In exchange, Chrysler received the equity interests in Motors and Utility and a promissory note in the amount of $1.225 billion issued by DCFSA to Chrysler (the "Note"). ¶ 36.

These elements of the Step Plan were part of the Pre-Closing Restructuring set forth in

Schedule 5.05(a) of the Contribution Agreement and were also expressly referenced in the text of the Contribution Agreement.  As stated in the preamble to the agreement:

> WHEREAS, DaimlerChrysler Company LLC ("DCC" [Chrysler]) and DaimlerChrysler Financial Services Americas LLC ("FinCo") are directly or through their respective Subsidiaries (as hereafter defined) engaged in the business of developing, manufacturing, distributing and selling a wide range of automotive products, mainly full-size, mid-size and compact cars, minivans, SUVs, parts and accessories, and of providing customized financing, leasing, insurance and fleet-management services for retail and commercial customers, at various locations in the United States and around the world (such business, after giving effect to the Pre-Closing Restructuring Transactions and the Post-Closing Restructuring Transactions (both as hereafter defined), the "Company Business");

> WHEREAS, after giving effect to the Pre-Closing Restructuring Transactions and immediately prior to the Closing (both as hereafter defined), DC Holding will be the record and beneficial owner of all of the then outstanding limited liability company interests (the "Company Equity Interests") of DaimlerChrysler Holding LLC, a Delaware limited liability company (the "Company" [Holding]); and

> WHEREAS, after giving effect to the Pre-Closing Restructuring Transactions and immediately prior to the Closing, the Company [Holding] will directly or through a Subsidiary own all the Equity Interests (as hereafter defined) in each of DCC [Chrysler] and FinCo . . . .

Contribution Agreement, Preamble.

Daimler had previously retained Houlihan Lokey Howard & Zukin Financial Advisers, Inc. ("Houlihan Lokey") to opine on the relative value of the assets exchanged pursuant to Step 15.  ¶ 48.  Houlihan Lokey valued DCFSA at $7.3 billion, DCFSCI at $500 million, and MB Canada at $150 million, for a total value of $7.95 billion for FinCo.  ¶ 49.  Houlihan Lokey valued Motors at $5.5 billion and Utility as having no value.  ¶ 50.  The Complaint alleges that this valuation of Motors was "fundamentally flawed."  ¶ 51.  The only reason alleged for this in the Complaint is that Houlihan assumed that the sales and distribution agreement between Motors and Chrysler would continue even though it was terminable at will by Chrysler.  *Id*.  The Complaint does not allege any reason why Chrysler would elect to terminate this agreement, and it does not explain how this assumption rendered the valuation flawed.

**D.    Other Steps in the Step Plan**

The Complaint describes certain of the other steps in the Step Plan and the ROW Step Plan to separate the Chrysler and Daimler businesses and to separate FinCo from Chrysler for purposes of accomplishing the "sale" of Daimler's equity interest in Chrysler. ¶¶ 37-43. These steps also were part of the Pre-Closing Restructuring required to be implemented pursuant to the Contribution Agreement and were conditions precedent to Cerberus's obligation to close. Contribution Agreement §§ 5.05, 8.02(e); Schedule 5.05(a).

**E.    The Complaint's Allegations Regarding "Reasonably Equivalent Value"**

The Complaint alleges that as a result of the foregoing and other transactions, Chrysler transferred assets to Daimler, DCNAH, DC Holding, or Holding with a fair market value of approximately $9 billion. ¶ 44. In exchange, the Complaint alleges, Chrysler received the $1.225 billion Note and equity in Motors and Utility "that were nearly worthless," for the reason described above. *Id.* The Complaint does not take into account in its calculation of "reasonably equivalent value" the many other elements of value received by Chrysler in the Cerberus Transaction, including the forgiveness and repayment of intercompany debt and the $5 billion in cash and $12 billion in financing it received at Closing (as discussed below). These elements of value received by Chrysler as an integral part of the Cerberus Transaction also included Daimler's undertaking to transfer from Daimler's overseas sales network to Chrysler a large inventory of Chrysler vehicles;[1] various tax indemnities provided by Daimler (including an indemnity regarding Canadian transfer pricing issues);[2] and numerous joint development, intellectual property, information technology, supply and transition agreements by which

---

[1] *See* Contribution Agreement, Exhibit L (Term Sheet for International Distribution Agreement) at 2 ("Assets and liabilities to be transferred to NSCs [National Sales Companies to be established by Chrysler]") (Goudiss Decl. Ex. 1-L).

[2] Contribution Agreement § 7.01. Daimler also agreed that Chrysler would receive a $500 million tax refund that otherwise would have been paid to Daimler. Contribution Agreement § 7.02(a); Final Closing Agreement on Final Determinations Covering Specific Matters, among Chrysler, Holding, DCNAH and the Commissioner of Internal Revenue, at 4, ¶ 5(i) (Goudiss Decl. Ex. 2).

Daimler agreed to cooperate with Chrysler in various projects, manufacture key auto components for Chrysler, and allow Chrysler to use Daimler engineering know-how and other intellectual property.[3]

**F.      Repayment or Forgiveness of Intercompany Debt and Third-Party Debt Guaranteed by Daimler**

1.      Intercompany Debt

The Complaint alleges that Chrysler repaid and/or forgave certain intercompany debts of Daimler, and Daimler repaid and/or forgave certain intercompany debts of Chrysler.  ¶ 59. These actions were expressly provided for in the Contribution Agreement.  Section 5.16 of the Contribution Agreement required these repayments and forgiveness of debt by, and in favor of, Chrysler prior to or at Closing:

> At or prior to the Closing, the DC Contributors shall cause the Company and the Company Subsidiaries and, as applicable, the Affiliates of the DC Contributors, to take the actions set forth on Schedule 5.16(a).  Effective immediately after the Closing, DCC [Chrysler] and its Subsidiaries shall, as a result of the foregoing actions and such further actions as may be required on the part of the Guarantor [Daimler], not owe any Funded Indebtedness to the Guarantor or any of its Affiliates.

Contribution Agreement § 5.16, Schedule 5.16(a).  Compliance with this covenant was a condition to Cerberus's obligation to close and to make the equity contributions required of it under the Contribution Agreement.  Contribution Agreement § 8.02(a).

This repayment and forgiveness of intercompany debt was a large net positive for

---

[3]  *See, e.g.*, "Ancillary Agreements" required to be delivered at Closing (Contribution Agreement §§ 2.04(b)(ii) and 2.05(b)(i)) and terms sheets for which were attached to the Contribution Agreement, including Cooperation Agreement for Project "Adaptation Work for Diesel Engines/Control Systems" Term Sheet (Contribution Agreement, Exhibit B), Cooperation Agreement for Project "Common Axle" Term Sheet (Ex. C), Cooperation Agreement for Project "Common Unibody SUV" Term Sheet (Ex. D), Cooperation Agreement for Project "Common V6" Term Sheet (Ex. E), Cooperation Agreement for Project "Fuel Cell Vehicle" Term Sheet (Ex. F), Fuel Cell Research & Development Agreement Term Sheet (Ex. J), Future Business Model in China and South Korea Term Sheet (Ex. K), International Distribution Cooperation Agreement Term Sheet (Ex. L), Information Technology Management Cooperation Agreement Term Sheet (Ex. N), Master Engineering, Research and Development Agreement Term Sheet (Ex. P), Procurement and Supply Cooperation Agreement Term Sheet (Ex. R), and Form of Technology Sharing Agreement (Ex. U), Form of Trademark Agreement (Ex. V).  Goudiss Decl. Exs. 1-B through 1-V.

Chrysler.[4]  The Complaint alleges that "[m]uch of the purported intercompany debt repaid or forgiven by Daimler is more properly characterized as equity," but the only basis asserted for this conclusion is that the loans to Chrysler reflected amounts advanced by Daimler at unspecified "times when the Debtor was insolvent or near insolvent and in circumstances where no-third party would have extended financing to the Debtor on an unsecured basis."  ¶ 59.  The Complaint does not attempt to reconcile its suggestion that Chrysler was not creditworthy with the fact that the third-party banks loaned $10 billion to Chrysler at Closing.

        2.      Payment of Third-Party Debt Guaranteed by Daimler

The Complaint alleges that Daimler caused Chrysler to repay approximately $1.825 billion of Chrysler's third-party debt, which was guaranteed by Daimler.  ¶ 60.  This publicly traded debt had been incurred prior to Daimler's acquisition of Chrysler and was guaranteed by Daimler only after the acquisition.  These repayments were expressly required by the Contribution Agreement and were a condition to Cerberus's obligation to close.  Contribution Agreement §§ 5.15, 8.02(a)(ii).  The Contribution Agreement set forth specific steps that the DC Contributors were required to take to ensure that this third-party debt was repaid, including, among others, the following:

> Treatment of DCC Debt.  (a)  The DC Contributors shall cause DCC [Chrysler] to
> (i) as promptly as possible (but in any event within 10 Business Days) following
> the date of this Agreement, issue a notice (the "Redemption Notice") of optional
> redemption (the "Redemption") for all of the 7.45% Debentures due 2027 (the
> "2027 Debentures"), the 7.45% Debentures due 2097 (the "7.45% 2097
> Debentures") and the 7.40% Debentures due 2097 (the "7.40% 2097 Debentures"
> and, together with the 2027 Debentures and the 7.45% 2097 Debentures, the
> "Debentures") issued pursuant to an indenture, dated as of March 1, 1985 (as
> amended and supplemented, the "Debenture Indenture"), among DCC, the

---

[4]  DCNAF repaid Chrysler approximately $920 million, and Chrysler forgave debt owed by Daimler in the amount of approximately $2.189 billion (Contribution Agreement § 5.16(a), Schedules 1.01(c), 5.16(a)(i); Goudiss Decl. ¶ 4, Ex. 3); and approximately $4.875 billion in debt owed by Chrysler to Daimler was forgiven (Contribution Agreement § 5.16(a), Schedule 5.16(a)(ii), (iii); Goudiss Decl. Ex. 3).  In sum, the intercompany debt forgiveness and repayment was positive for Chrysler in the net amount of approximately $3.7 billion.  Separately, Daimler loaned Chrysler $1.946 billion during the period between the execution of the Contribution Agreement and Closing, which Chrysler repaid at Closing.  Contribution Agreement §§ 5.19(b)(i), (ii) and 2.03(b)(ix).

Guarantor, as guarantor, and U.S. Bank N.A., as successor trustee (the "Trustee"), pursuant to the requisite provisions of the Debenture Indenture and the terms of each of the Debentures, (ii) on or prior to the date set for Redemption in the Redemption Notice, irrevocably deposit with the Trustee funds sufficient to pay the redemption price for each Debenture, as described in the Notice of Redemption (the "Redemption Payment") . . . .

Contribution Agreement § 5.15(a).

### 3. Phase-Out of Credit Support Instruments

The Complaint alleges that Daimler caused Chrysler to arrange for the phase-out or transfer of various Daimler performance guarantees, indemnities, letters of credit, and other contingent liabilities ("Credit Support Instruments") totaling at least $1.5 billion. ¶ 60. These actions were also required by the Contribution Agreement. In that agreement, Cerberus agreed to use commercially reasonable efforts to cause certain specified Credit Support Instruments provided by the DC Contributors or their Affiliates to be released, terminated, or returned (although, in the event, Daimler remained liable on a number of Credit Support Instruments following the closing of the Cerberus Transaction). Contribution Agreement §§ 5.08(a) and (b), Schedule 5.08(a). Compliance with this covenant by Cerberus was a condition to the DC Contributors' obligation to close. Contribution Agreement § 8.01(f). The Contribution Agreement also required the DC Contributors to use commercially reasonable efforts to cause Credit Support Instruments made by Chrysler in support of Affiliates of the DC Contributors to be released, terminated or returned. Contribution Agreement § 5.08(c). Compliance with this covenant was a condition to Cerberus's obligation to close. Contribution Agreement § 8.02(a).

### 4. New Financing Arranged by Cerberus

As contemplated by the Contribution Agreement, Cerberus made new debt financing arrangements for Chrysler going forward, and the removal of the existing funded indebtedness of Chrysler was necessary to accomplish this. Cerberus represented in the Contribution Agreement that it had obtained commitments for $12 billion in new debt financing for Chrysler and provided to the DC Contributors a copy of the commitment letter. Contribution Agreement § 4.05(b); Entity Debt Commitment Letter dated May 14, 2007 (Goudiss Decl. Ex. 4). The lenders were a

group of large and sophisticated commercial and investment banks including JPMorgan, Citibank, Goldman Sachs, and Morgan Stanley (collectively, the "Banks"). *Id*. As stated in the commitment letter, the financing provided thereby would "refinance existing indebtedness" of Chrysler. *Id*. The receipt of the new debt financing was a condition to Cerberus's obligation to close. Contribution Agreement § 8.02(g).

As it was intended to refinance Chrysler's existing indebtedness, the commitment letter expressly required, as a condition to the Banks' obligation to provide the financing, that Chrysler's existing funded debt be repaid:

> The availability of the Senior OpCo Facilities . . . shall be subject to the satisfaction of the following conditions . . . .
>
> Substantially all of the existing funded indebtedness of the OpCo Borrower [Chrysler] and its subsidiaries shall have been repaid on contractual terms other than up to $350 million in capital leases and other amounts, debt related to Auburn Hills and debt owing to the FinCo Borrower, each as may be agreed to by the Bookrunners . . . .

Entity Debt Commitment Letter at 5 ("Conditions"), and Exhibit B thereto at (b). An additional condition to the lenders' obligation to fund was that the Contribution Agreement be performed in accordance with its terms. *Id.* Other conditions for providing the financing included solvency representations and delivery of a solvency certificate by a qualified officer of Chrysler. *Id*., Exhibit A at 6, Exhibit B at (a) and (g).

## G.     The Closing of the Contribution Agreement

The Complaint alleges that on or around August 3, 2007, Daimler closed what the Committee refers to as the "sale" of Daimler's 80.1 percent interest in Holding pursuant to the Contribution Agreement for more than $7 billion. ¶ 57. Of that amount, $1.212 billion was distributed by Holding to DC Holding as "reimburse[ment] . . . for preformation expenses as described in Section 1.707-4(d) of the [Treasury] Regulations [promulgated under the Internal Revenue Code]" incurred in connection with the Cerberus Transaction. ¶ 58; Contribution Agreement § 2.02. As to the balance, $3.45 billion was contributed to Chrysler as equity, and $2.275 billion was contributed to FinCo as equity. ¶ 58. FinCo used $1.243 billion of this

contribution to pay the principal and interest on the Note it had previously issued to Chrysler. *Id.*
Thus, pursuant to the Contribution Agreement, Chrysler received approximately $5 billion in cash at the closing of the Cerberus Transaction.

These equity contributions were expressly provided for in the Step Plan:

• Step 41 provided that "Investor contributes to DaimlerChrysler Holding LLC approximately [$7.2B] in exchange for an 80.1% common interest." Contribution Agreement, Schedule 5.05(a), Step 41.

• Step 42 provided that "DaimlerChrysler Holding LLC contributes [$2.275B] to DCFS, and [$3.775] to DCC LLC [Chrysler] using the cash contributed by Investor to fund these contributions." Contribution Agreement, Schedule 5.05(a), Step 42.

• Step 43 provided that "Of the [$2.275B] contribution from DaimlerChrysler Holding LLC, DCFS uses [$1.225B] to satisfy its intercompany debt to DCC LLC." Contribution Agreement, Schedule 5.05(a), Step 43.

The equity contributions were also required by specific provisions of the Contribution Agreement. Contribution Agreement §§ 2.01, 2.03(b).[5]

The recapitalization of Chrysler effected pursuant to the Contribution Agreement, including the $5 billion cash injection, was taken into account in determining the solvency of Chrysler as of the closing of the Cerberus Transaction. Among the conditions to Cerberus's obligation to close the Contribution Agreement was the delivery at the closing of:

a certificate of an appropriate officer of DCC [Chrysler] certifying as to the solvency of DCC, *after giving effect to the recapitalization of DCC effected in connection with the Closing.*

Contribution Agreement §§ 2.04(b)(v), 8.02(a)(ii) (emphasis added). A solvency certificate was executed by Ronald Kolka, Chrysler's Vice President – Finance and Controlling as of August 3, 2007 and delivered at Closing. The certificate stated that "on August 3, 2007, after giving effect

---

[5]  With regard to Step 42, the text of the Contribution Agreement provides for a capital contribution by Holding to Chrysler of $3.45 billion rather than the $3.775 billion stated in Schedule 5.05(a), Step 42. The $325 million difference between the two amounts reflects the price paid to Chrysler for the Auburn Hills building by Auburn Hills LLC, an indirect subsidiary of Holding. *See* Contribution Agreement §§ 2.03(b)(ii) and (iii); ¶ 61.

to the recapitalization of the Company [Chrysler] in connection with the Closing (as defined in the Contribution Agreement):

1.      The amount of the 'present fair saleable value' of the assets of the Company [Chrysler] and its Subsidiaries, taken as a whole (the 'Group'), will, as of the date hereof, exceed the amount of 'all liabilities of the Group, contingent or otherwise', as of the date hereof, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors;

2.      the present fair saleable value of the assets of the Group will, as of the date hereof, be greater than the amount that will be required to pay the liability of the Company on its debts as such debts become absolute and matured;

3.      the Group does not have, as of the date hereof, an unreasonably small amount of capital with which to conduct its business; and

4.      the Group will be able to pay its debts as they mature."

Solvency Certificate (Goudiss Decl. Ex. 5).

At the Closing and as part of its recapitalization, Chrysler received a $10 billion loan pursuant to the Entity Debt Commitment Letter, which was fully funded at Closing.  *See* Affidavit of Ronald E. Kolka in Support For First Day Pleadings ("Kolka Aff.") ¶¶ 26, 27, filed April 30, 2009 in *In re Old CarCo LLC (f/k/a Chrysler LLC), et al*., Case No. 09-50002 ("*Old CarCo*"), D.I. 23.  In addition, a Daimler affiliate provided Chrysler with a loan facility of $1.5 billion and Cerberus provided Chrysler with a $0.5 billion loan facility.  Kolka Aff.  ¶¶ 29-31.

## ARGUMENT

### STANDARD OF REVIEW FOR A RULE 12(B)(6) MOTION TO DISMISS

On a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6), made applicable by Fed. R. Bankr. P. 7012(b)(6), the Committee must allege facts that, if "accepted as true [] 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible only if the alleged facts "allow[] the court to draw the *reasonable inference*" that the misconduct alleged did in fact occur.  *Iqbal*, 129 S. Ct. at 1949 (emphasis added).

Conclusory allegations and legal conclusions are not presumed to be true. *Id.* Nor are "formulaic" or "threadbare" recitations of the elements of a claim. *Twombly*, 550 U.S. at 555.

In addition to well-pleaded factual allegations, the Court also may consider the following in assessing the sufficiency of the Committee's claims: (i) documents incorporated by reference in the Complaint, (ii) documents on which the Committee relied in drafting the Complaint, (iii) facts of which judicial notice may be taken, and (iv) matters of public record, such as filings with a court or government agency. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991); *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328 (S.D.N.Y. 2009) (stating that the court may consider "documents 'integral' to and relied upon in the complaint, even if not attached or incorporated by reference"); *In re Saba Enters.*, 421 B.R. 626, 638 (Bankr. S.D.N.Y. 2009). If allegations in the complaint are contradicted by documents made part thereof or referred to therein, the documents control. *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

Claims that sound in fraud, such as the Committee's intentional fraudulent transfer claims, must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. P. 7009. *In re Allou Distribs.*, 379 B.R. 5, 36 (Bankr. E.D.N.Y. 2007); *see also In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir. 2005). To meet this standard, "a complaint must allege with some specificity the acts constituting fraud . . . conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Silverman v. Actrade Capital Inc.*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) (quoting *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.*, 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000)). Rule 9(b) also requires a complaint to include well-pleaded facts that give rise to a "strong inference" of fraudulent intent that is "at least as compelling as any opposing inference." *See In re Musicland Holding Corp.*, 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008) (applying standard stated in *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007), to intentional fraudulent transfer claim) (internal quotation marks and citations omitted).

## I. THE COMPLAINT FAILS TO STATE A CLAIM FOR CONSTRUCTIVE FRAUDULENT TRANSFER (COUNTS I-IV)

The Complaint alleges that certain specific Transfers[6] made pursuant to the Step Plan were constructively fraudulent transfers under Sections 544, 548 and 550 of the Bankruptcy Code and Sections 273, 274 and 275 of New York Debtor and Creditor Law ("NYDCL"). ¶¶ 64-79. It also alleges that Chrysler's repayment of certain third-party obligations was constructively fraudulent. ¶¶ 80-85. A transfer is constructively fraudulent only if the transferor was insolvent at the time of, or was rendered insolvent by, the transfer and if reasonably equivalent value (or "fair consideration") was not received in exchange for the transfer. 11 U.S.C. § 548(a)(1)(B); N.Y. Debt. & Cred. Law § 273. For the reasons discussed below, the Complaint fails to allege either element adequately.

### A. The Allegations of Insolvency in the Complaint Are Insufficient Because They Focus on Particular Elements of the Cerberus Transaction Rather Than the Transaction As a Whole

The Complaint alleges that Chrysler did not receive reasonably equivalent value in certain specific Transfers and that Chrysler was insolvent "immediately following" each such Transfer. ¶¶ 67, 72, 83. These allegations of insolvency are insufficient because they focus on particular elements of the Cerberus Transaction rather than on the transaction as a whole. The Transfers were not independent, unrelated transactions, but instead were part of a comprehensive, integrated plan set forth in the Contribution Agreement and implemented to facilitate Cerberus's investment in Chrysler. It is well-established that when a disputed transfer "is only a step in a general plan," the transfer must be viewed in the context of the plan "as a

---

[6] The Complaint defines "Transfers" as the transfer of FinCo; MB Canada; Newco Truck ULC; Newco Services ULC; 10,000 shares of Chrysler Foreign Sales Corporation; Chrysler do Brazil Ltda.; partial ownership of EvoBus Austria GmbH; the Mercedes Benz, Freightliner, and Western Star distribution business owned by Chrysler de Venezuela, LLC; and the Mercedes Benz and Smart Car distribution business owned by DC de Mexico S.A. de C.V., from CarCo to non-CarCo entities. ¶ 65.

whole with all its composite implications." *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (internal citations omitted); *accord In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002); *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995) (stating that courts generally analyze the "structure of the entire transaction and [] whether its components were part of a single scheme"). As the Second Circuit held in *Orr*, "[W]e will not turn a blind eye to the reality that the transfer of the New York Property and the spin-off of KIC shares constituted a single, integrated transaction." 991 F.2d at 35

Here, the Transfers were part of the integrated Cerberus Transaction. All of the Transfers were required by the Contribution Agreement and were a condition to Cerberus's performance under the Contribution Agreement, including its obligations to make the cash contributions to Chrysler via Holding. *See* §§ B, C, D, F, *supra*. The Transfers were done in order to separate Chrysler's businesses from Daimler's and to enhance FinCo's ability to obtain financing by making it a stand-alone entity. These actions were taken in anticipation of, and in order to facilitate, third-party investment in Chrysler. Likewise, the repayment and forgiveness of intercompany debt and debt guaranteed by Daimler were required by the Contribution Agreement and were conditions to Cerberus's investment in Chrysler. All of these steps were conditions to the Banks' obligation to provide $10 billion in financing for Chrysler pursuant to the Entity Debt Commitment and to the obligations of Cerberus and Daimler's affiliate to provide $2 billion in financing. *See* § F.4, *supra*.

Under the law, it is erroneous to consider particular elements of the Cerberus Transaction in isolation for purposes of fraudulent transfer analysis. When "[n]o single transfer would take place without the expectation that the entire transaction will be consummated" and "all parties to each subsidiary transfer were aware of" the larger transaction, it is appropriate to "collapse" the steps into a single plan for purposes of determining whether a particular set of transactions rendered a debtor insolvent. *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) (evaluating fraudulent transfer allegations in the context of a leveraged buyout). "Collapsing" is also appropriate in determining whether

reasonably equivalent value was received. *Orr*, 991 F.2d at 35-36; *In re All Am. Bottled Water Corp.*, No. 06-43133, 2009 WL 722994, at *4-9 (Bankr. W.D. Wa. Mar. 17, 2009) (holding that when the collapsing doctrine is applied and the transaction is considered as a whole, the debtor received reasonably equivalent value for the transfer); *In re Nat'l Forge Co.*, 344 B.R. 340, 348 (W.D. Pa. 2006) (stating that collapsing is often invoked to determine whether the debtor, "in the aggregate, receive[d] fair consideration or reasonably equivalent value for the transfer in question").

Some courts have applied various tests to determine whether a series of transfers should be collapsed for fraudulent transfer analysis. At least two of those tests — the "end result" and "interdependence" tests — are plainly met here based on the allegations of the Complaint and the provisions of the Contribution Agreement. *In re Foxmeyer Corp.*, 286 B.R. 546, 573–74 (Bankr. D. Del. 2002). The Transfers were undertaken to reach a particular end result (to facilitate the Cerberus investment and related financing), and they were interdependent in that it was unlikely that any one step would have been undertaken except in contemplation of the other steps. The "binding commitment" test is essentially met as well, since the steps were done pursuant to the terms of the Contribution Agreement, and most were implemented only after the Contribution Agreement had been executed. *See* Schedule 5.05(a).

Accordingly, in evaluating the effect of any of the Transfers on solvency and reasonably equivalent value, a court must consider all of the steps in the Step Plan, the provisions of the Contribution Agreement, and the instruments and agreements executed pursuant to the Contribution Agreement. These include the equity contribution of Cerberus, the forgiveness and repayment of debt by Daimler in favor of Chrysler, the $10 billion loan facility provided by the Banks, and the $1.5 billion and $0.5 billion loan facilities made available by affiliates of Daimler and Cerberus. They also include tax indemnities and the right to a large tax refund to which Daimler was entitled being transferred to Chrysler, the transfer by Daimler of a large inventory of Chrysler vehicles to Chrysler, and the sharing of valuable Daimler intellectual property pursuant to a number of joint cooperation and other agreements between Daimler and Chrysler.

*See* § E, *supra*.  Because the Complaint fails to take these elements into account in its fraudulent transfer claims, these claims are inadequately pleaded and should be dismissed.

Even if particular steps in the Cerberus Transaction were analyzed individually, the Complaint's allegations of insolvency would still be inadequate.  At the time of the Transfers, Chrysler could reasonably anticipate receiving the $5 billion cash injection from Cerberus, access to the new debt financing, and other elements of value contemplated by the Contribution Agreement.  *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creds. of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 156 (3d Cir. 1996) (investment from another company should be included in valuing assets and liabilities if "the debtor's belief that a future event would occur was reasonable").  Even before they were actually received at the Closing of the Cerberus Transaction, it was reasonable for Chrysler to expect these inflows pursuant to the Contribution Agreement.  *See id.*

### B. The Complaint Does Not and Could Not Plausibly Allege That Chrysler Was Insolvent As a Result of the Cerberus Transaction

There is a reason why the Committee chose to focus on specific elements of the Cerberus Transaction rather than on the transaction as a whole: if the Committee had taken into account the entire, integrated Cerberus Transaction, it could not plausibly allege that Chrysler was insolvent.

Insolvency is an element of constructive fraudulent transfer claims under both the Bankruptcy Code and the NYDCL.  A transfer can be constructively fraudulent only if one of the following three circumstances is plausibly alleged: (i) if Chrysler was insolvent when the transfer was made or was rendered insolvent by the transfer, (ii) if Chrysler was left with an "unreasonably small capital" after the transfer, or (iii) if, at the time of the transfer, Chrysler intended to incur, or believed it would incur, debts beyond its ability to pay.  11 U.S.C. §§ 548(a)(1)(B)(ii)(I), (II), and (III); N.Y. Debt. & Cred. Law §§ 273, 274, and 275.

Notwithstanding the conclusory allegations contained in the Complaint, the specific facts alleged and the documents relied upon in the Complaint render insufficient and implausible the

Committee's claim that Chrysler was insolvent. Based on the facts alleged, there can be no "reasonable inference," *see Iqbal*, 129 S. Ct. at 1949, that Chrysler was insolvent.

The actions of contemporary market participants described in the Complaint demonstrate the implausibility of the Complaint's claim of insolvency. *See In re Iridium Operating, L.L.C.*, 373 B.R. 283, 293 (Bankr. S.D.N.Y. 2007) ("[T]he public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation.") (citing *VFB L.L.C. v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir.2007)). In *Iridium*, Judge Peck established the primacy of "opinions regarding value of other contemporaneous market participants" in the evaluation of such claims. 373 B.R. at 346.

Cerberus, a sophisticated private equity firm, invested more than $7 billion in cash to acquire an 80.1 percent interest in Holding (which owned Chrysler and FinCo) and agreed that $5 billion of that amount would be cash injected into Chrysler. It is implausible that Cerberus would expend such huge sums for an entity that would be insolvent upon the Closing of the Cerberus Transaction. Although the Complaint suggests that Cerberus believed that FinCo was more valuable than Chrysler, it also alleges that the value of FinCo depended on the performance of Chrysler. ¶ 28. From Cerberus's perspective, it would make no sense to put up $7 billion (and to distribute $5 billion of that to Chrysler), if all Cerberus acquired was an 80.1 percent interest in an insolvent operating company and a finance company whose business depended upon the performance of that same insolvent operating company.

The actions of the Banks also render implausible the Complaint's allegation of insolvency. At the Closing of the Cerberus Transaction, the Banks extended and funded a $10 billion loan facility to Chrysler. See § F.4, G, *supra*. This action is inexplicable if Chrysler were insolvent. An affiliate of Daimler also committed to lend an additional $1.5 billion to Chrysler, and Cerberus committed to lend a further $500 million. It is not plausible that such sophisticated investors and lending institutions would risk billions of dollars of exposure with an insolvent company. *See Iridium*, 373 B.R. at 349 ("Courts examining the question of adequate capital also

place great weight on the ability of the debtor to obtain financing. The fact that [the debtor] closed on three syndicated bank loans and raised over $2 billion in the capital markets between 1996 and 1999 is an indication of both solvency and capital adequacy.") (citations omitted).

Given the actions of these market participants, the estimate of $17.5 billion for Chrysler's pre-tax OPEB liabilities referred to in the Complaint does not indicate insolvency. ¶¶ 88, 94. In addition to not being tax-affected (OPEB payments are tax-deductible), the number was far from certain, since the liability extended far into the future and was subject to numerous fluctuating variables such as rates of mortality, health care inflation, and return on assets. Therefore, "substantial uncertainty surround[s] an assessment or appraisal of the actual costs of this obligation." *Int'l Union, UAW v. Gen. Motors Corp.*, No. 07-CV-14074, 2008 WL 2968408, at *5 (E.D. Mich. July 31, 2008). Furthermore, the OPEB liabilities were subject to negotiation with the UAW, and Cerberus could have reasonably expected to achieve a favorable and workable resolution of this issue; and, indeed, the resolution of the OPEB liabilities (which included the UAW's accepting equity warrants in the restructured Chrysler) is further market information demonstrating Chrysler's solvency. *See* Kolka Aff. ¶¶ 43-45.

### C.     The Transfers and the Repayment of Third-Party Debt Were Made for Reasonably Equivalent Value

The constructive fraudulent transfer claims not only fail because the Committee cannot plausibly allege that Chrysler was insolvent. They also fail because the Committee cannot plausibly allege that Chrysler did not receive a reasonably equivalent value, or fair consideration. 11 U.S.C. § 548(a)(1)(B)(i); N.Y. Debt. & Cred. Law § 273. Nor can the Committee allege the bad faith required under New York law to disqualify the repayment of antecedent debt as fair consideration. *See* N.Y. Debt. & Cred. Law § 272 ("[w]hen in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied"); *In re Sharp Int'l Corp.*, 403 F.3d 43, 53-54 (2d Cir. 2005).

1. **The Complaint's Allegations Regarding Reasonably Equivalent Value Are Inadequate Because They Do Not Take into Account the Cerberus Transaction As a Whole**

The Complaint's allegations concerning lack of reasonably equivalent value are legally insufficient because they do not take into account all the elements of value that Chrysler received in the Cerberus Transaction. *See* ¶ 44. These include the $5 billion cash injection received by Chrysler at Closing and the forgiveness or repayment of debt by Daimler in favor of Chrysler (as well as other elements of value discussed above, *see* § E, *supra*). Because all parts of the Cerberus Transaction must be considered in determining whether reasonably equivalent value was received (*see* § I.A., *supra*), the Complaint's allegations that ignore these elements of value are inadequate.

2. **The Complaint's Attempt To Show Lack of Reasonably Equivalent Value by Claiming That Chrysler's Intercompany Debt Forgiven by Daimler Should Now Be Recharacterized As Equity Is Legally Insufficient**

The Complaint acknowledges that Daimler forgave intercompany debt but attempts to discount the value to Chrysler by claiming that the debt was "more properly characterized as equity." ¶ 59. The factual allegations of the Complaint do not support this conclusory statement.

First, recharacterization is not proper since the debt is not the subject of a claim in the bankruptcy. It is often held that bankruptcy courts may exercise their equitable powers to recharacterize as equity a debt for which a proof of claim has been filed. *See In re Official Comm. of Unsecured Creds. for Dornier Aviation (N. Am.), Inc.*, 453 F.3d 225, 231 (4th Cir. 2006) (recharacterization is appropriate to facilitate the orderly dispensation of an estate's assets.). But where no claim has been filed on the debt in question, recharacterization would not be an appropriate exercise of this Court's equitable powers. *See In re BH S&B Holdings L.L.C.*, 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009) (to assert a claim for recharacterization, a proof of claim for the debt in question must have been filed); *cf. In re Musicland Holding Corp.*, 398 B.R. 761, 775 (Bankr. S.D.N.Y. 2008).

Even if recharacterizing the debt were within the Court's powers, the Committee's factual allegations are insufficient to warrant such relief. To successfully seek

recharacterization, a plaintiff must at least plead facts sufficient to trigger the applicability of the *AutoStyle* factors.[7]  *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 75 n.216 (Bankr. S.D.N.Y. 2007), *aff'd in part*, 390 B.R. 64 (S.D.N.Y. 2008).  The Committee's conclusory allegations fall far short of that requirement.  The Committee merely alleges that the intercompany loans were made "at times when [Chrysler] was insolvent or near insolvent."  ¶ 59.  But the Committee never identifies which loans it is referring to or when the loans were made.  Nor does the Committee allege any facts to support its claims that Chrysler was insolvent at the time of these unspecified loans.  The Committee's bald assertion that "no third-party would have extended financing" to Chrysler is equally devoid of factual support.  ¶ 59.  Even if these facts were adequately alleged, however, the Complaint still would not support a claim for recharacterization, because the mere fact that a parent company makes a loan to a subsidiary that is unable to obtain a third-party loan is insufficient to recharacterize a loan as equity.  *See, e.g.*, *Dornier Aviation*, 453 F.3d at 234.

> **3.    The Complaint's Allegations of a Lack of Reasonably Equivalent Value for the Transfer of FinCo Are Inadequate, Even If That Transfer Could Be Considered in Isolation**

Similarly insufficient is the Committee's unsupported assertion that Chrysler did not receive reasonably equivalent value specifically in exchange for FinCo.  In connection with that specific Transfer, Chrysler received Motors, Utility, and a $1.225 billion note from FinCo (which was paid in cash, with accrued interest, at Closing).  At the time of the transfer of FinCo, Motors was valued at $5.5 billion by Houlihan Lokey.  ¶ 50.  The Complaint alleges that Houlihan Lokey's valuation of Motors was "fundamentally flawed" because Motors' earnings

---

[7]  These factors include (i) the names given to the certificates evidencing the indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of a fixed rate of interest and interest payments; (iv) the source of repayments; (v) the adequacy or inadequacy of capitalization; (vi) identity of interest between creditor and stockholder; (vii) the security, if any, for the advances; (viii) the corporation's ability to obtain financing from outside lending institutions; (ix) the extent to which the advances were subordinated to the claims of outside creditors; (x) the extent to which the advance was used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide repayments.  *Adelphia*, 365 B.R. at 75 n.216.

depended upon the continuation of a sales and distribution agreement between Motors and Chrysler. ¶ 51. But the Complaint does not allege a single fact supporting or explaining *why* this assumption was unreasonable or why Chrysler would have any reason to terminate the contract. Nor could it. Motors handled the marketing, sales, distribution, parts, and warranty claims servicing for all Chrysler vehicles, in an arrangement that optimized Chrysler's tax position. ¶¶ 21, 22. According to the allegations of the Complaint, terminating the agreement would have deprived Chrysler of the tax benefits afforded to it by the arrangement with Motors. ¶ 21. Even if the Complaint's treatment of the FinCo transfer in isolation were the correct approach (which it is not), it would still not state a claim, because the Complaint fails to make anything other than a conclusory allegation that the transfer was not for reasonably equivalent value.

### 4. The Repayment of Third-Party Debt Was Made for Reasonably Equivalent Value

The Committee alleges that the $1.825 billion of antecedent debt repaid by Chrysler to third-party lenders constituted constructive fraudulent transfers. ¶¶ 80-85. This claim must fail. Unless held by an insider, repayment of preexisting debt is presumed to be made in good faith and for fair consideration. *See In re Sharp Int'l Corp.*, 403 F.3d at 54; *see also* N.Y. Debt. & Cred. Law § 272 (defining fair consideration as a good-faith exchange of property where "an antecedent debt is satisfied"). Only if the transferees — in this case, third-party holders of debentures issued by Chrysler before it was acquired by Daimler — take in bad faith is a repayment of antecedent debt avoidable. *See In re Sharp Int'l Corp.*, 403 F.3d at 54; *see also HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995); *see also SEC v. Univ. Express, Inc.*, No. 04-CV-2322, 2008 U.S. Dist. LEXIS 35342, at *18 (S.D.N.Y. Apr. 30, 2008) (distinguishing "good faith" under NYDCL § 272 from an intentional fraudulent conveyance inquiry, where the relevant "good faith" would be that of the transferor). The Complaint does not allege that the third-party debentureholders who were repaid received these payments in bad

faith.  Instead, the Committee alleges in a conclusory manner that the repayment "was not in good faith."  ¶ 82.  This is not sufficient.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM FOR INTENTIONAL FRAUDULENT TRANSFER (COUNTS V AND VI)

The Complaint alleges that the Transfers made as part of the Cerberus Transaction should be avoided as intentional fraudulent transfers under federal and state law, pursuant to Sections 544 and 548 of the Bankruptcy Code and NYDCL Section 276.  ¶¶ 86-97.  To avoid a transfer as intentionally fraudulent, a plaintiff must show that the transfer was made "with actual intent to hinder, delay or defraud" creditors.  11 U.S.C. § 548(a)(1)(A); N.Y. Debt. & Cred. Law § 276.  Because such claims sound in fraud, they must be pleaded with particularity as required by Rule 9(b).  *In re Saba Enters.*, 421 B.R. 626, 640 (Bank. S.D.N.Y. 2009).  The Complaint fails to meet this pleading standard and fails to allege a plausible claim for intentional fraudulent transfer.

### A.    The Alleged Facts Do Not Create a Strong Inference of Fraudulent Intent

In an effort to plead fraudulent intent, the Committee alleges certain "badges of fraud" that courts sometimes consider as circumstantial evidence of fraudulent intent.  ¶¶ 88, 94; *see In re Sharp Int'l Corp.*, 403 F.3d at 56 (describing badges of fraud as "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent") (internal citation and quotations omitted). The Committee's "badge" allegations are conclusory and do not provide a sufficient factual basis to infer fraudulent intent.  *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935–36 (S.D.N.Y. 1995).

The Complaint's first alleged "badge" — that the Transfers were made through Daimler-owned entities (¶¶ 88, 94) — does not give rise to any inference of fraud.  The Committee does not allege that the Daimler Entities were used to hide assets or to effect secretive transfers.  Where companies "served simply as a convenience for effectuating the transaction," there cannot be an inference of fraudulent intent.  *MFS/Sun*, 910 F. Supp. at 935.  This is true even where the entities in question were created as shell companies in order to facilitate the disputed transfers (which is not the case here).  *Id.*

The Complaint's second alleged "badge" — that Daimler retained control over the transferred assets (¶¶ 88, 94) — is equally unavailing. The "critical question" for purposes of inferring fraud under this second "badge" is whether control is retained by the *transferor*. *See MFS/Sun*, 910 F. Supp. at 935–36. Because the Committee does not and cannot allege that Chrysler, the transferor, retained control over any of the assets transferred, there is no basis from which fraudulent intent can be inferred. *See id.*

The other alleged "badges" — that fair consideration was not exchanged for the Transfers and that Chrysler's liabilities exceeded its assets such that it would be unable to meet its obligations (¶¶ 88, 94) — are not well-pleaded allegations, for the reasons discussed above. Even if they were, these facts do not create a "strong inference" of fraud. *See In re MarketXT Holdings Corp.*, 361 B.R. 369, 397 (Bankr. S.D.N.Y. 2007) (holding that even where insolvency is admitted, a lack of adequate consideration, without more, "do[es] not support a claim of intent to defraud"); *see also MFS/Sun*, 910 F. Supp. at 935–36 (even assuming that consideration exchanged was inadequate, inference of fraud was not appropriate).

### B. It Is Implausible that Daimler (and Cerberus and the Banks) Would Intentionally Harm Chrysler

The overall structure of the Cerberus Transaction, including the disputed Transfers made under the Step Plan, is utterly inconsistent with an intent to pillage or loot Chrysler and thus delay, hinder, or defraud creditors. Where a defendant in a fraudulent transfer action remains an investor after the disputed transfer (as Daimler did here), "any suggestion of fraudulent intent is belied by the continued investment." *MFS/Sun*, 910 F. Supp. at 935; *cf. Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (courts should "assume that the defendant is acting in . . . informed economic self-interest"). As several courts have recognized, "it is unlikely that [a defendant] would retain a financial stake in a business if they believed that it would fail." *MFS/Sun*, 910 F. Supp. at 935; *Shields*, 25 F.3d at 1130 (rejecting fraud claim because "[i]t is hard to see what benefits accrue" when the alleged fraud would lead to "an inevitable day of reckoning").

The Complaint's conclusory allegation that Daimler "sold" Chrysler is contradicted by the more specific allegations of the Complaint and the provisions of the Contribution Agreement. Through the Cerberus Transaction, Daimler allowed its equity interest to be diluted in exchange for the injection of additional capital into Chrysler, but retained a 19.9 percent ownership interest in Chrysler (through its 19.9 percent interest in Holding). Daimler also negotiated with Cerberus detailed provisions for a Contingent Value Right to provide Daimler with a portion of the upside if Cerberus realized on its investment in Chrysler at certain levels within two years of Closing. Contribution Agreement § 5.12. This continued investment belies the conclusory allegations of fraudulent intent.

Furthermore, Daimler's financial stake in Chrysler's business extended beyond a continuing ownership interest and stake in the upside of Chrysler. At Closing, an affiliate of Daimler also became a creditor of Chrysler through a $1.5 billion loan facility for Chrysler that was subordinate to the Banks' $10 billion loan. Poor performance by Chrysler could have threatened Chrysler's ability to repay the loan, and bankruptcy would have exposed Daimler's affiliate to the loss of its subordinated loan. Furthermore, Daimler had continuing business engagements with Chrysler through numerous joint development, intellectual property, and supply and transition agreements by which Daimler agreed to cooperate with Chrysler in various projects and, effectively, to become a significant trade creditor of Chrysler. *See* § E, *supra.*

The Committee's claim of intentional fraudulent conveyance is even more implausible when the actions of Cerberus and the Banks are taken into account. Notwithstanding the Complaint's conclusory allegations that Daimler "orchestrated" the Cerberus Transaction, there was in fact an independent counterparty in that transaction, namely, Cerberus itself. The implementation of the Step Plan, the Transfers, the repayment of third-party debt, and the repayment or forgiveness of intercompany debt, were all covenants in the Contribution Agreement and conditions to Cerberus's obligation to perform. The notion that Cerberus, at the same time it was making a $7 billion equity investment in Chrysler's parent, would participate in

a scheme to weaken Chrysler's financial health or to defraud its creditors is unsupported and implausible. Even more implausible is the idea that the Banks — whose $10 billion loan made the Cerberus Transaction possible — would participate in a scheme to hinder, delay, and defraud creditors of Chrysler when they themselves were, for the first time, becoming large creditors of Chrysler as a result of the Cerberus Transaction.

## III. THE COMPLAINT FAILS TO STATE A CLAIM FOR AIDING AND ABETTING A BREACH OF FIDUCIARY DUTY (COUNT VIII)

The Committee alleges that the Daimler Entities aided and abetted a breach of fiduciary duty supposedly committed by some (but not all) of Chrysler's directors (the "Director Defendants") in approving and causing Chrysler to carry out the Transfers. ¶¶ 107-114. This claim should be dismissed because it was released under Settlement Agreement III. Even if this claim were not released, the well-pleaded facts alleged do not state a claim for aiding and abetting as a matter of law.

### A. The Committee's Newly Asserted Claim for Aiding and Abetting Is Barred by the Release in Section 6(b) of Settlement Agreement III

The Committee's aiding and abetting claim was asserted for the first time in the First Amended Complaint filed on December 31, 2009 and is therefore barred by the release provisions in Settlement Agreement III. That agreement, approved by this Court in an order dated June 5, 2009, released Daimler and its affiliates from "all [] claims by CarCo" against Daimler and its affiliates "upon the filing of a [] Complaint[8] . . . that does not assert such claims" within the time limit provided by Settlement Agreement III. *See* Settlement Agreement III § 6(b) (Goudiss Decl. Ex. 6). Because the aiding and abetting claim was not asserted in either the Proposed Complaint or the Original Complaint (Goudiss Decl. Exs. 7 and 8), the claim was released as of August 17, 2009, when the Original Complaint was filed, and should be dismissed.

---

[8] In this context, Section 6(b) refers to preserved claims as those asserted in a proposed complaint, defined in Settlement Agreement III as the "Committee Complaint", and a filed complaint, defined in Settlement Agreement III as the "Debtor Complaint." The Committee Complaint was submitted to this Court as part of the Committee's motion for leave to bring suit, filed August 4, 2009, and is described herein as the "Proposed Complaint." The Debtor Complaint was filed in this Court on August 17, 2009, and is described herein as the "Original Complaint."

### 1.    The Aiding and Abetting Claim Falls Squarely within the Claims Released under Section 6(b) of Settlement Agreement III

In May 2009, after extensive negotiations, Chrysler, Daimler, Cerberus and the PBGC entered into a comprehensive, final settlement agreement, known as Settlement Agreement III. Under Section 6(a) of Settlement Agreement III, Chrysler, Daimler and Cerberus mutually released any and all claims the parties may have had against each other under the Contribution Agreement and under all other agreements executed in connection with the Contribution Agreement and the LLC Agreement.[9]  Section 6(b) further provided for a broad, general release of all of Chrysler's claims against Daimler, subject to a carve-out.  Specifically, the Committee, through its counsel, requested and the parties agreed to a two-month time period during which the Committee could investigate any potential claims by Chrysler against Daimler and determine what claims (if any), in its view, had merit and should be pursued.  So long as the Committee complied with specified procedures — including filing a timely complaint against Daimler after obtaining permission from the Court to prosecute such claims on Chrysler's behalf — Settlement Agreement III exempted the claims brought by the Committee from the release given to Daimler. *See* Settlement Agreement III § 6(b).

However, this carve-out "appl[ied] only with respect to claims set forth in the Committee Complaint or Debtor Complaint filed within the time period[10] set forth in the foregoing subsection (B)." *Id.*  According to Settlement Agreement III, "the release of all other claims by

---

[9]  Daimler does not waive its defenses that all of the claims asserted by the Committee were released under Section 6(a) of Settlement Agreement III and also as a result of the Committee's failure to follow the procedure set forth in the Settlement Agreement III for asserting its alleged claims.  Because Daimler recognizes that these defenses could involve questions of fact not before this Court on a motion to dismiss, Daimler preserves all of its rights to assert these defenses, if necessary, at a later phase of the litigation.

[10] Under Section 6(b) of Settlement Agreement III, the Committee was given 45 days (the "Challenge Period") to investigate and make a written demand on CarCo to bring a claim against the Daimler Released Parties (the "Committee Demand").  The claims had to be set forth in the Proposed Complaint, which was to be attached to the Committee Demand.  The Committee then had 25 days from the making of the demand (but no more than 60 days from the beginning of the Challenge Period) to file a complaint "asserting some or all of the same claims" set forth in the Proposed Complaint.  *See* Settlement Agreement III § 6(b).  At the Committee's request, Daimler agreed twice in good faith to extensions of these time periods.

CarCo against the Daimler Released Parties pursuant to this Section 6(b) shall become effective and binding upon the parties to this Agreement upon the filing of a Committee Complaint or Debtor Complaint that does not assert such claims." *Id*. Settlement Agreement III expressly provides for the immediate release upon the filing of the Committee's Original Complaint of all claims by Chrysler against Daimler that were not asserted in the Original Complaint.

2. **The Aiding and Abetting Claim Was Released Because It Was Not Asserted in Either the Proposed Complaint or the Original Complaint**

The aiding and abetting claim is distinct from the breach of fiduciary duty claim asserted against Daimler in the Original Complaint. That original claim sought to hold Daimler liable for breach of fiduciary duty as a parent and controlling shareholder. The new claim seeks to hold Daimler liable as an aider and abettor of an alleged breach of a different fiduciary duty by another party, *i.e.* the Director Defendants. The Complaint's aiding and abetting claim and the Original Complaint's direct breach of fiduciary duty claim involve different legal theories, different elements, different facts, and different states of mind to create culpability. *See Pereira v. Cogan*, No. 00 CIV 619 (RWS), 2001 WL 243537, at *12 n.15 (S.D.N.Y. Mar. 8, 2001) (distinguishing between elements of aiding and abetting breach of fiduciary claim and direct breach of fiduciary duty claim).

The distinction between the Original Complaint's breach of fiduciary duty claim and the Complaint's aiding and abetting claim is most clearly illustrated by the wholesale changes made by the Committee to Count VIII of the Original Complaint (the direct breach of fiduciary duty claim). All that survived the Committee's revisions to the Count in the Original Complaint was the paragraph reincorporating the previously pleaded allegations and a few stray words in paragraph 111 of the Complaint. The distinction between the original and revised Count is also highlighted by the Committee's own representations to this Court. In its Motion for Leave, the Committee enumerated the claims against Daimler that it sought authorization to bring. *See Old CarCo* D.I. 4959 at 12. A claim for aiding and abetting is nowhere to be found. *Id.*

### 3. The Committee Is Bound by the Release in Settlement Agreement III

New York courts "will enforce 'a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into . . . as a private agreement between the parties.'" *Simel v. JP Morgan Chase*, No. 05-CV-9750 (GBD), 2007 WL 809689, at *2 (Mar. 19, S.D.N.Y. 2007) (quoting *Skluth v. United Merch. & Mfrs., Inc.*, 163 A.D.2d 104, 106 (1st Dep't 1990)). Here, Chrysler and the Committee negotiated and agreed to the terms of Settlement Agreement III, including the release. *See Old CarCo* D.I. 5307, Hr'g Tr. 18:4-12, Aug. 13, 2009 (Committee counsel acknowledges limited period to investigate and bring claims against Daimler pursuant to parties' agreement).

That agreement is even stronger in this case because it was "so-ordered" by the Court. *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974) (a court not only has the power, but the duty to "enforce a settlement agreement which it ha[s] approved"); *Joseph v. Nationwide Insur. Co.*, Index No. 001450TSN00, 2002 WL 31748591, at *1-2 (N.Y. City Civ. Ct. Nov. 27, 2002) (Settlement agreements "so-ordered" by the court have the same effect as if the court itself had rendered a decision and "are favored by courts and not lightly cast aside."). Because the release contained in Section 6(b) of Settlement Agreement III constitutes a thoroughly negotiated, unambiguous, court-approved contract, the Court should give full effect to its plain terms.

If the Committee wanted to renege on its release, it would bear the burden of demonstrating "both that the injury was unknown at the time of the release and that the release was limited rather than general, in order to establish that the parties had not intended the literal effect of the release." *Calavano v. N.Y.C. Health & Hosp. Corp.*, 246 A.D.2d 317, 319 (1st Dep't 1998). This is especially true because the release was part of a settlement agreement negotiated between commercial entities in equivalent bargaining positions. *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 932 (S.D.N.Y. 1995).

The Committee makes no attempt to carry this burden. Any injury purportedly caused by the alleged aiding and abetting was already known to the Committee at the time the Proposed

and Original Complaints were filed. The Committee received extensive discovery of Daimler and was twice afforded additional time in which to draft and file a complaint. The Committee received no additional information from Daimler after the Original Complaint was filed. There is no reason why the aiding and abetting claim could not have been asserted in the Original Complaint.

Because the aiding and abetting claim constitutes a new claim, both in form and in substance, that was not asserted in the Original Complaint filed with the Court within the time period allowed under Settlement Agreement III, that claim is barred by the release and should be dismissed.

**B.      Even If the Aiding and Abetting Claim Had Not Been Released, It Would Still Fail As a Matter of Law**

The aiding and abetting claim also fails because the Committee fails to allege plausibly: (i) that the Director Defendants owed a fiduciary duty to Chrysler that encompassed the interests of Chrysler's creditors, (ii) that there was a breach of that fiduciary duty by the Director Defendants, (iii) that the Daimler Entities knowingly participated in any purported breach, and (iv) that the Daimler Entities' knowing participation was a proximate cause of Chrysler's damages. *See Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (setting forth elements of aiding and abetting breach of fiduciary duty claim under Delaware law).

**1.      Because Chrysler Was Not Insolvent, No Fiduciary Duties Were Owed to Chrysler That Encompassed the Interests of Chrysler's Creditors**

The Complaint implausibly alleges that Chrysler was insolvent or in the zone of insolvency such that the Director Defendants owed a fiduciary duty to Chrysler and its creditors that was breached. ¶¶ 108-110. The Director Defendants did not owe a duty to Chrysler because Chrysler was not insolvent. Under established Delaware law, in the absence of insolvency, the fiduciary duties owed by Chrysler's directors ultimately flowed to Daimler, as the 100 percent shareholder. *Trenwick Am. Litig. Trust v. Ernst & Young L.L.P.*, 931 A.2d 438 (Del. 2007), *aff'g* 906 A.2d 168, 194, 200 (Del. Ch. 2006); *accord In re BH S&B Holdings L.L.C.*, 420 B.R. 112,

144 (Bankr. S.D.N.Y. 2009) (citing *Trenwick*).  Even if Chrysler had been in the "zone of insolvency" (whatever that may be) at the time of the Transfers, this would not impose fiduciary obligations on the Director Defendants that encompassed the interests of Chrysler's creditors.  *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (holding that in the "zone" of insolvency the fiduciary duties run to the shareholders and the corporation must be managed "for the benefit of its shareholder owners"); *see also Prod. Res. Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 789 (Del. Ch. 2004) (discrediting "zone of insolvency" concept).  Since the Director Defendants owed no duty to Chrysler that encompassed the interests of Chrysler's creditors, there was no breach of fiduciary duty that Daimler could have aided and abetted.

> ### 2. Even If a Fiduciary Duty Had Been Owed, There Was No Breach

Even if the Director Defendants owed a fiduciary duty to Chrysler that encompassed the interests of creditors, the Committee fails to allege sufficient facts to support a claim that there was a breach of such alleged duty.  *See* Memorandum of Law in Support of the Motion to Dismiss of Thomas W. Sidlik and Eric R Ridenour, dated March 5, 2010.  Without an underlying breach, the Committee cannot state a claim for aiding and abetting.  *See Globis Partners, L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-WCP, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007); *In re Trados Inc. S'holder Litig.*, Civ. A. No. 1512-CC, 2009 WL 2225958, at *10 (Del. Ch. Jul. 24, 2009).

> ### 3. Even If a Breach Occurred, the Alleged Facts Do Not Support an Inference of Knowing Participation by the Daimler Entities in Any Alleged Breach of Fiduciary Duty

Under Delaware law, the standard for knowing participation in a fiduciary breach is "stringent."  *Saito v. McCall*, Civ. A. No. 17132-NC, 2004 WL 3029876, at *9 (Del. Ch. Dec. 20, 2004).  The complaint must allege that the purported aider and abettor acted "with the knowledge that the conduct advocated or assisted constitutes such a breach."  *Malpiede*, 780 A.2d at 1097.  Conclusory allegations will not suffice.  *In re Lukens, Inc.*, 757 A.2d 720, 735 n.44 (Del. Ch. 1999) ("[A] conclusory statement that the alleged aider and abettor 'had

knowledge of' the director defendants' fiduciary duties and 'knowingly and substantially participated and assisted' in the alleged breaches [does] not state a claim.") (quoting *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995)). Instead, knowing participation "must be reasonably inferred from the facts alleged in the complaint." *Lukens*, 757 A.2d at 734–35. The Committee does little more than recite, in conclusory fashion, the legal components of the knowledge element. It does not "adequately plead specific facts demonstrating knowing participation," and its claim for aiding and abetting must therefore be dismissed. *In re RSL Com Primecall, Inc.*, Adv. 03-2176 (ALG), 2003 WL 22989669, at *14 (Bankr. S.D.N.Y. 2003).

## IV. THE COMPLAINT FAILS TO STATE A CLAIM FOR UNJUST ENRICHMENT (COUNT IX)

The Complaint alleges in a conclusory manner that the Daimler Entities were unjustly enriched by the Transfers. ¶¶ 115-118. To state a claim for unjust enrichment, the Committee must allege facts demonstrating that the Daimler Entities benefited from the Transfers at Chrysler's expense and that equity and good conscience require restitution. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).

The unjust enrichment claim first fails because it is predicated on the same Transfers underlying the fraudulent conveyance claims. ¶ 116; *see, e.g.*, *In re Allou Distribs., Inc.*, 404 B.R. 710, 726 n.10 (Bankr. E.D.N.Y. 2009) (unjust enrichment claim premised upon the same factual allegations as constructive fraudulent conveyance claim fails where plaintiff cannot show lack of fair consideration).[11]

The unjust enrichment claim also fails because Daimler did not profit from the Transfers. Rather, the Transfers resulted in a net loss to Daimler. Because Daimler was not enriched through, and Chrysler was not harmed by, the Transfers, there is no basis for restitution and the claim for unjust enrichment should be dismissed.

---

[11] The Committee may only plead unjust enrichment and fraudulent transfer claims in the alternative. *Allou Distribs., Inc.*, 387 B.R. 365, 412 (Bankr. E.D.N.Y. 2008). Recovery under both claims would constitute impermissible duplicative relief.

# V. THE COMPLAINT FAILS TO STATE A CLAIM FOR ALTER EGO LIABILITY (COUNT X)[12]

The Committee alleges that Holding, DCNAH, and DC Holding (together, "Holding Companies") were alter egos of Daimler that were "created and operated for the purpose of siphoning assets from Debtor to Daimler and its subsidiaries." ¶¶ 119-124. To establish alter ego liability under Delaware law, the Committee must show that Daimler and each subsidiary company operated as a "single economic entity" and "that an overall element of injustice or unfairness is present." *In re Sunbeam Corp.*, 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002). Because the corporate form is "sacrosanct" under Delaware law, "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *In re BH S & B Holdings L.L.C.*, 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009). The Committee fails to plead facts sufficient to meet this task.

## A. The Facts Alleged in the Complaint Fail To Show "Complete Domination" by Daimler of Any of the Holding Companies

To state an alter ego claim, a complaint must enumerate facts sufficient to permit the court to consider one or more factors that may indicate that a parent and subsidiary operated as a single economic unit. These factors, also known as the *Fletcher* factors, include: (i) whether the corporation was adequately capitalized for the corporate undertaking; (ii) whether the corporation was solvent; (iii) whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; (iv) whether the dominant shareholder siphoned corporate funds; and (v) whether, in general, the corporation simply functioned as a facade for the dominant shareholder. *Sunbeam*, 284 B.R. at 365 (citing *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1458 (2d Cir. 1995)).

The Complaint is devoid of any factual allegations relating to the corporate functions, company records, or capitalization of any of the Holding Companies, notwithstanding the fact

---

[12] Alter ego liability is not an independent claim for which the Committee may seek relief. *See In re Saba Enters., Inc.*, 421 B.R. 626, 638 n.9 (Bankr. S.D.N.Y. 2009). Rather, it is a "procedural device" that, when properly pleaded, facilitates the imposition of "a subsidiary's obligation on a parent." *Id.* (internal citation and quotations omitted). As discussed above, no claim lies against the subsidiaries of Daimler in any event, which is an additional reason the alter ego claim must fail.

that the Committee received extensive discovery on Daimler and its affiliates. Nor does the Complaint set forth any other factual allegations that might be relevant to an alter ego analysis. Rather, the Committee alleges "[o]n information and belief" that the officers and directors of DCNAH and DC Holding were "dominated and controlled" by Daimler. ¶¶ 12, 13. The Committee also claims that "[d]irectors and/or managers" of Holding and DC Holding were "nominated and controlled by Daimler, and in at least some instances were also employees of Daimler." ¶¶ 71, 77.

These conclusory statements, even if supported by well-pleaded facts, would not justify ignoring the corporate form. Indeed, courts refuse to pierce the corporate veil merely because a parent corporation retains decision-making authority over its subsidiaries. *See BH S&B Holdings*, 420 B.R. at 138; *accord Fletcher*, 68 F.3d at 1459–60. This is so because duality among directors and officers is typical in a parent/subsidiary relationship and perfectly acceptable under Delaware law. *See BH S&B Holdings*, 420 B.R. at 138 ("It is well-established that wholly-owned subsidiaries may share officers, directors and employees with their parent, without requiring the court to infer that the subsidiary is a mere instrumentality for the parent and without requiring the court to conclude that those officers and directors were not functioning properly."); *accord United States v. Bestfoods*, 524 U.S. 51, 69 (1998) ("[I]t is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.").

At most, the Committee's allegations indicate that Daimler exercised corporate control over its subsidiaries. But "mere domination and control" of a subsidiary by a parent corporation is not sufficient to establish alter ego liability. *See Sunbeam*, 284 B.R. at 366. Rather, the alleged domination must be so extensive that it "preclude[s] the controlled entity from having legal or independent significance of its own." *Id.* (internal quotation marks and citation omitted). As this Court has noted, there must effectively be an abuse of the corporate form equivalent to an "elaborate shell game." *Id.* Despite having had ample discovery, the Committee makes no allegations addressing the *Fletcher* factors, nor does the Complaint contain any other "specific

relevant allegations" from which complete domination and control might be inferred. *See Sunbeam*, 284 B.R. at 367; *see also In re Ticketplanet.com*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004) (To survive a motion to dismiss, a claim for alter ego liability "must allege facts that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability.").

      **B.**      **No Element of Unfairness or Injustice Is Present Here**

Even if the Committee had sufficiently pleaded complete domination and control of the Holding Companies, veil-piercing still would not be warranted unless a showing of unfairness or injustice similar in nature to fraud or a sham could be made. *BH S&B Holdings*, 420 B.R. at 134. The requisite injustice or fraud must be found in a defendants' use of the corporate form. *Id.*; *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 269 (D. Del. 1989); *see also Ticketplanet.com*, 313 B.R. at 70-71 (A plaintiff is required to "plead facts showing that the corporation [is] a sham and exist[s] for no purpose other than as a vehicle for fraud."). Typically, this situation arises where a controlling entity causes an underfunded controlled entity to act inequitably and for the controlling entity's benefit, creating a liability to a third party, and the controlling party then shields itself from liability by leaving the injured third party with no recourse against it or the underfunded controlled entity. *See Sunbeam*, 284 B.R. at 367 (explaining what circumstances are appropriate to pierce the corporate veil).

That plainly is not the situation here. The Committee's allegations focus entirely on Daimler's allegedly bad conduct. The Committee makes no allegations regarding inequitable conduct on the part of the Holding Companies. For example, the Committee never claims that the Holding Companies caused Chrysler to improperly transfer assets. Nor does the Committee claim that the Holding Companies were undercapitalized such that the Committee could not recover against them. As this Court has recognized, a situation such as this one does not present "sufficient rationale to overcome the reluctance to disregard the corporate structure." *Sunbeam*, 284 B.R. at 368.

The only "injustice" alleged by the Committee to support its alter ego claim are the allegedly improper Transfers — the same conduct that underlies every other claim in the Complaint. Courts will not recognize alter ego liability where the supposed injustice is identical to the causes of action for which relief is otherwise sought. *See In re Foxmeyer Corp.*, 290 B.R. 229, 236 (Bankr. D. Del. 2003). The injustice "must, in particular, be found in the defendants' use of the corporate form . . . the underlying cause of action, at least by itself, does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *BH S&B Holdings*, 420 B.R. at 134 (internal quotation marks and citation omitted); *accord Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 531 (D. Del. 2008) (dismissing alter ego claim where plaintiffs only point to underlying cause of action and "do not otherwise allege abuse or injustice in the use of the corporate form").

Because the Complaint alleges no facts that demonstrate complete domination of the Holding Companies by Daimler or that show an overall element of injustice, the alter ego claim should be dismissed.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should dismiss the Complaint in its entirety and without leave to amend.

Dated: March 5, 2010
      New York, New York

Respectfully submitted,

/s/ Alan S. Goudiss

SHEARMAN & STERLING LLP
Alan S. Goudiss
Jaculin Aaron
Paula M. Howell
K. Mallory Tosch
599 Lexington Avenue
New York, New York  10022
Telephone:  (212) 848-4000
Facsimile:  (212) 848-7179

BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller
William S. Ohlemeyer
Tricia J. Bloomer
575 Lexington Avenue, 7th Floor
New York, New York  10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Defendants Daimler AG,
Daimler North America Corp. and Daimler
Investments US Corp.*

SHEARMAN & STERLING LLP
Alan S. Goudiss
Jaculin Aaron
Paula M. Howell
K. Mallory Tosch
599 Lexington Avenue
New York, New York 10022
Telephone: (212) 848-4000
Facsimile: (212) 848-7179

BOIES, SCHILLER & FLEXNER LLP
Jonathan D. Schiller
William S. Ohlemeyer
Tricia J. Bloomer
575 Lexington Avenue, 7th Floor
New York, New York  10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Defendants Daimler AG,*
*Daimler North America Corp., and*
*Daimler Investments US Corp.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| OLD CARCO LLC | ) Chapter 11 |
| (F/K/A CHRYSLER LLC), *et al.*, | ) |
| | ) Case No. 09-50002 (AJG) |
| Debtors. | ) Jointly Administered |
| | ) |
| THE OFFICIAL COMMITTEE OF | ) |
| UNSECURED CREDITORS OF OLD CARCO | ) Adv. No. 09-00505 (AJG) |
| LLC (F/K/A CHRYSLER LLC), | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| DAIMLER AG, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**<u>CERTIFICATE OF SERVICE</u>**

I, Wesley H. Pang, hereby certify that on Friday, March 5, 2010, I caused to be served a true and correct copy of the following documents via email to counsel of record as indicated below:

- Notice of Motion and Motion of Defendants Daimler AG, Daimler North America Corporation, and Daimler Investments US Corporation To Dismiss the First Amended Complaint

- Declaration of Alan S. Goudiss in Support of Motion of Defendants Daimler AG, Daimler North America Corporation, and Daimler Investments US Corporation To Dismiss the First Amended Complaint

- Memorandum of Law in Support of Motion of Defendants Daimler AG, Daimler North America Corporation, and Daimler Investments US Corporation To Dismiss the First Amended Complaint

TO:   SUSMAN GODFREY LLP

Steve Susman, Esq.
Jacob Buchdahl, Esq.
Edgar G. Sargent, Esq.
Rebecca S. Tinio, Esq.
Shawn J. Rabin, Esq.
Suyash Agrawal, Esq.
Seth Ard, Esq.
Robert Ajiashvili

TO:   STUTZMAN, BROMBERG, ESSERMAN & PLIFKA PC

Robert T. Brousseau, Esq.
Sander L. Esserman, Esq.
Jacob L. Newton, Esq.
Peter C. D'Apice, Esq.

TO:   BRAYTON PURCELL LLP

Al Brayton, Esq.

Additionally, I caused a true and correct copy of the documents listed above to be served via email and Federal Express courier service, or where indicated, via U.S.P.S. Express Mail, to the parties on the Old CarCo LLC (f/k/a Chrysler LLC), *et al.* Special Service List dated February 5, 2010, annexed hereto as Exhibit A.

        /s/ Wesley H. Pang
        Wesley H. Pang

## EXHIBIT A

Old CarCo LLC
Attn: Holly E. Leese, Esq.
Senior Vice President, General Counsel and
Secretary
1000 Chrysler Drive, CIMS# 485-14-36
Auburn Hills, Michigan 48326


J. Christopher Kohn, Esq.
Tracy J. Whitaker, Esq.
James G. Bruen, Esq.
Matthew J. Troy, Esq.
John T. Stemplewicz, Esq.
Attorneys, Civil Division, U.S. Department
of Justice
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
(via U.S.P.S. Express Mail)


Corinne Ball, Esq.
Veerle Roovers, Esq.
JONES DAY
222 East 41st Street
New York, New York 10017


Jeffrey B. Ellman, Esq.
JONES DAY
1420 Peachtree Street, N.E.
Suite 800
Atlanta, Georgia 30309


Albert Togut, Esq.
Frank A. Oswald, Esq.
Scott E. Ratner, Esq.
TOGUT SEGAL & SEGAL, LLP
One Penn Plaza, Suite 3335
New York, New York 10119

Thomas Moers Mayer, Esq.
Phil Bentley, Esq.
Kenneth H. Eckstein, Esq.
Robert T. Schmidt, Esq.
Adam C. Rogoff, Esq.
KRAMER LEVIN NAFTALIS &
FRANKEL LLP
1177 Avenue of the Americas
New York, New York 10036


Peter Pantaleo, Esq.
David Eisenberg, Esq.
Thomas Rice, Esq.
Mary Beth Forshaw, Esq.
Kathrine McLendon, Esq.
David Mack, Esq.
Anne Knight, Esq.
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, New York 10017


John J. Rapisardi, Esq.
CADWALADER, WICKERSHAM &
TAFT LLP
One World Financial Center
New York, New York 10281


Michael J. Edelman, Esq.
Michael L. Schein, Esq.
VEDDER PRICE P.C.
1633 Broadway, 47th Floor
New York, New York 10019


Seth Gardner
Cerberus Capital Management, L.P.
299 Park Avenue, 22nd Floor
New York, New York 10171


Epiq Bankruptcy Solutions, LLC
Attn: Chrysler Claims Department
757 Third Avenue
New York, New York 10017

Jeannette Vargas, Esq.
Tara M. La Morte, Esq.
Assistant United States Attorneys, Southern
District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007


Brian Masumoto, Esq.
Office of the United States Trustee, SDNY
33 Whitehall Street, 21st Floor
New York, NY 10004