UNITED STATES BANKRUPTCY COURT      FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| OLD CARCO LLC | : | Case No. 09-50002 (AJG) |
| (F/K/A CHRYSLER LLC), *et al.*, | : | Confirmed Cases |
|  | : |  |
|          Debtors. | : |  |
| _____ | : |  |
|  | : |  |
| THE LIQUIDATION TRUST, | : |  |
|  | : |  |
|          Plaintiff, | : |  |
|      v. | : | Adv. No. 09-00505 (AJG) |
|  | : |  |
| DAIMLER AG, *et al.*, | : |  |
|          Defendants. | : |  |
| _____ | : |  |

## OPINION CONCERNING MOTION OF DEFENDANTS DAIMLER AG, DAIMLER NORTH AMERICA CORPORATION, AND DAIMLER INVESTMENTS US CORPORATION TO DISMISS THE FIRST AMENDED COMPLAINT

APPEARANCES:

SHEARMAN & STERLING LLP
Counsel for the Daimler Entities
New York, New York

       By:    Alan S. Goudiss, Esq.
                Jaculin Aaron, Esq.

BOIS, SCHILLER & FLEXNER, LLP
Co-Counsel for the Daimler Entities
New York, New York

       By:    Jonathan D. Schiller, Esq.
                William S. Ohlemeyer, Esq.

SUSMAN GODFREY LLP

Counsel for the Liquidation Trust
Houston, Texas

    By: Stephen D. Susman, Esq.

  - and -

Seattle, Washington

    By: Edgar G. Sargent, Esq.

STUTZMAN, BROMBERG, ESSERMAN & PLIFKA
Special Counsel for the Trust
Dallas, Texas

    By: Sander L. Esserman, Esq.


ARTHUR J. GONZALEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE




   This adversary proceeding seeks, *inter alia*, to avoid certain transfers by a debtor under various theories alleging constructive or intentional fraud.  Before the Court is a motion to dismiss the first amended complaint.  The parties previously agreed to the dismissal of certain of the counts.  With respect to the remaining counts, the Court concludes that those counts should also be dismissed.  Some counts are dismissed with prejudice.  However, others are dismissed without prejudice, thereby affording an opportunity to replead those counts.

   Therefore, the motion is granted insofar as the motion seeks dismissal, and granted, in part, and denied, in part, insofar as it seeks that the dismissal be with prejudice.

*Procedural Background*

On April 30, 2009, Old Carco LLC f/k/a Chrysler LLC ("CarCo") and certain of its domestic direct and indirect subsidiaries[1] (collectively, the "Debtors") filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Pursuant to orders entered by the Court, the Debtors' cases were jointly administered for procedural purposes, in accordance with Rule 1015(a) of the Federal Rules of Bankruptcy Procedure. On May 5, 2009, an Official Committee of Unsecured Creditors (the "Creditors' Committee") of CarCo was formed. On April 23, 2010, an order confirming the Second Amended Joint Plan of Liquidation of Debtors and Debtors in Possession, as Modified (the "Debtors' Plan"), was entered on the docket of the jointly administered cases. The Debtors' Plan became effective on April 30, 2010. Pursuant to the Debtors' Plan, a Liquidation Trust (the "Trust") was formed.

On August 17, 2009, the Creditors' Committee filed a complaint, which it subsequently amended by filing on January 4, 2010 the First Amended Complaint, dated December 31, 2009, (as amended, the "Complaint"), commencing this adversary proceeding. On May 5, 2010, an order was entered substituting the Trust as plaintiff in this adversary proceeding, in accordance with the terms of the Debtors' Plan.

The Complaint was filed against, *inter alia,* Daimler AG ("Daimler"), a stock corporation organized under the laws of the Federal Republic of Germany, Daimler North America Corporation (f/k/a DaimlerChrysler North America Holding Corporation) ("DCNAH"), a direct wholly owned subsidiary of Daimler, and Daimler Investments US Corporation (f/k/a DaimlerChrysler Holding Corporation) ("DC Holding", and together with Daimler and DCNAH,

---

[1] On May 19, 2009, an additional affiliate filed a petition for relief under title 11.

the "Daimler Entities"), an indirect wholly owned subsidiary of Daimler.[2]

In the Complaint, the Trust alleges that Daimler orchestrated a scheme to strip valuable assets away from CarCo prior to Daimler selling a controlling interest in the Chrysler entities (the "Chrysler Companies") to Cerberus Capital Management LP ("Cerebus"). The Trust alleges that, as part of that scheme, immediately prior to the sale to Cerebus, Daimler engineered a complex restructuring of the Chrysler Companies, which fraudulently transferred valuable assets from CarCo to DCNAH and DC Holding for little or no consideration. The Trust further alleges that certain segments of the 2007 restructuring resulted in transfers that enriched Daimler at the expense of the creditors of CarCo who could not reach these assets. Thus, the Trust seeks to recover, as fraudulent conveyances, the value of the transferred assets for the Debtors' estates.[3]

On March 5, 2010, pursuant to Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b), the Daimler Entities filed a motion seeking dismissal of the Complaint. The Daimler Entities argue that the restructuring of the Chrysler Companies and Daimler's ultimate sale of a controlling interest in the Chrysler Companies, with its concomitant recapitalization of CarCo and other of the Chrysler entities, comprise one integrated transaction. The Daimler Entities maintain that relevant law requires that an integrated transaction must be "collapsed" before analyzing whether there is a fraudulent transfer. The Daimler Entities maintain that the Trust has not and could not challenge the entire 2007 restructuring transaction. Taking its contention a step further, Daimler argues that the terms of the transactional documents

---

[2]Additional defendants included certain individuals who are former members of Chrysler's board of directors who have since been dismissed from the action. *See infra* note 4.

[3]In that regard, also listed as defendants in the Complaint are John Does 1-50, representing any subsequent transferees of assets that the Trust alleges were fraudulently transferred from the Debtor or to DCNAH or DC Holding.

themselves show that the restructuring and recapitalization constitute a single integrated transaction, and collapsing is not an issue in this case.

The Daimler Entities contend that the Trust is only challenging isolated elements of the restructuring as constituting fraudulent transfers. The Daimler Entities argue that the challenged transfers cannot be properly valued without considering the entirety of the transaction, including the ultimate sale of the controlling interest in the Chrysler Companies to Cerberus with the resulting cash infusion into CarCo. Consequently, the Daimler Entities argue that the Complaint is defective.[4]

The Trust opposes the dismissal arguing that the restructuring must be considered as distinct from the ultimate sale to Cerberus of a controlling interest in the Chrysler Companies with its resulting infusion of cash into CarCo. Alternatively, the Trust argues that, even considering the entirety of the restructuring and the sale of the controlling interest to Cerberus, CarCo received consideration of lesser value than the assets that it transferred.

A hearing (the "Hearing") concerning the motion to dismiss was conducted on May 13, 2010.

*Motion to Dismiss Standard*

Federal Rule of Civil Procedure ("Rule") 12(b)(6) is incorporated into bankruptcy procedure by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012(b). In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief, the court

---

[4]The Complaint also included a count against the individual defendants alleging that they had breached fiduciary duties owed to CarCo. The individual defendants that had been served also moved to dismiss the Complaint as against them. The parties, however, entered into a stipulation dismissing that aspect of the Complaint. Accordingly, a count alleging that the corporate defendants aided and abetted any such breach of fiduciary duties was also dismissed. In addition, in the stipulation, the Trust dismissed all of the individual defendants from the Complaint. The stipulation was "so ordered" by the Court and entered on the docket on June 29, 2010.

"must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 2200, 167 L. Ed.2d 1081 (2007). In addition, the court draws all reasonable inferences from the factual allegations in favor of the plaintiff. *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir. 1992); *Myvett v. Williams*, 638 F. Supp. 2d 59, 64 (D.D.C. 2009).

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 2944, 92 L. Ed.2d 209 (1986). Bare assertions, "devoid of 'further factual enhancement'[,]" are not sufficient to withstand a motion to dismiss. *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S.Ct. 1937, 1949, 173 L. Ed.2d 868 (2009) (citation omitted).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998); *see also Erickson*, 551 U.S. at 94, 127 S. Ct. at 2200 (noting that Rule 8(a)(2) sets forth "liberal pleading standards"). Pursuant to Rule 8(a), which is made applicable to adversary proceedings by Bankruptcy Rule 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Erickson*, 551 U.S. at 93, 127 S. Ct. at 2200 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964, 167 L. Ed.2d 929 (2007) (quoting, in turn, *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103, 2 L. Ed.2d 80 (1957). Thus, specific facts are not necessary. *Id*. 551 U.S. at 93, 127 S. Ct. at 2200.

While detailed factual allegations are not necessary, the need to provide the "grounds" for entitlement to relief requires "more than labels and conclusions" and more than "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65. The allegations must show that the right to relief is more than speculative. *Id.* at 553, 127 S.Ct. at 1965. There must be a "reasonably founded hope" that the discovery process will uncover relevant evidence. *Id.* at 559, 563 n.8, 127 S.Ct. 1967, 1969 n.8.

To adequately support the claim, there must be sufficient facts identified to suggest that the legally vulnerable conduct is plausible. *Id.* at 556, 127 S.Ct. at 1965. A complaint meets the plausibility standard when factual content is pled "that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, ___ U.S. at ___, 129 S.Ct. at 1949. Once the plausibility threshold is met, the complaint survives even if the identified facts seem improbable or recovery is thought to be remote or unlikely. *Twombly*, 550 U. S. at 556, 127 S.Ct. at 1965. Although *Twombly* was decided in the context of an antitrust litigation, the plausibility standard to test the sufficiency of a complaint applies in all civil actions. *Iqbal*, ___ U.S. at ___, 129 S.Ct. at 1953. The plausibility standard, however, does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974. Thus, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563, 127 S.Ct. at 1969.

Rule 8(a)(2) "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Id.* at 555 n.3, 127 S. Ct. at 1965 n.3. However, once the claim is adequately supported, specific facts beyond those needed to state the claim are not necessary. *Id.* at 570, 127 S.Ct. at

1973-74.  Indeed, other sections of the Federal Rules of Civil Procedure support a simplified notice pleading standard, including Rule 8(f), which provides that technical forms of pleading or motions are not required, and Rule 8(e)(1), which provides that pleadings are to construed in a way that does substantial justice.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513-14, 122 S. Ct. 992, 998, 152 L. Ed.2d 1 (2002).  The simplicity required by the rule, in forgoing additional factual detail, recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues.  *Id*. at 512-13, 122 S. Ct. at 998; *see also*, *Conley*, 355 U.S. at 47-48, 78 S. Ct. at 103.  Based upon the liberal pleading standard established by Rule 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).  In considering a motion to dismiss, it is not the legal theory but, rather, the factual allegations that matter.  *Id*.

In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by reference; matters of which judicial notice may be taken, *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); and a document of which plaintiff has notice and relied upon in bringing the claim or that are integral to the claim.  *Cortec Indus. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).  However, mere notice or possession of the document is not sufficient.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Rather, a necessary prerequisite for a court's consideration of a document is that the plaintiff relied "on the terms and effect of a document in drafting the complaint."  *Id*.  As such, the document relied upon in framing the complaint is considered to be merged into the pleading.  *Id*. at 153 n.3 (citation omitted).  In contrast, when

assessing the sufficiency of a complaint, a court does not consider extraneous material because considering such material would run counter to the liberal pleading standard, which requires only a short and plain statement of the claim showing entitlement to relief. *Id.* at 154. Nevertheless, in considering a Rule 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Federal Rule of Evidence 201. *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 357, 357 n.13 (S.D.N.Y. 2003) (citing *Chambers*, 282 F.3d at 153).

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to weigh the evidence which may be offered to support it. *Cooper*, 140 F.3d at 440. The determination is not whether a claimant will ultimately prevail, but whether the claimant should be allowed to offer evidence to support the claim. *Swierkiewicz*, 534 U.S. at 511, 122 S. Ct. at 997.

Thus, for the purposes of the motion to dismiss, the Court accepts as true all of the material factual allegations in the Complaint filed by the plaintiff. As such, most of the following facts are taken from the Complaint and accepted as true solely for the purposes of the motion to dismiss.

*The Restructuring and Sale of the Controlling Interest in the Chrysler Companies*

In 1998, Daimler acquired 100% of the equity interest in the Chrysler Companies.[5] In the Complaint, the Trust alleges that around late 2006, after the Chrysler Companies' financial performance declined significantly, Daimler decided to sell the Chrysler Companies. The Trust

---

[5]After this acquisition, and up until the restructuring that resulted in Daimler's sale of its majority interest in the Chrysler Companies, the various component Chrysler Companies were renamed DaimlerChrysler.

alleges that Daimler was concerned about its potential liability for pension obligations to Chrysler employees, restructuring costs and operating losses, and its liability as a guarantor of certain third-party obligations. However, the Trust asserts that the main motivating factor for Daimler's decision to sell its interest in Chrysler was the concern that it would be held responsible if certain other post-employment benefit ("OPEB") obligations of approximately $17.5 billion were not met.

Prior to the restructuring, DaimlerChrysler Motors Corporation ("Motors") was the parent of Daimler Chrysler Corporation n/k/a CarCo. The two companies comprised the automotive operations of the Chrysler Companies. CarCo was the manufacturer of vehicles and Motors managed distribution and sales. (CarCo and Motors are together referred to as "Automotive").[6] In that regard, the relationship between the two companies was governed by a sale and distribution agreement, which was terminable at will upon the election of CarCo. As a result of Automotive's declining performance, its potential for pension obligations, and its $17.5 billion in OPEB liabilities, several analysts attributed an implied negative equity value to Automotive, ranging from negative $1.5 billion to negative $15.5 billion.[7]

The Chrysler Companies' most valuable assets were two subsidiaries (together, "FinCo")[8] that comprised the financial services arm of the Chrysler Companies. Inasmuch as

---

[6] Automotive had been divided into two separate companies to take advantage of certain tax benefits.

[7] The Trust asserts that, in interpreting the various analyst reports, Daimler made an internal presentation to its Board of Management estimating the value contribution of Automotive to its market capitalization at approximately negative $7 billion. In addition, the Trust notes that, in its 2007 Annual Report, Daimler indicated that a 42% surge in its stock price was the result of its decision to dispose of its majority interest in the Chrysler Companies.

[8] FinCo, which included the United States and Canadian financing subsidiaries, provided financing to both the Chrysler Companies' dealers and consumers.

FinCo was a subsidiary of CarCo, Daimler determined that it would receive a higher price for the sale of the Chrysler Companies by separating FinCo from CarCo. The increase in price would result from ensuring that FinCo's assets were not available to CarCo's creditors. While the analysts had given Automotive an implied negative value, the same analysts had attributed a positive value to FinCo of between $6 billion to $8 billion as a stand-alone business.

Daimler engaged JPMorgan Chase ("JPMorgan") and Ernst & Young LLP ("E&Y") to restructure the Chrysler Companies, including separating the Daimler and Chrysler operations, and to "spin off" FinCo, with the ultimate goal of allowing Daimler to sell a majority interest in the Chrysler Companies. The corporate restructuring was implemented through a 48-step plan (the "Step Plan" or "Restructuring").[9] In the Restructuring, FinCo became a stand-alone entity to facilitate the ability to obtain third-party financing. In the Complaint, the Trust focuses on a few of the steps of the Step Plan, particularly step 15, pursuant to which FinCo was transferred from CarCo to a newly formed holding company, DaimlerChrysler Holding LLC ("Holding"). In step 11, Daimler caused DC Holding to create Holding as a special purpose company wholly owned by Daimler. Holding's purpose was to provide a vehicle through which Daimler could sell a controlling interest in the Chrysler Companies, including FinCo.[10] Holding also became CarCo's parent, thereby converting the relationship between CarCo and FinCo from that of parent-subsidiary to that of sister companies. As consideration for the transfer of FinCo, CarCo

---

[9] The Step Plan involved the restructuring of Chrysler Companies in the region covered by the North American Free Trade Agreement ("NAFTA") - *i.e.*, the United States, Canada and Mexico. In addition, there was another multi-step plan that involved the restructuring of Chrysler Companies primarily situated outside of the NAFTA region.

[10] Holding remained wholly owned and controlled by Daimler until the August 3, 2007 closing of the Cerberus transaction, pursuant to which Daimler sold the majority interest in Holding to Cerberus.

received stock in Motors and another Chrysler entity, Utility Assets LLC ("Utility"), as well as a note from FinCo for $1.225 billion.

The Trust alleges that the consideration received by CarCo in exchange for FinCo was inadequate based upon the valuation attributed to the assets by contemporaneous documents. Daimler retained Houlihan Lokey Howard & Zukin Financial Advisors, Inc. ("Houlihan Lokey") to value the consideration exchanged in the step 15. In its valuation opinion (the "Step 15 Valuation"), Houlihan Lokey valued FinCo and the related assets transferred by CarCo at $7.95 billion. With respect to the assets transferred to CarCo, Houlihan Lokey valued Motors at $5.5 billion and Utility as having no value. The Trust asserts that adding the $1.225 billion note to those valuations results in CarCo having received assets worth $6.725 billion in exchange for the sale. The Trust argues that, even accepting the accuracy of the Step 15 Valuation, CarCo received assets worth over $1 billion less than those it relinquished.

The Trust further argues that the value attributed to Motors was fundamentally flawed because Houlihan Lokey did not account for the fact that Motors' earnings depended on the continuation of its sales and distribution agreement with CarCo, and the fact that this contract was terminable at will by CarCo. According to the Trust, the core operations of Automotive resided with CarCo. The Trust further asserts that when Houlihan Lokey voiced concerns regarding the fact that CarCo could unilaterally end the contract, Daimler instructed Houlihan Lokey to assume that the contract would not be terminated, but instead would continue indefinitely. The Trust contends that, as a result of discounting the possibility that CarCo could terminate the contract, the value of Motors was actually a fraction of the $5.5 billion attributed to it by Houlihan Lokey.

12

After separating FinCo from CarCo, several additional assets valued at approximately $2.5 billion were removed from FinCo pursuant to other sections of the Step Plan, and the Trust alleges that no consideration was received for those assets.[11]

The Trust also delineates several other steps of the Step Plan that it alleges involved the transfer of assets from CarCo to companies controlled by Daimler for inadequate consideration. As a result of those singled-out segments of the Step Plan, the Trust alleges that Daimler received assets valued at over $9 billion, while CarCo received the $1.225 billion note and the interests in Motors and Utility that, according to the Trust, were nearly worthless.

Beginning around December 2006, with the assistance of JP Morgan and E&Y, Daimler initiated efforts to solicit offers for the sale of Automotive and FinCo. Five investors submitted bids. The bids included implied negative equity values for Automotive ranging from approximately negative $3 billion to negative $8 billion after considering pre-tax OPEB liabilities. They attributed an implied positive equity value to FinCo ranging from approximately $4 billion to $7 billion. The Trust acknowledges that the restructuring of the Chrysler Companies, as accomplished through the Step Plan, was implemented to allow Daimler to obtain the best price for the contemplated sale of its interest in the Chrysler Companies.

As part of the Restructuring, on Friday, May 11, 2007, CarCo's board of directors approved the sale of, among other things, the equity interests of the entities that made up most of FinCo's value to Holding. As a result of the Step Plan, Holding was the direct or indirect holder of the equity interests of the various Chrysler Companies, including CarCo, FinCo, Motors and

---

[11]The Trust contends that although, in certain instances, CarCo's ownership interest in these entities was exchanged for promissory notes, those promissory notes themselves were subsequently distributed by CarCo to Daimler controlled entities further up the corporate chain.

Utility. The next business day, Monday, May 14, 2007, certain Daimler entities executed an agreement (the "Contribution Agreement" with an affiliate of Cerberus (hereinafter, the affiliate will also be referred to as "Cerberus"). Daimler also executed the Contribution Agreement but solely as guarantor of the performance of various Daimler entities that were participants to the Contribution Agreement. The closing of the Contribution Agreement was on August 3, 2007. The fulfillment of all of the restructuring steps under the Step Plan was a condition precedent to Cerberus's obligation to close on the Contribution Agreement.

The Trust does not directly incorporate or reference the Contribution Agreement in its Complaint, and it asserts that the Step Plan is distinct from the Contribution Agreement. Nor is a copy of the Step Plan attached to the Complaint. Nevertheless, a copy of the Step Plan is attached to the Contribution Agreement as annex 1 to schedule 5.05(s). Phase III of the Step Plan, titled Investor Contribution, contemplates an agreement with a future investor, and Steps 41 through 43 provides for an investment by such investor.

Pursuant to the Contribution Agreement, Cerberus acquired 80.1% of the equity of Holding and, therefore, an indirect equity interest of an equal amount in the Chrysler Companies. As a result, Daimler's equity interest was diluted to 19.9%, thereby remaining a substantial investor. In exchange for acquiring an 80.1% interest in the Chrysler Companies, Cerberus made an equity contribution to the Chrysler Companies of $7 billion, a portion of which went to CarCo. In addition, Cerberus obtained $12 billion in new debt financing for the Chrysler Companies, consisting of $10 billion from large commercial and investment banks, a $1.5 billion loan facility from an affiliate of Daimler, and a $0.5 billion loan facility from Cerberus. The receipt of new debt financing was a condition to Cerberus's obligation to close.

The Chrysler Companies also received other elements of value in the Cerberus transaction, including the cancellation of approximately $3 billion net in intercompany debt; the direct repayment in cash of $920 million of intercompany debt by Daimler to CarCo; the repayment of third-party debt guaranteed by Daimler; the assignment of a $500 million tax refund; and participation in numerous joint development, intellectual property, information technology, supply and transition agreements by which the parties agreed to cooperate on various projects.

The $7 billion recapitalization of the Chrysler Companies resulting from the Contribution Agreement was distributed as follows: $1.212 billion was transferred from Holding to DC Holding for certain expenses incurred in connection with the Cerberus transaction; $3.45 billion was contributed to CarCo as equity; and $2.275 billion was contributed to FinCo as equity. FinCo used $1.243 billion of this contribution to pay the principal and interest on the note that it previously issued to CarCo.

The copy of the Step Plan attached to the Contribution Agreement was dated May 11, 2007, the same date that CarCo's board of directors approved the sale of the interest in FinCo to Holding. Steps 41 through 43 provide for an investment on terms that substantially correspond to those negotiated in the Contribution Agreement. Thus, pursuant to step 41, an "investor" would make a contribution of approximately $7.2 billion to Holding in exchange for an 80.1% interest. Pursuant to step 42, Holding would then contribute $2.275 billion of that amount to FinCo and $3.775 billion to CarCo. Pursuant to step 43, FinCo would use $1.225 billion of the

cash contribution from the investor to pay the $1.225 billion note owed to CarCo.[12]

*Arguments Concerning Collapsing*

The Daimler Entities move to dismiss the Complaint arguing that the Trust is challenging certain particular transfers while ignoring the entire transaction. The Daimler Entities argue that the proper focus should be on the entirety of the transaction, which includes the Restructuring and Daimler's sale of its interest in the Chrysler Companies to Cerberus pursuant to the Contribution Agreement. The Daimler Entities maintain that the restructuring plan set forth in the Step Plan and the Contribution Agreement comprise a single integrated transaction, the constituent pieces of which cannot be valued without reference to the entirety of the transaction. The Daimler Entities contend that the Complaint does not allege that, when viewed in its entirety, the transaction resulted in less than fair value to CarCo, constituted a fraudulent conveyance, or otherwise caused legal injury to CarCo. Rather, according to the Daimler Entites, the Trust ignores the economic reality of the entirety of the transaction and seeks to focus attention on isolated segments of the Step Plan.

The Daimler Entities further argue that the Court does not have to reach the issue of whether it should collapse transactions because the circumstances of the instant matter do not actually even present a "collapsing" case. The Daimler Entities contend that collapsing cases involve situations where a court must reconstitute separate transactions into a single integrated transaction to give effect to the economic reality of a series of transaction that appear separate.

---

[12] The variation in certain of the figures from those in the ultimate transaction can be reconciled; for example, in step 42, the discrepancy between the proposed $3.775 billion contribution by Holding to CarCo and the actual $3.45 billion contribution can be accounted for by a $325 million sale of another asset. In addition, the proposed $1.225 billion payment on the note in step 43 was actually increased to $1.243 billion to account for interest.

According to the Daimler Entities, that situation is not present where the documents at issue make clear by their terms that what is involved is a single integrated transaction. The Daimler Entities assert that the Contribution Agreement itself makes clear that there is a single integrated transaction. As a condition to Cerberus's obligation to close on the Contribution Agreement, there was a requirement that the Step Plan be fully implemented.

The Trust argues that Step Plan, which included the challenged transfers, is distinct from the subsequent Contribution Agreement, which required an investment by Cerberus (the "Cerberus Investment"), and that the two separate transactions should not be collapsed. In that regard, the Trust first argues that a decision to collapse the transactions raises factual issues that are inappropriate for a motion to dismiss. In addition, the Trust argues that the Step Plan and the Contribution Agreement, which included the Cerberus Investment should not be considered as one overall transaction because the FinCo transfer was not contingent on that subsequent capital infusion. In that regard, the Trust asserts that the Step Plan was developed before the terms of the Contribution Agreement were negotiated and before Cerberus was identified as the buyer. The Trust further asserts that nothing in the record reflects that the terms of the FinCo transfer and the other challenged transfers were negotiated together with, or even with knowledge of, the terms of the Contribution Agreement. Further, the Trust maintains that there is no evidence that Daimler knew that there would be any subsequent capital infusion into CarCo when the FinCo transfer was planned. The Trust argues that the transfer of FinCo was accomplished before Cerberus entered into the agreement setting the final terms for its acquisition of a majority share in the Chrysler Companies, which agreement was executed on May 14, 2007. The Trust further argues that, in addition to the fact that the Contribution was not mentioned in the agreement to

transfer FinCo, the FinCo transfer was irrevocable regardless of whether a sale to Cerberus was completed.  Inasmuch as the Contribution Agreement had not been signed at the time of the FinCo sale, the Trust argues that Cerberus could have refused to follow through with the deal.  In addition, Cerberus did not close the deal or make its capital contribution to Chrysler until August 3, 2007, nearly three months after the FinCo transaction was completed.  The Trust notes that the Contribution Agreement contained a number of contingencies that would relieve Cerberus of its obligation to close the transaction and make a capital contribution.  The Trust maintains that, despite those contingencies, the transfer of FinCo would remain binding without CarCo being afforded any recourse to force a Daimler company to provide additional consideration.

The Trust concedes that the ultimate purpose of Daimler's overall business plan was to sell the Chrysler Companies.  However, the Trust argues that there is nothing to suggest that the Step Plan was dependent upon Cerberus making an investment, particularly one that would flow to CarCo.  While the Contribution Agreement was conditioned upon all of the prior steps of the Step Plan, the Trust argues that the reverse was not true.  The Trust contends that no documents have been discovered to date suggesting that certain steps of the Step Plan would not be undertaken if others were not consummated.  The Trust argues that collapsing would be justified only if the Cerberus investment were a precondition to the FinCo transfer, and that before the Cerberus Investment can be viewed as consideration for FinCo, it must be shown that the FinCo transfer was planned and completed in reliance on the closing of the Contribution Agreement.

*Consideration of the Contribution Agreement*

In response to the Daimler Entities' argument that the Contribution Agreement makes clear that the Step Plan and the Contribution Agreement constituted a single integrated

transaction, the Trust first argues that the provisions of the Contribution Agreement cannot be considered on a Rule 12(b)(6) motion to dismiss because they are outside the scope of the Complaint. The Trust maintains that its brief references in the Complaint to the Contribution Agreement were only to provide background, and that such references are insufficient to incorporate the document into the Complaint.

The Daimler Entities reply that the Contribution Agreement can be considered for the purposes of this motion to dismiss because it is integral to the Complaint. The Daimler Entities assert that, notwithstanding the fact that it was not quoted from extensively or expressly incorporated, the document was clearly referred to in the drafting of the Complaint.[13] The Daimler Entities contend that the allegations of the Complaint make references to the relationship between the Step Plan and the Contribution Agreement. Further, the Daimler Entities argue that the Complaint provides a basis to collapse the elements of the entire transaction, and that the terms of the Contribution Agreement confirm the linkage.

The Court agrees that the Contribution Agreement is integral to the Complaint and can be considered on this motion to dismiss. The allegations in the Complaint acknowledge that the Step Plan and Contribution Agreement were parts of a single integrated transaction. Paragraph 27 of the Complaint addresses Daimler's decision to sell its interest in the Chrysler Companies. Paragraph 28 discusses Daimler's assessment that "spinning off" FinCo would enhance the value to be received from the sale of the overall package. Paragraph 30 of the Complaint references the 48-step restructuring plan, which provides for the separation of FinCo from CarCo in preparation for the contemplated sale to a third party. Thus, the allegations of Complaint

---

[13]Daimler asserts that the Contribution Agreement was part of the record of this case as a result of discovery conducted pursuant to Bankruptcy Rule 2004.

repeatedly acknowledge that the restructuring was undertaken in contemplation of a transaction with a third party.

The allegation in paragraph 52 of the Complaint shows that Daimler, with the assistance of JP Morgan and E&Y, began to solicit bids for its contemplated sale of the Chrysler Companies as early as December 2006.  As set forth in paragraph 30 of the Complaint, those advisors were also charged with restructuring the Chrysler Companies.  Further, paragraph 5 of the Complaint alleges that the restructuring was primarily orchestrated in the Spring of 2007.  Thus, the structural reorganization and the efforts to sell Daimler's interest in the company were pursued simultaneously.  The allegations of paragraphs 55 and 56 of the Complaint make clear that the timing for the approval of the terms of the Contribution Agreement and the FinCo transfer were virtually contemporaneous, having occurred within one business day.

As noted, it was repeatedly alleged in the Complaint that the transfers at issue were made to advance a transaction with a third party, and permit Daimler to sell or transfer its controlling interest in the Chrysler Companies.  Further, in paragraphs 52 to 61 of the Complaint, it is acknowledged that this contemplated transaction was concluded with Cerberus, through the Contribution Agreement.

These numerous references to the relationship between the Restructuring and the Contribution Agreement not only show that the Contribution Agreement can be considered on this motion to dismiss, but also show that the transfers involved in the Step Plan were part of one complete and integrated transaction that included the Cerberus Investment.

In addition, in the Step 15 Valuation, which is discussed in the Complaint, Houlihan Lokey also asserts that the Restructuring was done to facilitate a third-party investment.  In that

opinion, Houlihan Lokey describes the third-party investment as it was structured in the

Contribution Agreement.[14]

Moreover, there is no question that the Step Plan is incorporated into the Complaint.

There is a reference in the Complaint to the 48-step plan for restructuring and, although it does

not mention steps 41, 42 and 43, there are extensive quotations from other steps in that plan.

The Contribution Agreement, which is a part of the record as a result of the Rule 2004 discovery,

includes a copy of the Step Plan as annex a to Schedule 5.05(a).  Thus, the Court can consider all

the steps of the Step Plan.[15]  The Complaint alleges that the purpose of the FinCo transfer was to

facilitate a third-party investment.  The Step Plan attached to the Contribution Agreement

provides for an investment by an investor on almost the same terms as provided for in the

Contribution Agreement.  The specific elements of the Cerberus Investment were included as

numbered steps in the Step Plan.  While the Step Plan had been worked on for some time, the

FinCo transfer was not completed until the business day before the parties signed the contract

containing the finalized terms of the Contribution Agreement.

The Trust also argues that just because the Contribution Agreement was conditioned

upon the completion of the Step Plan does not establish the reverse, *i.e.*, that the Contribution

Agreement was a precondition to completion of the FinCo transfer.  As a result, the Trust

---

[14]Houlihan Lokey described the overall transaction as first, separately grouping the Automotive entities and
the FinCo entities, both of which groupings would then be owned by Holding.  Then, after that reorganization, the
third-party investor would make an investment into Holding.

[15]The Step Plan annexed to the Contribution Agreement is dated May 11, 2007, which is when the FinCo
transfer was approved and finalized.  The figures in steps 41, 42 and 43 in that document correspond substantially to
the amount Cerberus contributed under the Cerberus Agreement, which was signed Monday, May 14, 2007 - the
next business day.  Those figures likely had been continually revised as the terms of the Cerberus transaction were
updated.  Thus, as updated on May 11, 2007, the specific elements of the Cerberus investment were included as
numbered steps in the Step Plan.

contends that before the Cerberus Investment can be viewed as consideration for FinCo, it must be shown that the FinCo transfer was planned and completed in reliance on the Cerberus Investment.

The Court, however, is not merely relying on the fact that the Contribution Agreement was conditioned upon the completion of the Restructuring as the basis for considering the elements of the transaction as one integrated transaction. Rather, the Complaint provides the basis for considering the elements of the entire transaction as one integrated transaction. The Complaint makes clear, and the Trust concedes, that there was an overriding business plan that provided for the restructuring of the Chrysler Companies for the purpose of Daimler selling its interests in those companies. The Complaint shows that this plan culminated in the sale of an interest in the Chrysler Companies to Cerberus. As noted, the Complaint establishes the basis upon which to consider the Contribution Agreement integral to the Complaint. The terms of the Contribution Agreement expressly confirm that the entire transaction is linked. Thus, because the deal documents themselves make clear that the entire transaction is linked, collapsing of the constituent elements is not an issue.

The collapsing concept is usually applied when a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the "formal structure erected and labels attached" make them appear distinct. *See Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002). In the instant matter, the deal documents themselves make clear that the transaction is integrated, and that Daimler intended to sell its interest in the Chrysler Companies once those companies were restructured. Further, no issue is presented that the formal structure

set up or the labels attached did not reflect the intent.  In fact, the Trust does not dispute that Daimler's ultimate goal was to sell its interest in the Chrysler Companies to a third party.  Instead, Daimler argues that it was not specified that Cerberus would be the third party involved, or how much Cerberus would contribute.  That information, however, concerns the details of the transaction and is not relevant to the "intent issue" for determining whether there was an integrated transaction.  Thus, although intent is ordinarily a factual issue, the deal documents here expressly show the intent, and even the Trust does not dispute that Daimler intended to sell its interest in the Chrysler Companies.

Finally, the Trust argues that even if the original business plan contemplated Daimler disposing of its interest in the Chrysler Companies to a third-party, the FinCo transfer was irrevocable.  Thus, the Trust contends that, even if the transfer of Daimler's interest in the Chrylser Companies had not come to fruition, the FinCo transfer did not have to be reversed.

Those, however, are not the facts of the case.  Instead, the facts are that, in accordance with the original business plan, Daimler disposed of 80.1% of its interest in the Chrysler Companies.  As a result of that disposition, an equity contribution was infused into CarCo.  The entire business plan involved a single integrated transaction.  The Court does not address the Trust's speculation as to what might have transpired had the parties not been able to consummate constituent parts of that transaction.

*Consideration Received by CarCo*

Viewed as a single integrated transaction, the Daimler Entities argue that the Trust fails to account for billions of dollars that flowed to CarCo in the form of debt forgiveness; the repayment by Daimler to CarCo of intercompany debt; the assignment of a tax refund; and

numerous development, intellectual property, technology, supply and transition agreements.  The

Daimler Entities maintain that the Restructuring was part of a broader transaction, which

included a recapitalization of CarCo pursuant to the Contribution Agreement.  At the close of the

entire transaction, including the Contribution Agreement on August 3, 2007, Cerberus provided

billions of dollars in fresh capital to CarCo, and $12 billion in borrowing capacity was made

available to the Chrysler Companies.  The Daimler Entities argue that the Complaint fails to state

a claim because it does not account for the values received by CarCo both in the Restructuring

and as a result of the Contribution Agreement.

The Daimler Entities further argue that the case should be dismissed with prejudice.  The

Daimler Entities assert that this is a high profile case in which substantial investigation has taken

place.  In addition, the Daimler Entities state that negotiations have transpired amongst and

between various combinations of interested parties.  Prior to the filing of the adversary

proceeding, there was a period in which discovery was conducted, pursuant to Bankruptcy Rule

2004, allowing the Trust's predecessor in interest, the Creditors' Committee, access to

voluminous pages of documents, depositions of numerous witnesses, and access to other

interested parties.  According to the Daimler Entities, the availability of this pre-Complaint

discovery afforded the claimant an opportunity to investigate any potential claims prior to filing,

and subsequently amending, the Complaint.  Under these circumstances, the Daimler Entities

contend that no purpose would be served by affording leave to replead the Complaint.

Although the assertions in the Complaint focus on the alleged inadequate consideration

received for certain isolated steps of the Step Plan, without including all of the value received by

CarCo in the integrated transaction, the Trust argued at the Hearing that the Complaint, as filed,

pled sufficient facts to state a claim for relief even if the transaction is collapsed or, otherwise, considered a single integrated transaction.

In that regard, the Trust contends that CarCo only received an additional $3.45 billion pursuant to the Contribution Agreement, and that adding that value to the amount previously received by CarCo results in CarCo having received slightly over $7 billion. The Trust argues that when the consideration received is compared to the over $10.5 billion that it alleges CarCo surrendered, it leaves a shortfall of almost $3.5 billion.

In response, the Daimler Entities contend that the Trust ignores billions of dollars of value that flowed to CarCo under the integrated transaction. Specifically, the Daimler Entities reference the $7 billion that Cerberus provided to the Chrysler Companies, including $5 billion to CarCo; cancellation of approximately $3 billion net in intercompany debt; the direct repayment of $920 million by Daimler to CarCo of intercompany debt; the assignment of a $500 million tax refund; and numerous development, intellectual property, technology, supply and transition agreements. The Daimler Entities maintain that, in failing to account for these values received, the allegations of the Complaint fail to state a claim for relief.

The Court concludes that the Complaint fails to state a claim because it does not include, or even reference, the significant value received by CarCo pursuant to the overall transaction. The transaction included both direct and indirect value received by CarCo. *See MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Serv. Co.*, 910 F. Supp.2d 913, 937 (S.D.N.Y. 1995) (noting that indirect benefits to the debtor must be included in the calculation of fair consideration). CarCo received a direct equity infusion of $3.45 billion, and it also benefited by the cancellation of approximately $3 billion in debt owed by CarCo. In addition, Daimler

25

allocated a $500 million tax refund to CarCo. Further, Daimler made a direct repayment of $920 million in cash to CarCo for intercompany debt. Daimler also transferred certain tax indemnities and numerous valuable contractual rights. Moreover, the arrangement provided CarCo with the availability of $12 billion in borrowing capacity, which could result in an indirect benefit if shown to facilitate additional business opportunities. *See Id.*; *see also The Official Committee of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 738 (Bankr. S.D.N.Y. 2008) (noting that indirect benefits may include increased access to capital). The allegations of the Complaint do not include reference to any of this consideration.

In addition, while acknowledging that CarCo received the stock of Motors, the Trust undervalues the stock by applying an unrealistic discount to the value of Motors. The Trust argues that Motors should have been valued at less than the $5.5 billion attributed to it by Houlihan Lokey in the Step 15 Valuation. This assessment is based upon the fact that Motor's value was premised upon the earnings derived from the sales and distribution agreement with CarCo that was terminable at will by CarCo. As such, the Trust contends that the valuation of Motors would be impacted. However, rather than utilizing that fact to merely discount the value, the Trust ascribes zero value to Motors. The zero value is not appropriate for two reasons. First, even if a company's cash flow were contingent, it would still be accorded some value. In addition, the nature of the business of the two companies make it implausible that CarCo would terminate such contract, as it is undisputed that the entire purpose of the arrangement was to provide CarCo with certain tax benefits.

Inasmuch as the allegations of the Complaint do not account for all of the elements of

value that were received, the Complaint does not properly allege the lack of fair consideration and, therefore, fails to state a claim for constructive fraudulent conveyance. As such, Counts I through IV are properly dismissed.

Count IV of the Complaint is dismissed for the additional reason that it concerns the repayment of an antecedent debt, which is considered to be in good faith and for reasonably equivalent value when made to a non-insider. *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005). The same presumptions of good faith and reasonably equivalent value do not apply if the transfer is made to an insider. *Id*.

The Trust seeks to apply "the insider exception to those presumptions" to the facts of this case. The Trust argues that Daimler caused CarCo to repay certain third-party debt to bondholders, and that because Daimler was a guarantor of that debt, the Trust is challenging the release of that guarantee as a fraudulent conveyance. As the release was to an insider, the Trust argues that the conveyance constitutes a transfer to an insider and, therefore, the presumption that the payment of an antecedent debt was for reasonably equivalent value does not apply. The Trust contends that the situation here is analogous to that present in a preference action where an insider benefits from a transfer to a non-insider. In support, the Trust cites the analysis of *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1196 (7th Cir. 1989), *superseded by statute*, Bankruptcy Reform Act of 1994, Pub. L. 103-394, 108 Stat. 4106 (1994).[16]

---

[16]Ordinarily, a transfer is considered an avoidable preferential payment if made within 90 days prior to the bankruptcy filing, 11 U.S.C. § 547(b)(4)(A), however, if the transfer is to an insider, it is considered to be a preference when made within one year prior to the filing. 11 U.S.C. § 547(b)(4)(B). Even if the transfer is made to a non-insider, the look-back period is extended to one year if an insider benefits from the transfer. *See Levit*, 874 F.2d at 1196. As a result of the *Levit* decision, and prior to the subsequent amendments to the Bankruptcy Code addressing the issue, if the extended preference look-back period applied only by virtue of an insider having benefited, a transfer during that extended time frame could have been avoided against either the insider or the non-insider. As noted, subsequent to the *Levit* decision, the Bankruptcy Code was amended twice to protect non-insider creditors when insiders benefited from the relevant transfer. First, the Bankruptcy Code was amended in 1994 to

The Court does not agree that the preference scenario in *Levit* is analogous to this case. The *Levit* case based its ruling upon the fact that "the bankruptcy case [is] a *collective* proceeding for the determination and payment of debts." *Levit*, 874 F.2d at 1194. Further, the court determined that the extended recovery period for avoidance of a preference was "consistent with the structure of the [Bankruptcy] Code and [did] not subvert any of its functions." *Id*. at 1197. In that regard, the *Levit* court noted that even if non-insiders were required to return preferential payments, they would "retain their contractual entitlements," and those entitlements would determine their distribution from the debtor's estate. *Id*. at 1195. Thus, the *Levit* court concluded that a longer preferential look-back period would *facilitate* the bankruptcy function as a collective process and ensure returns to creditors according to their entitlements and the priorities of the Bankruptcy Code. *Id*. at 1197.

The considerations that influenced the *Levit* court are not present in the context of New York's fraudulent conveyance law. First, the state law is not a collective process, and the fact that this particular claim is being brought in the context of a bankruptcy proceeding would not alter the state law.[17] Further, New York state law is not concerned with the structure of the Bankruptcy Code or with ensuring that the Bankruptcy Code's principles not be undermined.

---

provide that even if an insider benefited, thereby extending the look-back period to one year, the claimant could only pursue a *recovery* for a transfer that occurred during the extended period from the insider. 11 U.S.C. § 550(c). An additional technical "fix" was applied in a 2005 amendment which addressed situations when avoidance of a security interest was sought. In such circumstances, because the security interest is merely avoided and preserved for the estate, there is no transfer of property. Consequently, there is no issue of *recovery*. The 2005 amendment provided that if the extended preference look-back period applied because an insider benefited, the transfer is considered avoided only with respect to the insider. 11 U.S.C. § 547(i).

[17]The purpose of the Bankruptcy Code is to provide equal distribution of a debtor's estate to the debtor's creditors, while the purpose of the fraudulent conveyance law set forth in the N.Y. Debtor & Creditor law is "to aid specific creditors who have been defrauded by the transfer of a debtor's property. *See Frank v. Lefcourt (In re HBE Leasing Corp.)*, 48 F.3d 623, 634 (2d Cir. 1995).

Further, unlike a creditor who returns a preferential transfer, a creditor whose claim is avoided as a fraudulent conveyance will not preserve its entitlement to share in a distribution of the estate.

Thus, the Court concludes that, in the context of a constructive fraudulent conveyance claim, the analysis of the *Levit* case does not support the denial of the presumptions of good faith and reasonably equivalent value to the payment of an antecedent debt merely because an insider benefited, as a guarantor, from that transfer.

Moreover, even if the presumption of fair consideration were not applied, there are no allegations that the payment made to the bondholders for the antecedent debt was not the fair equivalent of the value of that debt. At the Hearing, the Trust argued that it is not challenging the value transferred to the bondholders, but is challenging the value transferred to Daimler in the form of a release. Thus, the Trust appears to be treating the release separate and apart from the transfer from CarCo to the bondholders. The Trust does not cite any New York case law to support that proposition, and the *Levit* case, which it cites to support its overall theory, expressly found that for the purposes of analyzing the liability of a beneficiary there is only one transfer - that from the debtor to the creditor who was owed the antecedent debt. *See Levit*, 874 F.2d at 1196 (noting that a single payment is one "transfer," regardless of the number of persons who gain by that transfer).[18] The release received by Daimler was a by-product of that one transfer. Thus, the Trust must address its argument to the transfer from CarCo to the bondholders. To the extent that transfer is avoidable, the Trust can recover from an appropriate party.

The Trust does not dispute that an antecedent debt was owed to the bondholders.

---

[18]Although for policy reasons the Bankruptcy Code was amended to protect non-insider transferees, *see supra* note 14, these legislative "fixes" do not alter the conceptual analysis of the *Levit* decision, which requires one to consider the single transfer of property for the antecedent debt as the relevant transfer.

Therefore, as non-insiders, the bondholders are entitled to the presumption that the payment was in good faith and for reasonably equivalent value. The Trust does not dispute that the bondholders received reasonably equivalent value for the debt; however, it does contend that the payment was not in good faith. The bondholders were the transferees, and no one challenges the bondholders good faith. Rather, the Trust argues that, under New York law, the good faith of both the transferor and transferee must be shown; and because Daimler controlled CarCo's actions, Daimler's bad faith is relevant to show the absence of good faith on the part of the transferor. The Daimler Entities argue that it is only the good faith of the transferee that is relevant; and because the bondholders' good faith is not challenged, there is no viable challenge to the presumption of good faith.

The Second Circuit has referenced the difficulty of formulating the rationale for considering a transferor's good faith in the context of a constructive fraud claim, when the intent of the transferor is irrelevant to the analysis. *Sharp*, 403 F.3d at 53-54. Further, the Second Circuit concluded that "bad faith does not appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.'" *Id*. at 54. It is only when the transferee is an insider that New York courts recognize an exception "to the rule the repayment of an antecedent debt constitutes fair consideration." *Id*. (citing *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248-49 (2d Cir. 1987).[19] Nor is it considered bad faith even if the payment to a creditor is preferential or the preferred creditor is aware that the transferor is insolvent. *Id*.

---

[19]Moreover, even if the bad faith of the transferor were relevant, the transferor was CarCo, not Daimler, and the Trust has not cited any New York case law that would support imputing Daimler's alleged bad faith to CarCo, when Daimler was not the transferee.

Inasmuch as the bondholders were not insiders, the payment to them of the legitimate antecedent debt is considered to be in good faith and for fair equivalent value. Therefore, fair consideration was provided and Count IV is properly dismissed.

Finally, with respect to Counts I through IV of the Complaint, the parties' respective arguments concerning the issue of insolvency are unclear. The Trust references the value estimates for Automotive rendered by the various analysts that was obtained in the Rule 2004 discovery, ranging from a negative $1.5 billion to negative $15.5 billion. In addition, the Trust references other valuations, including the negative value attributed to Automotive by the entities bidding to purchase an interest in the Chrysler Companies. The Daimler Entities reference the fact that some, or all, of the estimated valuations did not include FinCo and, therefore, the Trust is subtracting the value of FinCo twice from those values. Further, both the Trust and the Daimler Entities switched back and forth between their arguments concerning the valuation of assets for purposes of determining the value of the consideration received for the transaction and for purposes of the insolvency analysis. Therefore, it was difficult to follow the separate arguments concerning consideration and insolvency.

The Court will afford the Trust an opportunity to amend Counts I to III of the Complaint to address the deficiencies in its allegations concerning the consideration that CarCo received in the single integrated transaction, including amplification as to all the assets received, as well as to clarify its position concerning the valuation of assets, both for the assessment of the consideration received in the integrated transaction and the insolvency analysis. Count IV of the Complaint, however, is dismissed with prejudice because the payment of a legitimate antecedent debt qualifies as fair consideration when made to a non-insider.

Counts V and VI of the Complaint seek to recover for alleged intentional fraudulent conveyances, pursuant to sections 544, 548(a)(1)(A) and 550(a) of the Bankruptcy Code, as well as section 276 of the New York Debtor and Creditor Law. These claims relate to allegations of actual intent to hinder, delay, or defraud creditors.

A claim seeking to avoid an intentional fraudulent conveyance must comply with the pleading requirements of Rule 9(b). *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 733 (Bankr. S.D.N.Y. 2008). Pursuant to Rule 9(b), in alleging a fraud, "a party must state with particularity the circumstances constituting fraud." FED. R. CIV. P. 9(b). Pursuant to the express terms of Rule 9(b), a party's requisite mental state, or scienter, may be pleaded generally. *Id*. Nevertheless, because the purposes of Rule 9(b) are to give fair notice to a defendant of the claim to enable it to prepare its defense, to protect the defendant's reputation and goodwill from ill-considered charges of misconduct, and to protect the defendant from strike suits, the relaxation of the specificity requirement for scienter is not to be viewed as permission to base fraud claims "on speculation and conclusory allegations." *Shields v. Citytrust BanCorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994) (citations omitted). Rather, to further the purposes of Rule 9(b), despite the reduced pleading standard for scienter, plaintiffs are required "to allege facts that give rise to a strong inference of fraudulent intent." *Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir. 2001). A plaintiff can sufficiently allege intent (a) by alleging that a defendant had both motive and opportunity to commit fraud; or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Id.* To sufficiently plead motive, the plaintiff must allege that a

defendant benefited in a concrete and personal way from the purported fraud.  *Id.*  In instances where motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater."  *Powers v. British Vita, P.L.C.,* 57 F.3d 176, 184 (2d Cir.1995).

As previously noted, one of the major functions of Rule 9(b) is to give the adverse party adequate notice of the claim to allow the party to prepare a defense.  As a result, fraud allegations cannot be based upon "information and belief," except in instances where the opposing party is in control of the facts or the facts are peculiarly within the knowledge of the opposing party.  *In re Manhattan Inv. Fund Ltd.,* 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002).  And when based upon information and belief, the complainant must set forth the facts upon which the belief is based.  *Di Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987).

As direct evidence of fraudulent intent is not easily obtained, courts examine the circumstances surrounding a transfer and draw an inference of such intent if certain factors that frequently accompany fraudulent transfers are present.  *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs., Co*., 910 F. Supp. 913, 935 (S.D.N.Y. 1995).  Those factors include (1) a close relationship among the parties to the transaction; (2) a secret and hasty transfer not in the ususal course of business; (3) inadequacy of consideration; (4) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (5) the use of dummies or fictitious parties; and (6) retention of control of property by the transferor after the conveyance.  *Id*. (citations omitted).  The context dictates the significance of any of these factors, and the more factors present, the stronger the inference.  *Id*.

Ordinarily, a party asserting an intentional fraudulent conveyance claim must include

allegations concerning the following aspects of the transfer (1) the property subject to it, (2) its timing and frequency, and (3) the consideration paid in exchange. *Fabrikant*, 394 B.R at 733.

Here, the allegations of the Complaint are insufficient because, as previously discussed, they do not adequately plead the consideration received by CarCo pursuant to the integrated transaction. However, even if the allegations of the Complaint had been sufficient with regard to the consideration received, the intentional fraudulent conveyance claim would still properly be dismissed.

The Trust argues that it should be allowed to avail itself of the more relaxed standard for pleading fraud that is sometimes afforded bankruptcy trustees who are strangers to the transaction at issue and who, therefore, do not have inside knowledge. The circumstances of this case, however, do not support such relief. Prior to the filing the Complaint, there was a period in which Rule 2004 discovery was conducted that allowed access to numerous documents, as well as the depositions of many witnesses. Moreover, there was access to other interested parties. Thus, there was ample opportunity to investigate any potential claims prior to filing the Complaint. There is no justification to relax the particularized standard required for intentional fraud claims. The Trust has not made any particularized allegations, which are required for a showing of intentional fraud.

Inasmuch as the Trust does not make a particularized showing of the alleged fraud, it argues that the circumstances support an inference of fraud. The Trust contends that these circumstances include the lack of fair consideration received for the transaction and the knowledge on the part of both Daimler and CarCo that the transaction left CarCo insolvent. In addition, the Trust argues that, aware of CarCo's insolvency, Daimler quickly set up an entity to

strip assets away from CarCo and that it engineered a pattern of non-arm's length transfers through parties with a close relationship to Daimler, which allowed Daimler to control the assets for its own benefit.

Although Holding was formed for the purpose of facilitating the transaction, that alone does not support an inference of fraud, especially when the company was not used for the purpose of hiding assets. *MFS/Sun*, 910 F. Supp. at 935. In addition, there are no particularized allegations concerning the absence of the requisite corporate formalities for that entity. Further, the Trust does not dispute that the transfer of the assets to the Daimler subsidiaries was for the purpose of completing the overall business plan and selling Daimler's interest in the Chrysler Companies to an unrelated third party. Daimler's sale of its interest in the Chrysler Companies does not support an inference of fraud. *Id*. (noting that "the sale of one's ownership of a business does not raise an inference of fraud"). As a result of the integrated transaction, over 80% of the interest in CarCo was transferred to Cerberus, an unrelated party, and billions of dollars of value flowed to CarCo. In addition, CarCo was the transferor of the assets and it did not retain any control over the assets transferred, nor were the transfers kept secret. In addition to not being a secret transfer, it also was not hasty. Instead, it was part of a business plan that was fully developed by financial advisors, and that plan played out over the course of several months. As noted, the allegations in the Complaint concerning the absence of fair consideration are insufficient, therefore, they cannot form the basis to support an inference of intentional fraud based upon lack of fair consideration.

In addressing the constructive fraudulent conveyance claims in the context of this Rule 12(b)(6) motion, the Court concluded that factual issues precluded a determination of

insolvency.  The presence of insolvency, however, is not an element of an intentional fraudulent conveyance claim.  Rather, whether insolvency is present is one of the surrounding circumstances from which the Trust seeks to establish that Daimler acted with fraudulent intent. As noted, because direct evidence of intentional fraud is rarely available, courts look to whether the cumulative effect of the surrounding circumstances could lead only to the conclusion that there was intentional fraud.  Thus, for example, if there were a close relationship of the parties to the transfers, which were secret and hasty and were effected through dummy parties with the transferor retaining control of the assets, all while aware that the company could not pay its creditors claims, then the only inference that could be drawn from the confluence of those factors was that the transferor intended to defraud its creditors.  Therefore, it is not actual insolvency that is at issue but whether the fact of insolvency, if established, should weigh against Daimler to evidence intent.  The Court concludes that even if insolvency were shown, the allegations would not support a claim of fraudulent intent.

The involvement of sophisticated and independent market participants[20] shows the implausibility of the allegations of intentional fraud.  The Trust argues that the intent of these independent, market participants is not at issue.  In the context of the intentional fraudulent conveyance claim, however, the Trust is seeking to utilize CarCo's putative insolvency as an accumulative factor from which to infer intentional fraud.  Therefore, the market participants' perception of CarCo's solvency is relevant.  The sale of the Chrysler Companies was open and highly publicized, with financial information concerning the valuation of the Chrysler Companies readily available to the investors and lenders.  Therefore, the contemporaneous

---

[20]The Court is taking judicial notice of the actions of market participants during the time of the transaction.

actions of the independent market participants serve as a benchmark of what is plausible concerning the perception of CarCo's insolvency.

FinCo financed both the dealers and consumers of the cars manufactured by CarCo. Therefore, FinCo's value depended upon CarCo's performance. It is implausible to suggest that an investor, such as Cerberus, would invest $7 billion to acquire a controlling position in a finance company whose value depended upon the performance of a company that was poised to fail. Nor is it plausible that several sophisticated banking establishments would agree to make $10 billion in credit available to fund the transaction. Further, one of CarCo's creditors, the United Automobile Workers union, agreed to accept warrants in the company for an obligation owed to it, an action that is not consistent with an impression that the company was being set up to fail.

The Trust attempts to speculate as to the motives that may have prompted certain of the market participants to undertake these actions even if CarCo was insolvent. However, no facts are offered to support what the Trust wants the Court to infer. *See Fabricant*, 392 B.R. at 739 (noting that the possibilities advanced in that case as to why banks would make uncollectible loans were "no more than an effort to bolster an implausible theory with rank speculation"). Rather, the contemporaneous market information shows how implausible the theory is that all of these participants would expose themselves to the financial risk of a company unable to sustain its operations. The actions of these third parties, in investing and relying on the wherewithal of CarCo, show that they perceived CarCo to be a viable entity. Inasmuch as they were privy to the same financial information as Daimler, these actions do not support an inference that Daimler knew that CarCo would be unable to pay its creditors and, therefore, acted with fraudulent

intent.[21]

In addition, Daimler's own actions do not support an inference of fraudulent intent. It is implausible that an affiliate of Daimler would make a $1.5 billion credit facility available to CarCo or that Daimler would make a direct $920 million repayment to CarCo of intercompany debt if Daimler were intentionally stripping assets from CarCo and expected CarCo to fail. Further, Daimler continued to hold a substantial investment of almost 20% in the Chrysler Companies, *see MFS/Sun*, 910 F. Supp. at 935 (noting that suggestions that fraudulent intent was involved in certain transfers made in an LBO were "belied by the continued investment in the company by [certain individuals]" who, although profiting from the LBO, would be unlikely to continue to "retain a financial stake in the business if they believed that it would fail"). Moreover, Daimler entered into many joint agreements with CarCo, with a view towards future business with it, conduct which further contravenes an intent to harm CarCo.

Further, with respect to the intentional fraud claim, the Court has determined that no purpose would be served by allowing the Trust leave to replead. As noted, through the

---

[21]The Trust argues that certain information was not available to the market based upon subsequent statements by Cerberus, made in November 2008, indicating its perception that it had been misled by Daimler concerning financing standards utilized by FinCo. At the Hearing, while acknowledging that the Cerberus statements focused on the weakness of FinCo, the Trust contended that, as a result of lax lending standards at FinCo, CarCo's sales and revenues were artificially boosted. The Trust, therefore, contends that the market was operating under inaccurate information concerning CarCo. The Trust, however, does not reconcile this argument with the main premise of its action. The premise of the fraudulent conveyance claim is that fair consideration was not received in exchange for FinCo. The Trust is effectively saying that FinCo's value was overstated but then does not take that into account when it challenges the adequacy of the value received by CarCo in exchange for FinCo.

Moreover, in the months after the August 3, 2007 closing of the Cerberus transaction, the Chrysler Companies were sufficiently well capitalized to pay $3 billion of the $10 billion loan ahead of schedule. The Trust argues that this may not be considered on a motion to dismiss. However, even without considering this factor, the Court reaches the same conclusion. This is because, even if the banks were misled, Daimler's own conduct, *see* discussion *infra*, renders the allegations of fraudulent intent implausible, as Daimler's own economic self interest is presumed to have motivated its actions. Finally, even if the restructured enterprise were insolvent, that alone would not be sufficient to establish fraudulent intent.

Bankruptcy Rule 2004 discovery, there was an opportunity afforded to investigate the claims presented in this adversary proceeding, prior to the filing of the Complaint, through the availability of voluminous documents, as well as the depositions of relevant parties. In addition, the complainant had access to relevant parties. Nevertheless, the Trust has not presented particularized facts concerning the alleged intentional fraud claim. Further, with respect to certain allegations from which the Trust asserts that fraud can be inferred, the surrounding circumstances do not support such inferences. In addition, under the facts of this case, even if the Trust could establish actual insolvency, that factor would not support an inference of fraudulent intent. Although the Court has allowed the Trust to replead concerning the value of the consideration that CarCo received under the integrated transaction, any amplification on that aspect would not remedy the deficiency in its allegations of intentional fraud because the lack of fair consideration by itself cannot support an inference of fraudulent intent. Moreover, even grouped with any remaining factors alleged would not be sufficient to give rise to a strong inference of fraudulent intent, which is required to withstand a motion to dismiss. Therefore, Counts V and VI of the Complaint are dismissed with prejudice.

*Additional Claims*

As a result of the settlement with the individual defendants, Counts VII and VIII of the Complaint were dismissed, as were all of the individual defendants.

Count IX and X of the Complaint are premised upon the allegations of the earlier Counts, including the absence of fair consideration. Count X of the Complaint alleging alter ego liability was pled for the purpose of making Daimler accountable for any liability of the other Daimler Entities. As the Court has afforded the Trust an opportunity to replead certain of the

constructive fraud claims to amplify the allegations concerning the consideration received and to clarify the insolvency allegation, Counts IX and X, which are premised on the allegations of the earlier Counts, are also dismissed without prejudice. Further, because Counts IX and X are premised upon the other dismissed Counts, they are not otherwise addressed at this juncture.

*Conclusion*

Based upon the foregoing, Counts I, II, III, IX, and X of the Complaint are dismissed without prejudice, and the Trust is afforded 60 days to replead to amplify and clarify the allegations concerning the consideration received and the insolvency issue. Counts IV, V, and VI are dismissed with prejudice. Counts VII and VIII were previously dismissed.

The Daimler Entities are to settle an order consistent with this Opinion.


Dated: New York, New York
     July 27, 2010



                    **s/Arthur J. Gonzalez**
                    CHIEF UNITED STATES BANKRUPTCY JUDGE